

# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JALILAH OTTO | Case Number: 2516-CV37442 |
|---|---|
| Plaintiff/Petitioner:<br><br>LTC MANAGEMENT SERVICES, LLC<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO 64108 |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons in Civil Case

| The State of Missouri to: STEELE CHAFFEE, LLC<br>Alias: | |
|---|---|

JONATHAN STEELE
2029 WYANDOTTE, STE 100
KANSAS CITY, MO 64108

**COURT SEAL OF**



**JACKSON COUNTY**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

19-NOV-2025
Date

Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____        _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

*(Seal)*          **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date                                                            Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $   10.00 | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | **Case Number: 2516-CV37442** |
| Plaintiff/Petitioner:<br> LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO  64108 |
| **vs.** | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO  64106 |
| Nature of Suit:<br>CC Other Tort | |

(Date File Stamp)

## Summons in Civil Case

**The State of Missouri to:**  STEELE LAW FIRM II, LLC
**Alias:**

JONATHAN STEELE
2029 WYANDOTTE, STE 100
KANSAS CITY, MO  64108

*COURT SEAL OF*



*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

19-NOV-2025
Date

Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by:  (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.
☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.
☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).
☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

*(Seal)*        **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $ 10.00 | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) *For Court Use Only:* Document ID# 25-SMCC-12572   1  of   1    Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:25-cv-00926-DGK    Document 1-1    Filed 11/24/25    Page 3 of 267

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | **Case Number: 2516-CV37442** |
| Plaintiff/Petitioner:<br>LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO 64108 |
| **vs.** | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | *(Date File Stamp)* |

## Summons in Civil Case

**The State of Missouri to:** STEELE LAW FIRM, LLC
                              Alias:

JONATHAN STEELE
2029 WYANDOTTE, STE 100
KANSAS CITY, MO 64108

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

<u>19-NOV-2025</u>
Date

Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server              Signature of Sheriff or Server

*(Seal)*          **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____                    _____
                              Date                                      Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | Case Number: 2516-CV37442 |
| Plaintiff/Petitioner:<br>LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address:<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO  64108 |
| vs. | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO  64106 |
| Nature of Suit:<br>CC Other Tort | |

(Date File Stamp)

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to: **STEPHANIE ALEXANDER**
**Alias:**

**4607 TIMBERGLEN RD.**
**APT. 1724**
**DALLAS, TX  75287**

*COURT SEAL OF*

     You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the plaintiff/petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

*JACKSON COUNTY*

<u>19-NOV-2025</u>
Date

_____
Clerk

Further Information:

## Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by:  (check one)
   - ☐ delivering a copy of the summons and petition to the Defendant/Respondent.
   - ☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.
   - ☐ (for service on a corporation) delivering a copy of the summons and petition to _____ (name) _____ (title).
   - ☐ other _____.

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Subscribed and sworn to** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)
- ☐ the clerk of the court of which affiant is an officer.
- ☐ the judge of the court of which affiant is an officer.
- ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
- ☐ authorized to administer oaths.  (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $ _____ |
| Non Est | $ _____ |
| Mileage | $ _____ ( _____ miles @ $ _____ per mile) |
| **Total** | $ _____ |

**See the following page for directions to officer making return on service of summons.**

## Directions to Officer Making Return on Service of Summons

A copy of the summons and petition must be served on each defendant/respondent. If any defendant/respondent refuses to receive the copy of the summons and petition when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the defendant's/respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person at least 18 years of age residing therein, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the defendant/respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than 10 days nor more than 30 days from the date the defendant/respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020

Electronically Filed - JACKSON - KANSAS CITY - November 17, 2025 - 04:58 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | | |
|---|---|---|
| LTC MANAGEMENT | ) | |
| SERVICES, LLC, at al. | ) | |
| | ) | **Case No.: 2516-CV37442** |
| Plaintiffs, | ) | |
| | ) | **Division 15** |
| v. | ) | |
| | ) | |
| JONATHAN STEELE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

It is hereby ordered that the Plaintiff's Motion for Approval and Appointment of

private process server is granted and the following individuals are hereby approved and

appointed to serve process in the above-captioned matter:

D&B Legal Service, LLC.: Legal Names (s):

Scott Brady PPS25-0013
Brandon Fisher PPS25-0382
Terri Frank PPS25-0422
Darnell Hamilton PPS25-0038
Darnell I Hamilton PPS25-0536
James Hannah PPS25-0039
Rufus Harmon PPS25-0040
Moses Hicks PPS25-0340
Kennedy Hoy PPS25-0046
Angelique Julian PPS25-0051
Chelsey Ketron PPS25-0054
Leisa Ketron PPS25-0055
Brent Kirkhart PPS25-0058
Janice Kirkhart PPS25-0056
Tyler Kirkhart PPS25-0057
.

Justin Mertzig PPS25-0073
Greg Noll PPS 25-0081
Charles Perry PPS25-0084
Jacob Peterson PPS25-0085
Candy Poese PPS25-0427
Craig Poese PPS25-0086
Samantha Powell PPS25-0087
Kenneth Prewett PPS25-0088
David Shirley PPS25-0104
Austin Weekley PPS25-0121
Ryan E Weekley PPS25-0120
Ryan M Weekley PPS25-0122
Robert Weishar PPS25-0123
Andrew Wickliffe PPS25-0127
Conni Wilson PPS25-0128

11/19/2025

DEPUTY CLERK

1

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

☒ AT KANSAS CITY    ☐ AT INDEPENDENCE

**RE**:   **LTC MANAGEMENT SERVICES, LLC ET AL. V. STEELE, ET**
**CASE NO:**   **2516-CV37442**

**TO:**   **DOUGLAS L CARTER**
       **2345 GRAND BLVD**
       **SUITE 1675**
       **KANSAS CITY, MO 64108**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on _____.
However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ Additional service instructions are needed.
☐ Incorrect case number/filed in wrong county.
☐ Document is unreadable.

**RULE 4.2 (2)**
☐ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee, or incorrect fee, received; fee required is $_____.
☐ Insufficient Filing Fee; Please Remit $_____
☐ No signature on check/form 1695.
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12 SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

☒ **OTHER:**   **Please, include the servers information on the Proposed Order for Private Process Server like how you have it on the Motion. Questions, call 816-881-3970.**
☒ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ The private process server listed is not on our approved list.
☐ Execution in effect. Return date _____. Request may be resubmitted within one week prior to return date.
☐ Supreme Court Rule 90.13 requires interrogatories be served with summons of garnishment.

**<u>If the filing was a new case, please be advised that unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost. Collection efforts will be pursued for these costs.</u>**

**Please refer to the Court's website at www.16thcircuit.org for Court Rules or Forms.**

Copies electronic noticed, faxed, emailed and/or mailed NOVEMBER 17, 2025 to:

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

_____
NOVEMBER 17, 2025
Date

By _____
Deputy Clerk
☒ 415 East 12th St., Kansas City, Missouri 64106
☐ 308 W. Kansas, Independence, Missouri 64050

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

**LTC MANAGEMENT SERVICES, LLC,**

                    **PLAINTIFF(S),**                **CASE NO.  2516-CV37442**

**VS.**                                          **DIVISION 15**

**JONATHAN STEELE,**

                    **DEFENDANT(S).**

**NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE**
**AND ORDER FOR MEDIATION**

---

       NOTICE IS HEREBY GIVEN that this case is currently assigned to the Honorable JALILAH OTTO and a Case Management Conference will be held with the Honorable JALILAH OTTO  on **23-MAR-2026** in **DIVISION 15** at **09:45 AM,** pursuant to Administrative Order.  All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting.  Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file.  All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

       A lead attorney of record must be designated for each party as required by Local Rule 3.5.1. A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2.  The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS.  Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

       At the Case Management Conference, counsel should be prepared to address at least the following:

     a.       A trial setting;

     b.       Expert Witness Disclosure Cutoff Date;

     c.       A schedule for the orderly preparation of the case for trial;

     d.       Any issues which require input or action by the Court;

     e.       The status of settlement negotiations.

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.


### /S/ **JALILAH OTTO**
JALILAH OTTO**, Circuit Judge**


### Certificate of Service

This is to certify that a copy of the foregoing was mailed postage pre-paid or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition. It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
DOUGLAS L CARTER, 2345 GRAND BLVD, SUITE 1675, KANSAS CITY, MO 64108

Defendant(s):
JONATHAN STEELE
 STEELE LAW FIRM II, LLC
 STEELE CHAFFEE, LLC
 STEELE LAW FIRM, LLC
STEPHANIE ALEXANDER
MICHELLE WHITE

Dated:  17-NOV-2025                                BEVERLY A. NEWMAN
                                                              Court Administrator

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

☒ AT KANSAS CITY  ☐ AT INDEPENDENCE

**RE**: **LTC MANAGEMENT SERVICES, LLC ET AL. V. STEELE, ET**
**CASE NO:** **2516-CV37442**

**TO:** **DOUGLAS L CARTER**
**2345 GRAND BLVD**
**SUITE 1675**
**KANSAS CITY, MO  64108**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on <u>11/14/2025</u>. However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ Additional service instructions are needed.
☐ Incorrect case number/filed in wrong county.
☐ Document is unreadable.

**RULE 4.2 (2)**
☒ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee, or incorrect fee, received; fee required is $_____.
☐ Insufficient Filing Fee; Please Remit $_____
☐ No signature on check/form 1695.
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12 SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

☒ **OTHER:  Per Local Court Rule 4.22, please submit a Form 4 - Confidential Civil Filing Information Sheet for all parties which can be found at https://www.16thcircuit.org/miscellaneous-forms. Also, file a Proposed Order for Private Process Server. The one attached with the motion has its own heading, so it needs to be filed separately. For questions please contact at 816-881-3970.**
☒ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ The private process server listed is not on our approved list.
☐ Execution in effect. Return date _____. Request may be resubmitted within one week prior to return date.
☐ Supreme Court Rule 90.13 requires interrogatories be served with summons of garnishment.

<u>**If the filing was a new case, please be advised that unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost.  Collection efforts will be pursued for these costs.**</u>

**Please refer to the Court's website at www.16thcircuit.org for Court Rules or Forms.**

Copies electronic noticed, faxed, emailed and/or mailed NOVEMBER 14, 2025 to:

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

NOVEMBER 14, 2025
Date

By _____
Deputy Clerk

☒ 415 East 12th St., Kansas City, Missouri 64106
☐ 308 W. Kansas, Independence, Missouri 64050

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | |
|---|---|
| LTC MANAGEMENT SERVICES, LLC, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) . |
| v. | ) |
| | ) |
| JONATHAN STEELE, at al. | ) |
| | ) |
| Defendants. | ) |

**MOTION FOR APPROVAL AND APPOINTMENT
OF PRIVATE PROCESS SERVER**

COMES NOW Plaintiff, by and through its attorney of record, and for its

Motion for Approval/Appoint of Private Process Server, and requests that

D&B Legal Service, LLC.: Legal Names (s):

| | |
|---|---|
| Scott Brady PPS25-0013 | Justin Mertzig PPS25-0073 |
| Brandon Fisher PPS25-0382 | Greg Noll PPS 25-0081 |
| Terri Frank PPS25-0422 | Charles Perry PPS25-0084 |
| Darnell Hamilton PPS25-0038 | Jacob Peterson PPS25-0085 |
| Darnell I Hamilton PPS25-0536 | Candy Poese PPS25-0427 |
| James Hannah PPS25-0039 | Craig Poese PPS25-0086 |
| Rufus Harmon PPS25-0040 | Samantha Powell PPS25-0087 |
| Moses Hicks PPS25-0340 | Kenneth Prewett PPS25-0088 |
| Kennedy Hoy PPS25-0046 | David Shirley PPS25-0104 |
| Angelique Julian PPS25-0051 | Austin Weekley PPS25-0121 |
| Chelsey Ketron PPS25-0054 | Ryan E Weekley PPS25-0120 |
| Leisa Ketron PPS25-0055 | Ryan M Weekley PPS25-0122 |
| Brent Kirkhart PPS25-0058 | Robert Weishar PPS25-0123 |
| Janice Kirkhart PPS25-0056 | Andrew Wickliffe PPS25-0127 |
| Tyler Kirkhart PPS25-0057 | Conni Wilson PPS25-0128 |

who are qualified persons to serve process, are not parties to the case and are not less than

1

eighteen (18) years of age, as private process servers in the above cause to serve process in this case.

Respectfully Submitted,

**LAW OFFICES OF DOUGLAS L. CARTER, P.C.**

By:  /s/ Douglas L. Carter
Douglas L. Carter     MO #35759
2345 Grand Blvd., Suite 1675
Kansas City, Missouri 64108
Tel:  (816) 283-3500
Fax: (816) 283-3084
E-mail: doug@carter.law

***COUNSEL FOR PLAINTFF***

2

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

| | |
|---|---|
| **LTC MANAGEMENT SERVICES, LLC, et al.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) . |
| **v.** | ) |
| | ) |
| **JONATHAN STEELE, at al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## ORDER

It is hereby ordered that the Plaintiff's Motion for Approval and

Appointment of private process server is granted and the above-named individuals

are hereby approved and appointed to serve process in the above-captioned matter.

Date: _____     _____

Judge or Clerk

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| **LTC MANAGEMENT SERVICES, LLC** | ) |
| | ) |
| *and* | ) |
| | ) |
| **HEALTH SYSTEMS, INC.** | ) **Case No.** |
| | ) |
| | ) **Division:** |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JONATHAN STEELE** | ) |
| | ) |
| *Serve*:   Jonathan Steele | ) |
|               2029 Wyandotte, Suite 100 | ) |
|               Kansas City, MO 64108 | ) |
| | ) |
| | ) |
| **STEELE LAW FIRM, LLC** | ) |
| | ) |
| *Serve*:   Jonathan Steele | ) |
|               2029 Wyandotte, Suite 100 | ) |
|               Kansas City, MO 64108 | ) |
| | ) |
| | ) |
| **STEELE LAW FIRM II, LLC** | ) |
| | ) |
| *Serve*:   Jonathan Steele | ) |
|               2029 Wyandotte, Suite 100 | ) |
|               Kansas City, MO 64108 | ) |
| | ) |
| | ) |
| **STEELE CHAFFEE, LLC** | ) |
| | ) |
| *Serve*:   Jonathan Steele | ) |
|               2029 Wyandotte, Suite 100 | ) |
|               Kansas City, MO 64108 | ) |

1



STEPHANIE ALEXANDER )
)
*Serve*:   Stephanie Alexander )
        4607 Timberglen Rd., Apt 1724 )
        Dallas TX, 75287 )
)
      *and* )
)
MICHELLE WHITE )
)
*Serve*:   Michelle White )
        3501 E. 104th Street )
        Kansas City, MO 64137 )
)
      **Defendants.** )
)

## PETITION FOR DAMAGES FOR MALICIOUS PROSECUTION

Plaintiffs LTC Management Services, LLC and Health Systems, Inc., by counsel, state the following as their Petition for Damages for Malicious Prosecution against Defendants Jonathan Steele, Steele Law Firm, LLC, Steele Law Firm II, LLC, Steele Chaffee, LLC, Stephanie Alexander, and Michelle White:

### PARTIES

1.   Plaintiff LTC Management Services, LLC ("LTC") is a limited liability company organized under the laws of the State of Missouri. Plaintiff LTC was inappropriately named as a defendant in the nursing home negligence action that is the subject of this lawsuit which is styled, Stephanie Alexander and Michelle White v. N & R of South Kansas City, LLC, Health Systems, Inc., and LTC Management Services, LLC, 16th Judicial Circuit of Jackson County, Missouri, Case No. 1916-CV29764,

2

and which was subsequently prosecuted before the Court of Appeals for the Western District of Missouri as Appeal No. WD87040 (the "Underlying Action").

2.      Plaintiff Health Systems, Inc. ("HSI") is a corporation formed under the laws of the State of Missouri. Along with Plaintiff LTC, HSI was inappropriately named as a defendant in the Underlying Action.

3.      Defendant Jonathan Steele ("Steele") is an attorney licensed to practice law in the State of Missouri. Defendant Steele represented Defendants Alexander and White throughout the Underlying Action and exercised actual, inherent, and implied authority while acting as their agent in all matters pled herein.

4.      Defendant Steele Law Firm, LLC ("Steele Law Firm") is a limited liability company organized under the laws of the State of Missouri. At times material to this Petition, Defendant Steele acted as a manager, employee, and agent for Defendant Steele Law Firm in the course of representing Defendants Alexander and White. Under principles of respondeat superior, Defendant Steele Law Firm is vicariously liable to Plaintiffs for the cause of action pled herein.

5.      Defendant Steele Law Firm II, LLC ("Steele Law Firm II") is a limited liability company organized under the laws of the State of Missouri. At times material to this Petition, Defendant Steele acted as a manager, employee, and agent for Defendant Steele Law Firm II in the course of representing Defendants Alexander and White. Under principles of respondeat superior, Defendant Steele Law Firm is vicariously liable to Plaintiffs for the cause of action pled herein.

3

6.   Defendant Steele Chaffee, LLC ("Steele Chaffee") is a limited liability company organized under the laws of the State of Missouri. At times material to this Petition, Defendant Steele acted as a manager, employee, and agent for Defendant Steele Chaffee in the course of representing Defendants Alexander and White. Under principles of respondeat superior, Defendant Steele Law Firm is vicariously liable to Plaintiffs for the cause of action pled herein.

7.   Defendant Stephanie Alexander ("Alexander") is an individual residing in Collin County, Texas. Defendant Alexander was a plaintiff in Underlying Action.

8.   Defendant Michelle White ("White") is an individual residing in Jackson County, Missouri. Defendant White was a plaintiff in the Underlying Action.

## JURISDICTION AND VENUE

9.   This Court has original jurisdiction over this lawsuit under Section 14 of Article V of the Missouri Constitution and under Section 478.070, RSMo.

10.  Venue is proper in this Court under Section 508.010.4, RSMo, because the Plaintiffs were first injured in Jackson County, Missouri, where the Underlying Action was commenced and prosecuted.

## FACTS

### The Underlying Action

11.  On November 1, 2019, Defendants Alexander and White commenced the Underlying Action by filing a three-count petition in the 16th Judicial Circuit of Jackson County, Missouri, against LTC and HSI as well as against a third defendant, N & R of South Kansas City, LLC d/b/a Timberlake Care Center ("N & R").

4

12. In Count I of the petition, Defendants Alexander and White claimed that while residing at the Timberlake Care Center, a skilled nursing home in Kansas City, Missouri, operated by N & R ("Timberlake" or "Timberlake Care Center"), their grandmother, Geneva Miller, developed a pressure sore due to the alleged negligence of LTC, HSI, and N & R, and that the alleged negligence of LTC, HSI, and N & R directly caused or directly contributed to cause Ms. Miller's death.

13. In Count II of the petition, Defendants Alexander and White pled an "alter ego" theory of recovery against HSI which was premised on the contention that HSI exercised "complete control and dominance" over the limited liability company that operated Timberlake, i.e., N & R.

14. In Count III of the petition, Defendants Alexander and White pled an "agency liability" theory of recovery against HSI which was premised on the contention that HSI "possessed the right to control the conduct of N & R."

**Defendants' False Affidavits of Merit**

15. Under Missouri law, within ninety days of commencing a lawsuit such as the Underlying Action, the plaintiffs or their attorney must file affidavits of merit with the circuit court affirming that the affiant has in her or his possession:

> [T]he written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

§ 538.225, RSMo.

5

16. On January 2, 2020, Defendant Steele filed three affidavits which purported to comply with Section 538.225—one affidavit implicating N & R, one affidavit implicating LTC, and a third affidavit implicating HSI. *See* Exhibits A, B, & C.

17. In the three affidavits, Defendant Steele swore that he had obtained written opinions from a legally qualified health care provider—specifically, from Dr. Jacob Dimant, 400 E. 56th Street, #29B, New York, NY—and that Dr. Dimant's written opinions stated that N & R, LTC, and HSI had failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages that were being claimed in the Underlying Action.

18. When Defendant Steele filed his three affidavits, the only written opinion from a legally qualified health care provider that he had in his possession was a single letter dated December 20, 2019, from Dr. Dimant. The letter from Dr. Dimant specifically named N & R, thereby meeting the requirements of Section 538.225, then generically referenced—without identifying any corporation, limited liability company, or individual—"owners, managers, operators and others tasked with operation of the nursing home." Dr. Dimant's letter did not name LTC or HSI, as Defendant Steele had sworn in two of the three affidavits. *See* Exhibit D. The affidavits naming LTC and HSI were patently false.

### Dr. Dimant's Second Opinion Letter

19. On January 3, 2020, Plaintiffs LTC and HSI filed a motion under Section 538.225.7, RSMo, requesting an in camera inspection of Dr. Dimant's opinion letters.

6

20.     The circuit court sustained the motion seeking the in camera inspection on January 28, 2020, and ordered Defendant Steele to submit Dr. Dimant's opinion letters to the court.

21.     On the afternoon on which the court ordered Defendant Steele to submit Dr. Dimant's opinion letters, specifically at 3:07 p.m. on January 28, 2020, Defendant Steele emailed the court asking permission to submit "the written opinions" (plural) by email.

22.     At 3:16 p.m. that same day, the court's law clerk, Lauren Berry, responded affirmatively to Defendant Steele's request.

23.     Four minutes later, Defendant Steele sent a second email to Ms. Berry which stated, "Just sent."

24.     Eleven minutes later, Defendant Steele sent a third email to Ms. Berry (and therefore to the court) which represented falsely that there was "Just the one" letter from Dr. Dimant, i.e., the letter that Defendant Steele had sent minutes before when he wrote, "Just sent." *See* Exhibits E & F.

25.     In truth, on the very day the circuit court sustained the motion for an in camera inspection, January 28, 2020, Defendant Steele procured a *second* letter from Dr. Dimant. The second letter inserted the corporate names of LTC and HSI into the body of the letter. *Compare* Exhibit D *with* Exhibit G. Defendant Steele then transmitted the second letter to the court but failed to inform the court that he had received two letters from Dr. Dimant, not "Just the one," and that the second letter *did not exist* when he timely filed his three affidavits of merit with the court.

7

26.    That same day, January 28, 2020, without being expressly informed that the submitted letter did not exist when Defendant Steele filed his three affidavits of merit, and after being falsely told that there exists "Just the one" letter signed by Dr. Dimant, the circuit court ordered that Section 538.225's requirements were met.

### Dr. Dimant's Withdrawal Under Oath of His Second Opinion Letter

27.    On September 28, 2021, Dr. Dimant was deposed in the Underlying Action.

28.    At his deposition, Dr. Dimant testified that he lacked information or knowledge sufficient to determine whether LTC or HSI owned, managed, operated, or were tasked with operating the Timberlake Care Center. *See, e.g.,* Exhibit H, pp. 167-68 (Dr. Dimant: "I do not have specific information as to exactly how these relationship[s] in these companies work."). Dr. Dimant thereby revealed yet another material misrepresentation that Defendant Steele made to the court on January 28, 2020. In the email that Defendant Steele sent that day to Ms. Berry at 3:31 p.m., Defendant Steele stated falsely that "*according to Dr. Dimant*, Health Systems and LTC Management *are* the owners, managers, operators and others tasked with operation of the nursing home." Exhibit F (emphasis added).

29.    Consistent with the above-quoted testimony of Dr. Dimant, i.e., that he did not know how the relationships between N & R, LTC, and HSI worked, Dr. Dimant also testified that naming LTC and HSI in his second opinion letter was not based on his review of clinical records or other evidence relating to the case but was instead, according to his best recollection and belief, done at the behest of Defendant Steele. Moreover, Dr. Dimant testified that the alterations to his original opinion letter,

which named LTC and HSI, did not reflect opinions that he could and would offer in the case. *See* Exhibit H, pp. 165-68.

30. Accordingly, Defendants stipulated during Dr. Dimant's deposition that Dr. Dimant would not be offering opinions implicating LTC or HSI *in any respect*—including with respect to the care and treatment of Geneva Miller at the Timberlake Care Center and her allegedly wrongful death. *See* Exhibit H, p. 167.

### Lack of Other Supporting Evidence

31. Nor did Defendants provide other evidence to support naming LTC and HSI as defendants in the Underlying Action—because no such evidence exists.

32. Thus, after being served with interrogatories and document requests seeking facts to support naming LTC and HSI as defendants in the Underlying Action, Defendants consistently responded that the interrogatories and document requests were premature and that they would supplement their inadequate responses at a later date—promises that Defendants failed to keep, including to the present date.

33. Nonetheless, despite the complete absence of evidence to establish that LTC and HSI were negligent or otherwise liable in the case, Defendants continued to prosecute the Underlying Action against LTC and HSI for *over two more years*.

### Belated LTC Dismissal and Abandonment of Counts II and III

34. The Underlying Action then proceeded to trial in November 2023.

35. On the fifth day of trial, November 17, 2023, after presenting their case-in-chief, Defendants Alexander and White, acting through their attorney, Defendant Steele,

9

voluntarily dismissed with prejudice all claims they had pled against LTC, thereby belatedly releasing LTC with prejudice as a defendant in the case.

36. Defendants Alexander and White also belatedly announced through Defendant Steele on November 17, 2023, that they would not submit their claims pled in Counts II and III, thereby likewise abandoning with effective prejudice the "alter ego" and "agency liability" theories of recovery which they had pled against HSI.

**The Doctored Evidence**

37. For use during the trial, Defendant Steele fabricated at least two trial exhibits in an effort to falsely implicate HSI in Timberlake's alleged understaffing and mismanagement. Defendant Steele then displayed the fabricated exhibits to the jury on large, preprinted poster boards, each of which bore the headline:



# Health Systems and Timberlake
## What did they know about understaffing?

Exhibits L & J.

38. First, Defendant Steele altered an email from Michael Catron, the Administrator at Timberlake, in which Catron was addressing staffing and resident-census issues at the nursing home. Defendant Steele doctored the Catron email by inserting the words "Health Systems," i.e., HSI, first into the email's "From" line, changing "Timberlake Care Center-Admin" to "<mark>Health Systems and Timberlake-Adm in</mark>" (yellow highlighting as shown appeared on the poster board displayed to the jury), and then into the email's signature block, changing "Administrator Timberlake Care

10

Center" to "Administrator Health Systems and Timberlake"—when in truth no words associating Timberlake with HSI appear anywhere in the actual trial exhibit.

*Compare* Exhibit I *with* Exhibit J (screen shots from the original and altered exhibits appear in that sequence below):

Mike Catron, LNHA
Administrator
Timberlake Care Center
12110 Holmes Road
Kansas City, MO 64145
816-941-3006
816-942-8049 fax
timberlakeadmin@socket.net

Mike Catron, LNHA
Administrator
Health Systems and Timberlake
12110 Holmes Road
Kansas City, MO 64145
816-941-3006

*See also* the "From" lines in the original and altered exhibits (screen shots appear in that sequence below; yellow highlighting as shown appeared on the poster board displayed to the jury):

**From:** Timberlake Care Center - Admin

**From:** Health Systems and Timberlake - Adm in

Exhibits I & J.

39. Additionally, Defendant Steele doctored an email from Donna Parker, the Director of Nursing (DON) at Timberlake, which likewise addressed staffing issues at the nursing home. Defendant Steele altered the Parker email by again inserting the words "Health Systems," i.e., HSI, into the email's signature block, changing "Donna L. Parker, RN, DON Timberlake Care Center" to "Donna L. Parker, RN, DON Health Systems and Timberlake"—when in truth no words associating

11

Timberlake with HSI appear anywhere in the actual exhibit. *Compare* Exhibit K *with* Exhibit L (screen shots from the original and altered trial exhibits appear in that sequence below):

Donna L. Parker RN, DON
Donna L. Parker, RN, DON
Timberlake Care Center
12110 Holmes Rd.
Kansas City, MO 64145
PH: (816) 941-3006
Fax: (816) 942-8049
timberlakedon@socket.net

Donna L Parker RN, DON
Donna L. Parker, RN, DON
Health Systems and Timberlake
12110 Holmes Rd.
Kansas City, MO 64145
PH: (816) 941-3006

40. Further, as shown in the screen shots above, Defendant Steele also deleted the senders' email addresses from the two doctored exhibits. Emails from *HSI-affiliated* senders use HSI's domain address, which is "@health-systems-inc.com." *See, e.g.,* Exhibit M (admitted into evidence as Plaintiffs' trial exhibit no. 33; highlight of domain address added for present reference):

From: Casandra Gould [mailto:cgould@health-systems-inc.com]
Sent: Monday, March 04, 2019 1:37 PM
To: Joplin Gardens - Admin; Hermitage - Admin; 'McDonald - Admin'; |
'Westwood - Admin'
Subject: Census Incentive started Friday

Emails from *Timberlake-affiliated* senders use "@socket.net." Defendant Steele's removal of the Timberlake email addresses from the two doctored exhibits also represents a thoughtful, carefully tailored attempt to implicate HSI in Timberlake's alleged understaffing and mismanagement.

12

41. After defense counsel discovered the fabrications at the conclusion of the trial, they documented the doctored exhibits with photographs (Exhibits J and L) and then brought the matter to the attention of the court. However, when Defendant Steele was confronted about his misconduct after closing arguments, rather that voicing appropriate contrition, Defendant Steele replied: "It only took you seven days to notice." Defendant Steele then left the courtroom with his falsified poster boards in hand, without saying more.

42. Beyond the response that is quoted in the paragraph above ("It only took you seven days to notice"), when the Underlying Action was on appeal, Defendant Steele stated to the appellate court that a graphic designer had altered the two fabricated exhibits without Defendant Steele's knowledge or consent. Specifically, Defendant Steele wrote in his Reply Brief filed on January 22, 2025:

> The discrepancy between the original email and demonstrative was the result of a contracted graphic designer making a typographical error when retyping the text of the email so that it could be used on a large board. The resolution of the original document did not allow for a blown-up version.

Exhibit N, p. 5.

43. It defies credulity that a graphic design artist could or would have made such uncorrected layout mistakes, let alone done so inadvertently. The multiple alterations—made in a manner that precisely targets the key issues in the case, with yellow highlighting on the very words that had been altered, which were then displayed to the jury under the bolded headline, "**Health Systems and Timberlake What did they know about understaffing?**," were again the product of *thoughtful*

13

work by a person *keenly knowledgeable* about the precise issues in the case. The fabrications were hardly the product of random "typographical error," as Defendant Steele commenced claiming in January 2025.

44. However, were Defendant Steele's graphic-designer claim somehow proven, Defendant Steele nonetheless shouldered the duty as an officer of the court to superintend his contractor's trial-related work and to correct the material alterations to his trial exhibits, rather than responding to defense counsel in November 2023: "It only took you seven days to notice."

**Termination of Proceedings**

45. At the conclusion of the seven-day trial, the jury returned a unanimous defense verdict.

46. After the circuit court denied Defendants Alexander and White a new trial and entered judgment according to the jury's verdict, Defendants Alexander and White, through their attorney, Defendant Steele, filed Appeal No. WD87040.

47. The Underlying Action terminated on May 28, 2025, when the Court of Appeals for the Western District of Missouri issued its mandate sustaining the circuit court's judgement in favor of the remaining two defendants in the case, HSI and N & R.

**COUNT I: MALICIOUS PROSECUTION**

(Against All Defendants)

44. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

45. Defendants Alexander and White, acting by and through Defendant Steele and at times the law firms named as Defendants in this case, commenced and then prosecuted the Underlying Action.

46. Defendants were the legal cause and instigators of the Underlying Action in that Defendant Steele and at times the law firms named as Defendants in this case, acting on behalf of Defendants Alexander and White, prepared and then filed the petition for damages that commenced the Underlying Action as well as all subsequent pleadings that were filed against LTC and HSI.

47. Defendants Alexander and White authorized Defendant Steele and his law firms to prosecute the Underlying Action on their behalf and against LTC and HSI.

48. The Underlying Action terminated in favor of LTC on November 17, 2023, when Defendants Alexander and White dismissed with prejudice all claims against LTC.

49. The Underlying Action terminated in favor of HSI on May 28, 2025, when the Court of Appeals for the Western District of Missouri issued its mandate.

50. Defendants lacked probable cause to file and prosecute the Underlying Action against LTC and HSI, as demonstrated by the following facts, among others:

   a. From start to finish, Defendants consistently failed to provide evidential support for their claims against LTC and HSI, as confirmed in part by the voluntary dismissal of LTC and the abandonment of Counts II and II— because no such evidential support exists;

   b. Defendant Steele filed false affidavits of merit claiming that he had obtained written opinions from a qualified expert implicating LTC and HSI in Geneva

Miller's allegedly deficient health care and her allegedly wrongful death, when in fact no such written opinions existed;

c.  Defendant Steele then surreptitiously procured a second written opinion from his designated expert purporting to implicate LTC and HSI in the claims that were pled against LTC and HSI, which opinion was subsequently disavowed by the expert whom Defendant Steele had designated;

d.  Based on the evidence that was presented throughout the case, no legally qualified health care provider could or would reasonably opine that either LTC or HSI was responsible for Geneva Miller allegedly deficient health care or her allegedly wrongful death;

e.  Defendant Steele also repeatedly lied to the circuit court, both directly and by omission, in emails seeking to avoid the timely and appropriate dismissal of the meritless claims that were pled against LTC and HSI;

f.  During the trial of the case, Defendant Steele then displayed fabricated evidence to the jury in a knowing and deceitful attempt to implicate HSI falsely in Geneva Miller's allegedly deficient health care and her allegedly wrongful death, and thereby misrepresent facts in the case and mislead the jury, when no actual evidence supports the claims that were pled against HSI;

g.  On appeal, Defendant Steele claimed to the appellate court that a graphic designer had inadvertently altered the two fabricated exhibits when in truth, no graphic designer could or would have made such precise and targeted

16

changes to the two altered exhibits without the active involvement and/or knowledge of the lawyer who had commissioned the work; and

h.  When confronted about the fabricated evidence that he displayed to the jury in November 2023, Defendant Steele exhibited no remorse but instead replied: "It only took you seven days to notice."

51.  Defendants acted with malice in filing and prosecuting the Underlying Action against LTC and HSI, as demonstrated by the following facts, among others:

a.  Defendant Steele misrepresented in two affidavits of alleged merit that he had obtained written opinions from a legally qualified health care provider implicating LTC and HSI in Geneva Miller's allegedly deficient health care and her allegedly wrongful death, when in fact he knew that no such written opinions existed;

b.  After Defendant Steele filed his two false affidavits of alleged merit with the circuit court, he purposefully procured an altered and misleading version of the written opinion that he had originally obtained, then submitted the altered and misleading version of the written opinion to the court in a fraudulent attempt to avoid the timely and appropriate dismissal of the claims that were pled against LTC and HSI;

c.  The expert who signed the altered and misleading opinion letter subsequently disavowed all opinions implicating LTC and HSI in Geneva Miller's allegedly deficient health care and her allegedly wrongful death but

17

Defendants nonetheless continued to prosecute the meritless claims against LTC and HSI;

d.  Defendant Steele also knowingly lied to the circuit court, both directly and by omission, in multiple emails concerning the altered and misleading written opinion—evincing a continuing and deliberate effort, premised on false and misleading grounds, to avoid the timely and appropriate dismissal of the meritless claims that were pled against LTC and HSI;

e.  Defendant Steele then fabricated evidence which he displayed to the jury during the trial in a purposeful and deceitful attempt to implicate HSI falsely in Geneva Miller's allegedly deficient health care and her allegedly wrongful death;

f.  On appeal, Defendant Steele claimed to the appellate court that a graphic designer had inadvertently altered the two fabricated exhibits when in truth, no graphic designer could or would have made such precise and targeted changes to the two altered exhibits without the active involvement and/or knowledge of the lawyer who had commissioned the work;

g.  When confronted about the fabricated evidence that he displayed to the jury, Defendant Steele showed no remorse but instead replied: "It only took you seven days to notice."; and,

h.  The primary purpose in filing and prosecuting the claims against LTC and HSI was to coerce a settlement, harass the Plaintiffs, or for some other improper purpose, not to secure a proper adjudication of a legally valid claim.

18

52.    As a direct and proximate result of the Defendants' malicious prosecution of the

Underlying Action, Plaintiffs LTC and HSI sustained economic damages which

include substantial attorney's fees, significant litigation expenses, and other

recoverable costs and expense.

WHEREFORE, Plaintiffs LTC Management Services, LLC and Health Systems, Inc.

respectfully pray that judgment be entered in their favor and against Defendants Jonathan

Steele, Steele Law Firm, LLC, Steele Law Firm II, LLC, Steele Chaffee, LLC, Stephanie

Alexander, and Michelle White, jointly and severally, for:

a.  Compensatory damages in an amount exceeding $25,000 that is fair and

reasonable;

b.  Pre-judgment interest, post-judgment interest, and statutory costs, as allowed by

law; and

c.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LAW OFFICES OF DOUGLAS L. CARTER, P.C.**

By:  /s/ Douglas L. Carter
Douglas L. Carter     MO #35759
2345 Grand Blvd., Suite 1675
Kansas City, Missouri 64108
Tel: (816) 283-3500
Fax: (816) 283-3084
E-mail: doug@carter.law

*COUNSEL FOR PLAINTIFFS*

19

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

STEPHANIE ALEXANDER and
MICHELLE WHITE Individually, And In
A Representative Capacity For All Persons
Identified By RSMo. § 537.080

Case No.: 1916-CV29764

Plaintiffs.

v.

**JURY TRIAL DEMAND**

N & R OF SOUTH KANSAS CITY LLC

Defendants.

<u>**AFFIDAVIT PURSUANT TO RSMO. § 538.225**</u>

Jonathan T. Steele, of lawful age, being first duly sworn upon his oath, states as follows:

I have obtained the written opinion of a legally qualified health care provider who states that defendant N & R Of South Kansas City LLC, failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The health care provider who has furnished me with such an opinion is Jacob Dimant, MD, 400 E. 56th Street, #29B, New York, NY 10022..

Dr. Dimant offers this opinion based on his medical training and experience as a physician with extensive experience in long term care treatment, geriatric medicine, and long term care facility administration.

**Further Affiant Saith Naught.**

**EXHIBIT**

**EXHIBIT 29**

A

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Jonathan Steele          MO # 63266
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiffs*

STATE OF _MISSOURI_          )
                             ) ss:
COUNTY OF _JACKSON_          )

Subscribed and sworn to before me this _23rd_ day of _DECEMBER_, 2019.

_____
Notary Public

My Appointment Expires:

GERALDINE F. JACKSON
Notary Public - Notary Seal
STATE OF MISSOURI
Clay County
My Commission Expires Oct. 27, 2022
Commission # 14546783

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY**

**STEPHANIE ALEXANDER and
MICHELLE WHITE Individually, And In
A Representative Capacity For All Persons
Identified By RSMo. § 537.080**

**Plaintiffs.**

**Case No.: 1916-CV29764**

**v.**

**JURY TRIAL DEMAND**

**N & R OF SOUTH KANSAS CITY LLC**

**Defendants.**

<u>**AFFIDAVIT PURSUANT TO RSMO. § 538.225**</u>

Jonathan T. Steele, of lawful age, being first duly sworn upon his oath, states as follows:

I have obtained the written opinion of a legally qualified health care provider who states that defendant LTC MANAGEMENT SERVICES, LLC, failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The health care provider who has furnished me with such an opinion is Jacob Dimant, MD, 400 E. 56th Street, #29B, New York, NY 10022..

Dr. Dimant offers this opinion based on his medical training and experience as a physician with extensive experience in long term care treatment, geriatric medicine, and long term care facility administration.

**Further Affiant Saith Naught.**

**EXHIBIT 31**

**EXHIBIT**

**B**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Jonathan Steele          MO # 63266
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiffs*

STATE OF _MISSOURI_ )
                     ) ss:
COUNTY OF _JACKSON_  )

Subscribed and sworn to before me this _23rd_ day of _DECEMBER_, 2019.

_____
Notary Public

My Appointment Expires:

GERALDINE F. JACKSON
Notary Public - Notary Seal
STATE OF MISSOURI
Clay County
My Commission Expires Oct. 27, 2022
Commission # 14546783

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY

| | |
|---|---|
| STEPHANIE ALEXANDER and MICHELLE WHITE Individually, And In A Representative Capacity For All Persons Identified By RSMo. § 537.080 | |
| Plaintiffs. | Case No.: 1916-CV29764 |
| v. | JURY TRIAL DEMAND |
| N & R OF SOUTH KANSAS CITY LLC | |
| Defendants. | |

<u>AFFIDAVIT PURSUANT TO RSMO. § 538.225</u>

Jonathan T. Steele, of lawful age, being first duly sworn upon his oath, states as follows:

I have obtained the written opinion of a legally qualified health care provider who states that defendant Health Systems, Inc., failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The health care provider who has furnished me with such an opinion is Jacob Dimant, MD, 400 E. 56th Street, #29B, New York, NY 10022..

Dr. Dimant offers this opinion based on his medical training and experience as a physician with extensive experience in long term care treatment, geriatric medicine, and long term care facility administration.

Further Affiant Saith Naught.

**EXHIBIT 30**

EXHIBIT

C

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Jonathan Steele        MO # 63266
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiffs*

STATE OF _MISSOURI_ )
)ss:
COUNTY OF _JACKSON_ )

Subscribed and sworn to before me this _23rd_ day of _DECEMBER_, 2019.

_____
Notary Public

My Appointment Expires: _____

GERALDINE F. JACKSON
Notary Public - Notary Seal
STATE OF MISSOURI
Clay County
My Commission Expires Oct. 27, 2022
Commission # 14546783

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**JACOB DIMANT MD**
**400 E 56th Street**
**New York, NY 10022**

December 20, 2019

Jonathan Steele, Esq.
The Steele Law Firm
2345 Grand Blvd, Suite 750
Kansas City, MO 64108

<u>**Re: Geneva Miller**</u>

Dear Mr. Steele:

I have reviewed the medical records of Geneva Miller while under the care and supervision of N&R OF SOUTH KANSAS CITY LLC and other relevant records. It is my opinion that N&R OF SOUTH KANSAS CITY LLC along with the owners, managers, operators and others tasked with operation of the nursing home failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and such failure to use such reasonable care directly caused or directly contributed to cause the injuries described in the Petition.

*Jacob Dimant, MD*

Jacob Dimant, MD

EXHIBIT

D

exhibitsticker.com

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**Subject:** Re: Local Rule 33.5.1 notification in 1916-CV29764 - S ALEXANDER ET AL V N & R OF SOUTH KAN ET AL

**Date:** Tuesday, January 28, 2020 at 3:20:23 PM Central Standard Time

**From:** Jonathan Steele

**To:** Lauren.Berry@courts.mo.gov

**CC:** Elizabeth Moeller, Janet Larson, John Mullane, Matt Merrill

Lauren,

Just sent. Thanks.

--
Jonathan Steele
Nursing Home Abuse Lawyer

The Steele Law Firm
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Ph: 913.721.6878
Fax: 913.416.9425
E-Mail: jonathan@jsteelelawfirm.com
https://nursinghomeabuselaw.com


------------------------------------------------------------------------------------------------
NOTICE:  Many states require attorneys to notify email recipients that email is not a secure method of communication, that it may be copied and held by any computer through which it passes, and persons not participating in the communication may intercept the communication. Should you wish to discontinue this method of communication, please advise, and no further e-mail communication will be sent to you.  The information contained in this message is confidential, attorney privileged, and intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by email or telephone.  Then, please permanently delete the original email and all copies of it.
Sans Serif


> On Jan 28, 2020, at 3:16 PM, Lauren.Berry@courts.mo.gov wrote:
>
> Judge is okay with that if you guys are.
>
> Thanks,
> Lauren Berry
> Law Clerk to the Honorable Patrick W. Campbell
> Division 10, 8th Floor
> Jackson County Courthouse
> 415 E 12th Street
> Kansas City, Missouri 64106



**EXHIBIT**

**E**

**EXHIBIT 7**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

> Phone: (816) 881-3948
> Fax: (816) 881-3893
> Lauren.Berry@courts.mo.gov
>
>
>
> From: Jonathan Steele <jonathan@jsteelelawfirm.com>
> To:     Lauren.Berry@courts.mo.gov
> Cc:     Matt Merrill <mmerrill@brlawkc.com>, "Elizabeth D. Moeller"
>         <emoeller@brlawkc.com>, Janet Larson <jlarson@brlawkc.com>,
>         John Mullane <jmullane@brlawkc.com>
> Date:   01/28/2020 03:07 PM
> Subject:    Re: Local Rule 33.5.1 notification in 1916-CV29764 - S
>     ALEXANDER ET AL V N & R OF SOUTH KAN ET AL
>
>
>
> Lauren,
>
> Can I just email the written opinions to you?  Thanks.
>
> On Tue, Jan 28, 2020 at 3:05 PM <Lauren.Berry@courts.mo.gov> wrote:
> Just wanted to let you know that this was granted and e-filed just a
> little
> bit ago.
>
> Thanks!
> Lauren Berry
> Law Clerk to the Honorable Patrick W. Campbell
> Division 10, 8th Floor
> Jackson County Courthouse
> 415 E 12th Street
> Kansas City, Missouri 64106
> Phone: (816) 881-3948
> Fax: (816) 881-3893
> Lauren.Berry@courts.mo.gov
>
>
>
> From: Matt Merrill <mmerrill@brlawkc.com>
> To:    "Div10.cir16@courts.mo.gov" <Div10.cir16@courts.mo.gov>,
>        "lauren.berry@courts.mo.gov" <lauren.berry@courts.mo.gov>
> Cc:    Jonathan Steele <jonathan@jsteelelawfirm.com>, "Elizabeth D.
>        Moeller" <emoeller@brlawkc.com>, John Mullane
>        <jmullane@brlawkc.com>, Janet Larson <jlarson@brlawkc.com>
> Date:  01/22/2020 06:43 AM
> Subject:    Local Rule 33.5.1 notification in 1916-CV29764 - S
> ALEXANDER ET
>        AL V N & R OF SOUTH KAN ET AL
>
>
>
> Dear Judge Campbell,
>

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

> My clients, the Defendants in this matter, filed Defendants' Motion for
> In
> Camera Examination of Written Opinions of Dr. Dimant on January 3, 2020,
> a
> copy of which is attached for your reference, as is the proposed Order
> that
> accompanied said motion.
>
> Plaintiffs have filed no suggestions in opposition.
>
> Pursuant to Local Rule 33.5.1, "Upon the filing of suggestions as
> provided
> herein, or upon expiration of the time for doing so, whoever occurs
> first,
> the matter shall be presented to the judge for consideration…"
>
> We hereby, pursuant to Local Rule 33.5.1, present to you Defendants'
> Motion
> for In Camera Examination of Written Opinions of Dr. Dimant filed
> January
> 3, 2020 and notify you that the matter is ripe for ruling at
> your
> convenience.
>
> Thank you very much for your attention to this matter.
>
> Very truly yours,
>
> Matt
>
> Matt Merrill
> Attorney/Shareholder
> Direct Dial: 816.292.7084 | mmerrill@brlawkc.com | v-card |
> LinkedIn
>
> BrownAndRuprecht
>
> 2323 Grand Boulevard, Suite 1100, Kansas City, MO 64108-2670
> P: 816.292.7000 | F: 816.292.7050 | www.brlawkc.com
> This e-mail, and any attachments, is confidential, privileged, and
> intended
> only for the use of the addressee(s). If you are not the intended
> recipient, reading it is prohibited. If you have received this e-mail in
> error, please reply to the sender that you have received this message,
> and
> delete it from your system. E-mail is not a secure method of
> communication.
> We assume if you contact us by e-mail, you have accepted this risk and
> therefore authorize us to respond to you by e-mail. Any tax advice in
> this
> communication is not intended or written by the author to be used, and
> cannot be used, for the purpose of (1) avoiding penalties that may be
> imposed on a taxpayer or (2) promoting, marketing, or recommending to
> another party any matters addressed herein.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

>
> [attachment "MOTION FOR IN CAMERA EXAMINATION AND SIS.pdf" deleted by
> Lauren N Berry/16/Courts/Judicial] [attachment "ORDER SUSTAINING
> MFICE.pdf"
> deleted by Lauren N Berry/16/Courts/Judicial]
>
>
> --
> Jonathan Steele
> Nursing Home Abuse Lawyer
>
> The Steele Law Firm
> 2345 Grand Blvd., Suite 750
> Kansas City, MO 64108
> Ph: 913.721.6878
> Fax: 913.416.9425
> E-Mail: jonathan@jsteelelawfirm.com
> https://nursinghomeabuselaw.com
>
>
> ---------------------------------------------------------------------------------
> NOTICE: Many states require attorneys to notify email recipients that
> email is not a secure method of communication, that it may be copied and
> held by any computer through which it passes, and persons not participating
> in the communication may intercept the communication.  Should you wish to
> discontinue this method of communication, please advise, and no further
> e-mail communication will be sent to you.  The information contained in
> this message is confidential, attorney privileged, and intended only for
> the use of the individual or entity named above.  If the reader of this
> message is not the intended recipient, you are hereby notified that any
> dissemination, distribution, or copying of this communication is strictly
> prohibited.  If you have received this communication in error, please
> immediately notify us by email or telephone.  Then, please permanently
> delete the original email and all copies of it.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Direct Dial: 816.292.7084 | mmerrill@brlawkc.com | v-card <http://www.brlawkc.com/downloads/vcards/matthew_merrill.vcf> | LinkedIn <http://www.linkedin.com/in/mattmerrill>

<http://www.brlawkc.com/>

2323 Grand Boulevard, Suite 1100, Kansas City, MO 64108-2670
P: 816.292.7000 | F: 816.292.7050 | www.brlawkc.com <applewebdata://6E097294-D0ED-4AEB-8C0F-C1CE0706C588/www.brlawkc.com>
This e-mail, and any attachments, is confidential, privileged, and intended only for the use of the addressee(s). If you are not the intended recipient, reading it is prohibited. If you have received this e-mail in error, please reply to the sender that you have received this message, and delete it from your system. E-mail is not a secure method of communication. We assume if you contact us by e-mail, you have accepted this risk and therefore authorize us to respond to you by e-mail. Any tax advice in this communication is not intended or written by the author to be used, and cannot be used, for the purpose of (1) avoiding penalties that may be imposed on a taxpayer or (2) promoting, marketing, or recommending to another party any matters addressed herein.

[Quoted text hidden]

---

**Lauren.Berry@courts.mo.gov** <Lauren.Berry@courts.mo.gov>            Tue, Jan 28, 2020 at 3:37 PM
To: Jonathan Steele <jonathan@jsteelelawfirm.com>

Okay, perfect. Thank you!

Lauren Berry
Law Clerk to the Honorable Patrick W. Campbell
Division 10, 8th Floor
Jackson County Courthouse
415 E 12th Street
Kansas City, Missouri 64106
Phone: (816) 881-3948
Fax: (816) 881-3893
Lauren.Berry@courts.mo.gov


From:   Jonathan Steele <jonathan@jsteelelawfirm.com>
To:     Lauren.Berry@courts.mo.gov
Date:   01/28/2020 03:31 PM
Subject:    Re: Local Rule 33.5.1 notification in 1916-CV29764 - S
        ALEXANDER ET AL V N & R OF SOUTH KAN ET AL


Lauren,

Just the one because according to Dr. Dimant, Health Systems and LTC Management are the "owners, managers, operators and others tasked with operation of the nursing home."


--
Jonathan Steele
Nursing Home Abuse Lawyer

EXHIBIT
F

**EXHIBIT 37**

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**JACOB DIMANT MD**
**400 E 56th Street**
**New York, NY 10022**

January 28, 2020

Jonathan Steele, Esq.
The Steele Law Firm
2345 Grand Blvd, Suite 750
Kansas City, MO 64108

**Re: Geneva Miller**

Dear Mr. Steele;

I have reviewed the medical records of Geneva Miller while under the care and supervision of N&R OF SOUTH KANSAS CITY LLC and other relevant records. It is my opinion that N&R OF SOUTH KANSAS CITY LLC, and LTC Management Services and Health Systems as the owners, managers, operators and others tasked with operation of the nursing home, failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and such failure to use such reasonable care directly caused or directly contributed to cause the injuries described in the Petition.

Jacob Dimant, MD

EXHIBIT

G

**EXHIBIT 38**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1

```
 1   IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
                     AT KANSAS CITY
 2
     STEPHANIE ALEXANDER
 3   and
     MICHELLE WHITE, Individually,
 4   And in a Representative
     Capacity for All Persons
 5   Identified by R.S.Mo. 537.080,
 6          Plaintiffs,
 7   -vs-                    CASE NO: 1916-CV29764
 8   N & R OF SOUTH KANSAS
     CITY, LLC, ET AL.,
 9
            Defendants.
10
11     THE VIDEOCONFERENCE RECORDED DEPOSITION OF
                  JACOB DIMANT, M.D.,
12
     produced, sworn and examined on the part of the
13   Defendants, pursuant to Notice of Deposition on
     September 28, 2021, at each parties' respective
14   home/office, with the reporter physically located
     at 1100 Main Street, Suite 2060, in the City of
15   Kansas City, in the County of Jackson, and State
     of Missouri, before me,
16
17          BRENT W. CHRISTOPHER
        (Mo) CCR NO. 883 - (Ks) CCR NO. 1193
18                    of
           CHRISTOPHER VIDEO & REPORTING
19
20   a Certified Court Reporter in and for the States
     of Missouri and Kansas.
21
22
23
24
25
```

EXHIBIT

H

2

```
 1                    APPEARANCES:

 2    For Plaintiff:

 3            THE STEELE LAW FIRM
              2345 Grand Boulevard, Suite 750
 4            Kansas City, Missouri  64108
              913.608.4133
 5            jonathan@nursinghomeabuselaw.com
              By:  Mr. Jonathan Steele
 6
      For Defendant:
 7
              BROWN & RUPRECHT, PC
 8            2323 Main Street, Suite 1100
              Kansas City, Missouri 64106
 9            816.471.7000
              emoeller@brlawkc.com
10            by:  Ms. Elizabeth D. Moeller

11    Videoconference Moderator:

12            CHRISTOPHER VIDEO & REPORTING
              City Center Square
13            1100 Main Street, Suite 2060
              Kansas City, Missouri  64105
14            816.471.7800
              donny@christophervideo.com
15            By:  Mr. Donny Lane

16                    ***

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2                                        Page

 3    Examination by Ms. Moeller              4
      Examination by Mr. Steele             170
 4    Signature Page                        173
      Reporter's Certificate                174
 5

 6                      ***

 7

             Exhibit No.       Idfd
 8
                   1  -        28
 9                 2  -        30
                   3  -        30
10                 4  -        33
                   5  -        33
11                 6  -        xx
                   7  -        49
12                 8  -        104

13           (Exhibits are attached.)

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (The deposition commenced at 10:01 a.m.)

2                    JACOB DIMANT, M.D.,

3     of lawful age, after having been first duly sworn

4     to tell the truth, the whole truth, and nothing

5     but the truth, testified as follows:

6                         EXAMINATION

7     BY MS. MOELLER:

8          Q.    Could you state your name, please, for

9     the record?

10         A.    I can barely hear you.

11         Q.    Sorry.  Let me check my mic settings.

12         A.    Can you make that a little louder?  Mine

13    is at the top.

14         Q.    Can you hear me better now?

15         A.    Oh, a lot better.  Yes.

16         Q.    I don't know what I did but I might also

17    just need to talk louder.  Sorry about that.

18              Can you state your name please for the

19    record?

20         A.    Jacob Dimant, D-I-M-A-N-T.

21         Q.    Dr. Dimant, my name is Elizabeth, I'm

22    the attorney representing three defendants in

23    this case:  N&R of South Kansas City, LLC, Health

24    Systems, Inc., and LTC Management Services, LLC.

25    And I understand that you've been retained by the

1 plaintiff as an expert in this case; is that

2 correct?

3     A.   Yes, that's correct.

4     Q.   And I understand that you have been

5 deposed as well before, correct?

6     A.   Correct.

7     Q.   Well, then I'll skip most of the ground

8 rules, but just a couple things to keep in mind.

9     A.   Your voice goes up and down, sometimes

10 it's high I can hear you and then it like fades

11 away.

12     Q.   Okay.  Let me --

13     A.   See what else you can do there with our

14 modern technology.

15     Q.   Let me know when you can't hear me, I'll

16 try to keep my voice up.

17     A.   It's good now.

18     Q.   You're not the first person to tell me I

19 talk too quietly.

20        Just a couple of sort of ground rules.

21 Try to let me finish my question and I'll do the

22 same for you, of course let me know if you can't

23 hear me.  With videoconferences I'm sure what

24 you've learned over the past whatever we're at,

25 18 months, that there's a little bit of a lag so

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    it makes it a little bit more important to try to

2    finish questions and answers.  And then I will

3    almost certainly ask a question that doesn't make

4    sense today, so if that happens just ask me to

5    rephrase and I will try my hardest to make it

6    make sense.  We're going to be talking about

7    Geneva Miller's admission at Timberlake Care

8    Center and if I use the term "facility," will you

9    understand that I'm referring to Timberlake.

10        A.    Yes, I would.

11        Q.    Have you ever been to Timberlake Care

12   Center?

13        A.    Have I -- did you ask have I been to

14   that place?

15        Q.    Yes.

16        A.    No.

17        Q.    Since we're on videoconference, where

18   are you physically located today?

19        A.    In Manhattan, New York City.

20        Q.    And you've been hired by plaintiff's

21   counsel, Jonathan Steele; is that correct?

22        A.    Correct.

23        Q.    Is there a contract for your retention

24   in this case?

25        A.    No.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1     Q.    And are you paid hourly?

2     A.    Yes, I am.

3     Q.    And my understanding is that you had

4  requested prepayment for your deposition today,

5  and I just wanted to make sure that you received

6  that check from our clients.

7     A.    I don't recall requesting it but I did

8  receive the check.

9     Q.    Okay.  I think maybe your CV or

10  something we were told that that was requested

11  ahead of time and I wanted to make sure the check

12  got there.

13     A.    Okay, yeah, I did get it.

14     Q.    How did you first get into legal

15  consulting?

16     A.    I think it originally was in the early

17  80s, I'm (unintelligible) and I have an expertise

18  in disabilities so I was doing a lot of

19  disability work for Social Security

20  Administration, New York City Police Department

21  and other agencies, and some of the cases

22  involved workers' compensation, and there were

23  dispute and also some of those agencies would

24  send me specifically cases that were in dispute

25  to kind of be a third party (unintelligible) and

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    speak from a medical point of view.  So many of

2    those cases required court appearances so I got

3    to go a lot to court and do that work.

4              Also at the same time there was for some

5    reason I think the idea of getting guardians for

6    nursing home patients also started and I had a

7    lot of requests to do guardianship work for

8    patients, for my own patients actually that I've

9    seen in nursing homes and needed guardians, so in

10   -- at least in Brooklyn where I was practicing,

11   it was required by the judges that I appear in

12   person in court to advocate for those people and

13   explain why they needed guardians and the like.

14             And after that it went into defending

15   physicians in malpractice cases.  At that time it

16   was mostly disability cases and their

17   consequences.

18             In the 90s I was asked to start doing

19   some defense work in malpractice cases.  I don't

20   really recall exactly when in the 90s, and later

21   on I was approached to also do plaintiff work.

22        Q.   Do you know when you were --

23   approximately when you were approached to do

24   plaintiff's work?

25        A.   I know exactly.  It was 2002.

1  Q. Okay. How did that come about?

2  A. I had a beach home in New Jersey and my

3 next door neighbor was a partner in one of the

4 law firms in New Jersey, and we were having

5 dinner and I told him that I do some -- the

6 conversation came, I told him I do some defense

7 cases, and he said his firm is engaged in doing

8 malpractice for plaintiff, would I consider doing

9 that. And he put me in touch with the attorneys

10 in his office that were doing this kind of work

11 and it worked out and I started working with

12 them.

13  Q. And I understand that you are a medical

14 doctor, correct?

15  A. Yes, I am.

16  Q. And you're here to give medical opinions

17 in this case?

18  A. Correct.

19  Q. This case obviously involves

20 Ms. Miller's skin breakdown and I just wanted to

21 talk to you at the outset. What terminology do

22 you use for skin breakdown?

23  A. I don't normally use the word skin

24 breakdown because pressure -- pressure injuries

25 are not necessarily skin breakdown, they involve

1  deeper tissues and the -- the skin actually

2  breaks down secondary to that, but there's some

3  relationship.  So I try to use the NPUAP

4  terminology, now it's NPIAP, which is an

5  organization dealing with pressure injuries.  So

6  I try to use their terminology, which is really

7  not that different from the terminology that was

8  originally proposed by a panel of the federal

9  government in the early 90s.

10      Q.   My understanding of the NPUAP

11  terminology is that now they're calling what was

12  once called a pressure ulcer is now referred to

13  as a pressure injury; is that right?

14      A.   That's correct, since 2016 I believe,

15  yeah.

16      Q.   Is there a difference between a pressure

17  injury and I've also seen the term decubitus

18  ulcer?

19      A.   No, these are just older terms.

20  Pressure sores, decubitus ulcers, they all refer

21  to the same thing.  I still use -- I still use

22  the word pressure ulcer when there's an actual

23  opening, because an ulcer simply means an opening

24  in the skin; and I use the term pressure injury

25  when the injury does not involve an opening of

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  the skin.  The NPUAP (unintelligible) to so many

2  of us uses pressure injury for everything,

3  including an open skin.  My own opinion which I

4  actually voiced to them in comments that were

5  solicited by their decision, I feel that if

6  there's an opening in the skin it should be

7  called an ulcer or wound, not necessarily an

8  injury.  The injury is what actually causes the

9  onset to happen later, so I just think it's

10  inappropriate.  And I do teach this stuff at NYU,

11  so I generally give a disclosure to my -- the

12  doctors I teach that I'm not totally using the

13  NPUAP definitions as they are in their opinion.

14      Q.   What about the term bed sore, is that a

15  medical term or is that just sort of common

16  parlance?

17      A.    I think it's -- well, it used to be a

18  medical term years ago.  We used the word bed

19  sores or pressure sores or decubitus ulcers,

20  there were all kinds of names, because there was

21  no one to really propose a uniform terminology,

22  which really only came about around 1990 and then

23  when NPUAP, when they started they became kind of

24  active.  It seems that they got the (audio

25  garbled) a mess, so the Government adopted their

1   terminology and now it became the terminology for

2   everyone dealing with ulcers or pressure

3   injuries, except surgeons.

4          Surgeons, particularly plastic surgeons,

5   they have their own system of what they call

6   grading, which was not in conforming to the NPUAP

7   but to be honest with you I have noticed recently

8   that a lot of the younger plastic surgeons or any

9   surgeons that I deal with are starting to adopt

10  the NPUAP terminology, they're no longer using

11  the grading system.  But the older plastic

12  surgeons they still stick to the grading system.

13  Sometimes if you deal with hospital records it

14  becomes a little difficult to figure out -- a way

15  to figure out who's talking about what.

16     Q.   I've heard about the grading system and

17  I was wondering if that wouldn't cause issues if

18  somebody's using the NPUAP terms and somebody

19  else is using grading and, you know, figuring out

20  who is talking about what and what they really

21  mean.

22     A.   That's exactly right.  That's what all

23  of this struggle when I deal with some trials,

24  particularly from hospitals where surgeons are

25  more involved.  But even in one of my nursing

1  home where a certain period of time the wound

2  physician was a plastic surgeon and an older one

3  at that who kind of forget he was not used to the

4  -- to the old system and the nurses would

5  complain that, you know, our physician would say

6  stage X and he'll say stage Y, and the nurses

7  were getting very confused with that so, you

8  know, but that's ces't la vie.  You know, that's

9  the way we have to deal with it, you know.

10      Q.    Yeah.  When were you first contacted by

11 Mr. Steele about this case?

12      A.    This particular case?

13      Q.    Yes.

14      A.    I have no clue.  I can look it up.  I

15 don't remember offhand.

16      Q.    He provided me with the file he gave you

17 throughout the case with the records and letters,

18 so we might be able to go through that when I get

19 to that.

20      A.    Okay.  If you want I can always look at

21 my -- everything is in the computer, I can look

22 it up, maybe I'll find the date.

23      Q.    Yeah.  Well, we'll go through that in a

24 little bit, I was just wondering if you knew.

25            In terms of your reviewing this case,

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  what did he ask you to do?

2     A.   Basically originally I think he asked me

3  for causation, and also I think he may have asked

4  for looking deviations in standard of care.  I

5  totally don't recall what was in the beginning.

6     Q.   Did he ask you to not do anything?

7     A.   Did he ask me what?  I didn't hear you.

8     Q.   To not do anything?

9     A.   Not do anything?

10    Q.   Yeah.

11    A.   No.  No.

12    Q.   Did you ask to review any documents or

13 records that were not provided to you?

14    A.   I don't understand the question.

15    Q.   Well, when you were reviewing the case

16 did you maybe see reference in some records to,

17 you know, another provider and ask for those

18 records?

19    A.   No, whatever I -- I'm in the habit of

20 whatever is sent to me I review.  If they're

21 really not relevant to the period of what I'm

22 investigating, I look through them quickly, but I

23 -- I'm not going to review them in depth.  For

24 example, if -- I mean, it's not unusual I see

25 somebody who had a pressure injury that's at the

1   heart of the case in 2019 and they'll send me

2   charts from 2011 from the hospital, you know,

3   there's no reason to waste billable time in

4   reading that.  I'll quickly go through what I

5   think is relevant in this kind of charts to see

6   if there's any information I can glean, but

7   particularly medical history.  Sometimes medical

8   history kind of changes or gets lost over time.

9   If you have quite a lot of records you might

10  discover some medical condition that might be

11  relevant to what you're doing.  So I generally

12  try to pinpoint areas where I can get relevant

13  information but I certainly am not going to

14  review the entire chart if it's totally

15  irrelevant.  Although I will mention, if I'm

16  asked to reply to the report I'll mention it.

17      Q.   Yeah, I understand.  But there's not

18  something when you were reviewing your records in

19  this case that you're like, I'd like to see those

20  records; could you send them to me?

21      A.   I might have.  I don't recall.  I'm very

22  frequently -- very frequently if I see a gap and

23  I see or not see that a patient was in a certain

24  institution in between, or say was at home in his

25  own care, quite frequently I'll request those

1    records just so I have a continuity to see, you

2    know, what happened in the case day to day.  I do

3    not recall if I requested those records in this

4    case.  I may or may not.  I don't know.

5        Q.   If you had requested something else,

6    would you have just called Jonathan or would you

7    have sent an e-mail or something else?

8        A.   I generally call.

9        Q.   Did you in reviewing this case and

10   forming your opinions, did you consider any

11   verbal data?

12       A.   Verbal?

13       Q.   Yeah, like anything that Mr. Steele

14   might have told you?

15       A.   I don't think he told me anything about

16   the case.  I generally like not to get more than

17   a timeline of the case from the attorney.  This

18   is so I know which records to look at first and

19   so on to make the work flow -- the work flow

20   better, I don't usually get to discuss the case

21   before I read the chart.  I like to make my own

22   opinions, my own decision.

23       Q.   Have you done any of your own research

24   in this case?

25       A.   It's possible.  Again, I don't recall

1    but many times if I see something in the cause of

2    illness that I'm not sure about or I don't know,

3    for example, type of equipment, if I'm not

4    familiar with, I will either search Google to see

5    what that is.  For example, there's mattresses,

6    things like that, names, commercial names if I'm

7    not familiar I'll search that.  If there's any

8    medical issue I search the New York, NYU Library

9    which is totally online so I have access at any

10   time from anywhere.

11       Q.   But you don't have any recollection if

12   you did that here in this case?

13       A.   I don't recall.  Generally the way it

14   works is if I reach a place in the chart, I'm

15   reading something that I need clarification, I'll

16   go in the library or go into Google and look at

17   the date and figure it out.  And sometimes I will

18   download an article, for example, if it's

19   relevant.  This did not happen in that case

20   because if I did it would be in my file.

21       Q.   You jumped to my next without me having

22   to ask it.

23            Are you prepared to give your full and

24   final opinions today?

25       A.   I didn't hear you.  Am I prepared to...

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

18

1      Q.   To give your full and final opinions

2   today?

3      A.   Yes.

4      Q.   Is there anything else that you would

5   need in order to give your complete opinions?

6      A.   I don't believe so.

7      Q.   And are you going to give me all of the

8   opinions that you intend to offer at trial?

9      A.   I usually don't give a monolog and try

10  to remember all my opinions.  I usually expect

11  you or the attorney to ask me questions in the

12  sequence so I can cover everything.

13     Q.   Never fear, I have plenty of questions

14  to ask.

15     A.   I'm sure you will, but I just say that

16  because I was in a deposition not long ago where

17  they said Okay, tell me all your opinions.  I

18  said, you know, I don't have -- if I had

19  documents in front of me I might.  I don't have

20  anything and I can't just out of the blue sky

21  come up with the whole list.  So I always

22  qualify, it's not the whole list.  There may be

23  something else I forget, but I certainly prefer

24  it if you just ask me one after the other and

25  I'll give you the opinions as you -- in response

1   to your questions.

2       Q.    What did you come to prepare for your

3   deposition today?

4       A.    I looked at relevant parts of the

5   records.  There were apparently two of them, one

6   earlier, one later, and I tried to see if I

7   missed something when I got the larger record.

8   And I then looked also at hospital records and

9   looked at my own notes and that's basically it.

10      Q.    You referenced that you prepared notes

11  in this case?

12      A.    I prepared a timeline.  What I usually

13  do when records -- these records were pretty bad

14  as far as the timing and you can't really jump

15  online, you know, from page to page.  It takes so

16  much time, so I just as I read the chart I

17  prepared the record in a timely fashion and I put

18  them in dates.  So then when I finish reviewing

19  the chart, I'll have at least in a chronological

20  order.  So really it's a chronology of notes that

21  I either copy or summarize.  If I can copy them I

22  do that.  If the record does not allow copying, I

23  just write something about them of what's in

24  there so I have a good chronology.  And once I

25  have a good chronology I can start understanding

1   the case.

2       Q.    Have you ever been sued before?

3       A.    Yes.

4       Q.    When was that?

5       A.    There were two cases; one in 1988 and

6   one in -- well, no, it was I think maybe '86 and

7   '88.  The case in '88 was about a patient I never

8   saw but my name was on the chart by error because

9   he was related to an insurance company I worked

10  for so they automatically put my name there, but

11  the patient chose to see a private physician so

12  that was thrown out obviously.

13          The second one was also a patient

14  belonged to that insurance company with which we

15  had a contract, our medical group, but she died

16  in a hospital that's unrelated to us and not

17  under our care; however, their attorney chose to

18  sue every partner in the group, including myself,

19  and my response was to sue her for medical -- for

20  legal malpractice and took ten years until I got

21  thrown out of the case.

22      Q.    You sued the attorney that sued you?

23      A.    Yes, I did.  I thought that was highly

24  inappropriate to sue a whole group of physicians,

25  I don't remember how many partners we had,

1  probably about 50 of them, just because the

2  patient had gotten care in our center a long time

3  before all this happened, and then she goes to a

4  New York City hospital and dies there from

5  something that had nothing to do with she ever

6  got by us.  And then she sues everyone?  I

7  thought that was inappropriate so I sued that

8  attorney, at my own cost and expense I should

9  say, because my insurance wouldn't pay for that.

10    Q.    As a defense attorney I agree with you

11  on that, but I've never heard of anyone going to

12  sue the attorney.

13    A.    Yeah, you never saw anyone, right?  Now

14  you did.

15    Q.    So after 10 years the case was

16  dismissed?

17    A.    The case -- no, the case I think what

18  happened after 10 years the hospital decided it's

19  time to settle because they totally had the

20  malpractice, I must say.  But they couldn't

21  settle because of my whatever -- I know legal

22  terms, whatever pending action there was so they

23  had to dismiss me from the case and I presume my

24  entire group also, but I only got letter from the

25  court saying that I was dismissed.  And I guess I

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   presume they settled it after, I can't tell you

2   for sure, but I know that I was dismissed.

3   That's all I asked for.  I did not ask for any

4   monetary compensation, I did not ask for legal

5   fees, I just asked to be thrown out of the

6   lawsuit, which I was.

7       Q.   I think that's the most interesting

8   story I've heard about an expert being sued

9   before.

10          Has a facility or a nursing home or a

11  hospital that you've worked for ever been sued?

12      A.   Yes.

13      Q.   And what was that about?

14      A.   I assume, I would not know all of them,

15  only ones that I was involved in as doing a

16  testimonial or something like that.

17      Q.   I saw from the CV that was attached to

18  the expert designations that was filed in this

19  case that you've been a medical director at

20  multiple nursing homes.  Have any of those

21  nursing homes to your knowledge been sued related

22  to pressure injuries?

23      A.   I would presume so.  I can't -- I can't

24  say I remember for sure yes or no.  But given

25  that it's a very common issue, particularly in

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   the earlier years when we didn't really know as

2   much about pressure injuries as we do now, I

3   would assume that they were.  I really don't

4   recall specific cases except one.

5        Q.   Can you tell me about the one you do

6   remember?

7        A.   The one that I remember involved a

8   pressure injury that actually occurred at a

9   hospital where I was working and the patient

10  eventually went to the nursing home where I was

11  the medical director, which was owned by that

12  hospital.  So for whatever reason both were sued,

13  and even though I was a physician in that

14  hospital I never saw the patient there, but I was

15  asked to appear as a fact witness in the part for

16  the nursing home.  That's what I remember, it was

17  a pressure ulcer case.  That's all I remember

18  about it but I remember appearing in court -- in

19  the deposition, I would say, not in the court.

20  In the deposition as a fact witness for the

21  nursing home.

22       Q.   Do you know when that was approximately?

23       A.   I would say at least 20 years ago,

24  something like that.  Early 2000s, I think.

25       Q.   Do you know what the outcome of that

1    case was?

2         A.   To the best of my knowledge, it settled

3    on the hospital side.  I actually don't know what

4    happened with the nursing home, whether they

5    settled or they were thrown out of the case.

6    That I don't know.  I've heard that the hospital

7    settled.

8         Q.   Have you ever been involved in a

9    licensure action?

10        A.   In a...

11        Q.   In a licensure action?

12        A.   Yeah, I was actually defending

13   physicians in what in New York is called Office

14   of Professional Medical Conduct, OPMC.  I've

15   appeared before them a couple of times defending

16   physicians against allegations that had to do

17   with their license.

18        Q.   And you actually did answer the question

19   I asked.  I asked a bad question.  I meant has

20   your license been the subject of any sort of

21   licensure action?

22        A.   Oh, no.  No, I'm sorry.  I didn't

23   understand the question.  I'm sorry.

24        Q.   No, you answered my question, my

25   question was bad.

1          Has your license ever been a subject of

2    a disciplinary action?

3       A.   No.

4       Q.   In what states have you ever been

5    licensed?

6       A.   I'm licensed in four states and it's

7    active in New York, New Jersey, Florida and

8    Nevada.

9       Q.   Have you -- and those are all currently

10   active?

11      A.   Currently active, yes.

12      Q.   Do you have any other -- have you ever

13   had any other licenses that aren't active?

14      A.   No.

15      Q.   Have you ever been licensed to practice

16   medicine in Missouri or Kansas?

17      A.   No.

18      Q.   Have you ever been to Missouri or

19   Kansas?

20      A.   I've been to Kansas City exactly once.

21   That's about it.

22      Q.   Your noticeably grinning when you say

23   that.  Why did you come to Kansas City?

24      A.   You're laughing.  Well, he texted me a

25   day before trial that the trial was going to

1    occur so I went there and I went to meet him and

2    he was gone.  And as it turned out what he meant

3    to say the license was not going to occur, but he

4    forgot the word not.  So I spent eight hours in

5    your great airport, which I think could use some

6    improvements.

7        Q.    You'll be happy to know they are

8    currently working on that.

9        A.    Oh, they are?  Good.

10       Q.    Yes.

11       A.    It's about time.

12       Q.    There's a lot of construction happening

13   there.

14       A.    I'm happy to hear that.  That was one of

15   the worst places I've ever been to when it comes

16   to airports.

17       Q.    That's what I was going to say, as a

18   person who lives in Kansas City, that airport is

19   amazing.  You can show up 30 minutes before your

20   flight and you're just fine.  If you are

21   connecting through Kansas City, you're stuck

22   there for eight hours.  That's about the worst

23   place I can imagine being.

24       A.    Yeah.  That's what happened to me.  I

25   had to wait eight hours.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1     Q.    Sounds like an --

2     A.    To get out of there.

3     Q.    All because of a text message.

4           Have your privileges ever been revoked

5     or not granted?

6     A.    No.

7     Q.    To your knowledge have your opinions

8     ever been discussed in a court opinion or a court

9     order?

10    A.    I didn't understand.

11    Q.    I know sometimes attorneys will try to

12    strike an expert or exclude their testimony and

13    that might come up in a court order.  To your

14    knowledge has that ever happened for your

15    opinions?

16    A.    No, never happened.

17    Q.    I know sometimes experts may not even

18    know that that's going on, but sometimes they

19    find out.  Do you know if a court has ever

20    refused to allow your testimony?

21    A.    Never.  Again, best of my -- of my

22    knowledge.

23    Q.    I understand that.  I'm going to go

24    ahead and mark Exhibit 1, which is the deposition

25    notice and hopefully it will pop up and you can

1  see it.

2      A.   I didn't hear the question at all.  It

3  went -- the sound went down really.  Oh, here.

4  Okay.

5      Q.   I was muttering to myself about trying

6  to share my screen.

7      A.   Okay.

8      Q.   So I've marked this as Exhibit 1.

9           (Deposition Exhibit Number 1 was marked

10  for identification.)

11  BY MS. MOELLER:

12      Q.   This is the deposition notice in this

13  case.  Have you seen this before?

14      A.   Yes.

15      Q.   And on Exhibit A we asked you to bring

16  some items with you today, or since we're by

17  videoconference, provide them.  So I just want to

18  go through this and ask you some questions about

19  what was provided.

20           Jonathan gave me a Dropbox link about 25

21  minutes before we got started that I understand

22  to be all of the items requested by this list,

23  but I just wanted to go through that.

24      A.   Okay.

25      Q.   The first topic, Number 1, asks for all

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

29

1  documents and materials and reports that were

2  referenced, reviewed, utilized, created, or

3  relied upon by you in rendering your opinion.

4      A.   So I only have my notes that I mentioned

5  before.

6      Q.   And that --

7           MR. STEELE:  Elizabeth, so I think

8  that I never got a copy of his notes and so you

9  want to take a quick break, let him e-mail those

10 over to them and then I can send those to you.

11          MS. MOELLER:  Yes, I would

12 appreciate that very much.

13          So Dr. Dimant, it sounds like Jonathan

14 didn't get a copy of your notes that we talked

15 about, that chronology, so we can take a quick

16 break and if you could e-mail those to him, he'll

17 e-mail them to me.

18          THE WITNESS:  Okay.  Let me see.

19 I'm going to look for them.  Okay.

20          (Recess taken at 10:37 a.m.)

21     (Back on the record at 10:44 a.m.)

22 BY MS. MOELLER:

23     Q.   Dr. Dimant, we just took a quick break

24 to get a copy of the notes or chronology that you

25 prepared in this case, and I think we'll go

1   through that in more detail in a bit.  I'll go

2   ahead and mark it as an exhibit and I think we'll

3   go through that.  I think it's probably the basis

4   of your opinions.

5         Did you create anything else when you

6   were reviewing this case besides those notes?

7      A.   No.

8      Q.   And I asked you earlier if you

9   remembered when you first were contacted about

10  this case and I'm going to share my screen to

11  show you some correspondence that is separately

12  marked as Exhibit 3 and there's a letter here, if

13  you can see my screen, that's dated November 5th,

14  2019 and it's a letter that shows Mr. Steele

15  enclosing a retainer check and it looks like some

16  records.  Does that sound like when you were

17  first contacted about this case?

18     A.   I guess that would be the first one.  I

19  don't recall the letter but I'm sure I've seen

20  it.

21     Q.   All right.  And just for clarity sake

22  for the transcript, I've marked your entire file

23  as Exhibit 2.  So Exhibit 1 is this notice, your

24  file is Exhibit 2, and then 3 and some other

25  exhibits I'll pull out separately.

1          Category 2 is a little bit similar and

2     it asks for all notes, documents and reports that

3     you prepared that reflect or summarize any

4     opinions that you hold and intend to express.

5          And we've already talked about that

6     chronology.  Did you ever prepare a written

7     opinion or report in this case?

8          A.   No.  I wasn't asked to.

9          Q.   Are you familiar with Missouri's

10    Affidavit of Merit requirement?

11         A.   Yes.

12         Q.   So you understand that in order to

13    maintain a case, a plaintiff or their attorney

14    has to file an affidavit that says that he or she

15    has obtained the written opinion of a legally

16    qualified expert that says that the defendant in

17    the case has breached the standard of care and

18    that that breach caused the damages claimed in

19    this petition?

20         A.   Yes, I know that.  I actually recall

21    doing a few of those.

22         Q.   Did you do one of those letters in this

23    case?

24         A.   I don't know.  I can look it up if you

25    wish in my computer.  If I did it would be there.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    Q.   Yes, I would.  I would appreciate it if

2  you could look and see if you --

3    A.   Sure.  I'll take a quick look.  Yes, I

4  have it and it was done on January 28th, 2020.

5    Q.   You said the 20th or the 28th?

6    A.   January 28, 2020.

7    Q.   Could you forward that to Jonathan as

8  well?

9    A.   Can I?  Sure.

10    Q.   Yes, and I'll ask him to forward it to

11  me.

12    A.   Absolutely.

13    Q.   I think that would fall within this

14  second category of something that you can --

15    A.   I should do that right now.

16    Q.   Thank you.

17    A.   Now, if I can figure out how to do this.

18  Let me see.  Okay.  Sent.

19    Q.   Thank you.

20        MR. STEELE:  Elizabeth, I just

21  e-mailed them to you.  So there were two of them;

22  one was a revised one and one was an original

23  one.  I think he just overwrote the original one

24  would be my guess, but I sent you the PDFs of the

25  ones that I have.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

```
1              MS. MOELLER:  Thank you.

2           (Off-the-record discussion.)

3           (Back on the record at 10:52 a.m.)

4    BY MS. MOELLER:

5       Q.   I've marked these Affidavit of Merit

6    letters that you've provided as Exhibits 4 and 5.

7           (Deposition Exhibit Numbers 4 and 5 were

8    marked for identification.)

9    BY MS. MOELLER:

10      Q.   So Jonathan just explained to me that

11   there's a revised letter from the original one.

12   Do you remember revising this letter?

13      A.   No, but I would assume that's correct.

14      Q.   Well, okay, so this is it looks like the

15   first one and it's dated December 20th, 2019 and

16   it says that you reviewed the records of Geneva

17   Miller while under the care and supervision of

18   N&R of South Kansas City, LLC and other relevant

19   records and it's your opinion that that company,

20   along with the owners, managers, operators and

21   others tasked with the operation of the nursing

22   home failed to use such care as a reasonably

23   prudent and careful healthcare provider would

24   have under similar circumstances and such failure

25   to use reasonable care directly caused or
```

1  directly contributed to cause the injuries

2  described in the petition.

3         So that language about a reasonably

4  prudent and careful healthcare provider in

5  similar circumstances, is that your language or

6  is that something that's provided to you?

7     A.   I think this was provided, it's the one

8  required in Kansas because different states --

9  states that require an AOM have their own

10  specific language that they ask.  If I find that

11  the language is appropriate, I use it.

12    Q.   Okay.  So this language was provided to

13  you and you reviewed the records and you agreed

14  with this language?

15    A.   I assume so.  I mean, I generally don't

16  change unless I see something that's to me

17  doesn't reflect my opinion, then I will speak to

18  the attorney and ask for change.  I don't think I

19  changed it.  I think that's what I got, but I

20  don't recall for a hundred percent.  Again, it's

21  a long time ago and a few interesting things

22  happened in between as you can imagine.

23    Q.   An entire global pandemic.

24    A.   In my life, so...

25    Q.   It sounds like this is language that was

1  provided to you by Mr. Steele.  Would he have put

2  this in an e-mail to you or dictated it to you

3  over the phone?

4      A.   I have no clue.  Possibly e-mail,

5  possibly read it, or possibly I had it already

6  from another case.  I really don't recall any of

7  it.

8      Q.   Okay.  And mostly I'm trying to figure

9  out how you got this and if there's

10 correspondence with him that we don't have.  The

11 only correspondence I've been provided with is

12 those three letters that I showed you that are

13 Exhibit 3.

14     A.   Again, I have no clue.  I don't recall

15 how this came about.

16     Q.   Yeah, I --

17     A.   It's possible this is the same language

18 I used in another case and maybe I was going to

19 do that.  Excuse me, can I take this call?  It's

20 NYU.

21     Q.   Of course.

22     A.   It's garbage.  You never know.  Sorry

23 about that.  Go ahead.  I don't like to answer

24 the question in full, I don't recall what I said

25 last.

1      Q.   Yeah, we were talking about where this

2  language came from and so when we're on a break,

3  a quick bathroom break maybe in a little bit, I

4  might ask you if you can check your e-mails and

5  just search and see if there's any e-mail

6  correspondence with Jonathan or his office.

7      A.   I don't think I'll be able to find it

8  because I don't keep those.

9      Q.   Do you think it would have been deleted?

10      A.   I don't --

11           MR. STEELE:  I'll look for it,

12  okay?

13           MS. MOELLER:  Thank you.

14           MR. STEELE:  I'll look for it on my

15  end.

16           MS. MOELLER:  Okay, thank you.

17  BY MS. MOELLER:

18      Q.   Okay.  I want to get back to these two

19  letters.  So we talked about this first one that

20  I have as Exhibit 5.  I guess I marked them in

21  reverse order, but this is the first one

22  chronologically.  The second one is dated January

23  28th, 2020 and it's Exhibit 4, and from what I

24  can tell the difference is that you've added this

25  language about not only N&R of South Kansas City,

1    but also LTC Management Services and Health

2    Systems, Inc.?

3        A.    Okay.    That's the one I just sent you,

4    yeah.

5        Q.    Yes.    And Jonathan provided the first

6    one to me.

7              Do you know how this came about that you

8    did this second revised letter?

9        A.    I have no clue.    I don't recall.

10       Q.    Well, Jonathan I guess is going to look

11   for e-mails so maybe there's an e-mail that will

12   shed light on why a month and eight days later

13   these two other entities were added to this

14   Affidavit of Merit letter.

15             Since you've included LTC Management

16   Services and Health Systems here as companies you

17   said breached the standard of care, what's your

18   understanding of what those two companies are?

19       A.    Well, it's general understanding that

20   most states allow owners of facilities to have a

21   management company run the facility.    That is

22   illegal in New York by the way so I'm not that

23   familiar with this type of management.    Because

24   in New York the company that has the license must

25   manage the nursing home.    Period.    So we don't

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   have management companies here, but I've noticed

2   in many states the facilities actually are

3   managed by a management company that may have

4   owners manage multiple facilities or just one

5   facility.  So in general they might be the I

6   would say the governing entity that's responsible

7   for what goes on in the nursing home.  And that's

8   why they're usually found in lawsuits against

9   nursing homes that include the different entities

10  that are involved, and sometimes even the real

11  estate entity that owns the building and things

12  like that.

13      Q.   And how is it that you knew that these

14  two companies were affiliated with this facility?

15      A.   I would assume that I got a

16  communication from Jonathan in one way or

17  another.

18      Q.   So this -- these two companies are

19  affiliated with Timberlake wasn't necessarily

20  something you gleaned from the records you were

21  provided, it was just something that Jonathan

22  relayed to you and you included it here?

23      A.   I don't recall, but it's not uncommon to

24  see the facility as one name and the defendants

25  have totally different names.  So because many

1   facilities do a name as d/b/a and sometimes,

2   again I'm not familiar with the legal

3   requirements, in some states they will state the

4   d/b/a name in the court papers, in some states

5   they don't.  So I'm just not surprised.

6       Q.    Yeah, and I understand that and the sort

7   of general idea that sometimes nursing homes

8   are -- you know, they have other companies

9   involved in management or consulting or operating

10  or what have you.  I'm just trying to figure out

11  here what it is that you knew on January 28th

12  when you wrote this letter that made you conclude

13  that LTC Management Services and Health Systems,

14  Inc. had breached the standard of care?

15      A.    I would assume it was a communication

16  from Jonathan saying that they are the management

17  companies involving -- involving the operations

18  of that particular nursing home, and therefore

19  they are the governing -- they're the governing

20  body that is responsible for the -- anything that

21  happens in the nursing home, for the operations I

22  should say.  I would assume that that's what I

23  was told and that's why I put them in.

24      Q.    Okay.  So for N&R of South Kansas City,

25  LLC, which is the operator of Timberlake, that's

40

1   the one that has the d/b/a tied to it, you looked

2   at the records and concluded that they breached

3   the standard of care; and then as to these other

4   two companies, Jonathan communicated to you that

5   they were involved as a management company or

6   something else, and that's the basis of your

7   opinion for those two companies?

8      A.   Most likely, yes.

9          MR. STEELE:  Objection to form and

10  foundation.

11     A.   I don't recall exactly.  I mean, it's

12  really a long time ago.  I don't recall exactly

13  how all this came about so -- but as I said, it's

14  an assumption that I would have known about them

15  from Jonathan.  I kind of doubt generally those

16  -- that information is not something that you

17  find in a clinical record.  Sometimes you do, but

18  -- and if I find some name in the record that I

19  don't know, I generally ask the attorney, What's

20  that, and how do they fit into the picture?  If I

21  don't know.

22  BY MS. MOELLER:

23     Q.   Okay.  And I understand that.  I was

24  just -- this is my only chance to talk to you

25  today and learn your opinions.

1    A.   Okay.

2    Q.   I just have I guess -- well, I thought I

3  had one more question but I think I just

4  completely lost it.  Oh, I remember.  So we

5  talked a little bit about, you know, you have

6  this general understanding that some nursing

7  homes have other companies involved in them,

8  whether it's a management company or a consulting

9  company or something like that, although you

10  mentioned that that's not allowed in New York.

11  Do you have any understanding specifically

12  about -- as you sit here today, about what

13  exactly these two companies' roles are with

14  Timberlake?

15    A.   The specifics, no.

16    Q.   Okay.  Well, I stopped sharing

17  prematurely.  I want to go back to the deposition

18  notice now.  The third topic asked for all

19  exhibits or summaries that you intend to use at

20  trial, and we've talked about your notes so I

21  know you have those.  Are those something that

22  you would be using at trial?

23    A.   That depends what the attorney instructs

24  me.  It's not my decision.  Or sometimes the

25  court may instruct me.

1    Q.   At this time are there any other

2    exhibits or summaries that you would plan to use

3    at trial?

4    A.   No.

5    Q.   The fourth topic asks for a copy of your

6    current curriculum vitae and I don't see that one

7    was included in the Dropbox folder, but I know I

8    have one that was attached to the expert

9    designation, which you might be able to see on

10   the screen now.  This expert designation was

11   filed on November 2nd of last year, so about a

12   year ago.  Have you updated your CV in the last

13   year?

14   A.   Yes.  Yes, I did.

15   Q.   Do you have a copy of that that you

16   could send to Jonathan?

17   A.   I have one right in front of me if you

18   want me to bring it up, but do you want it sent?

19   Q.   If you could send it to Jonathan that

20   would be great.

21   A.   I shall do that.

22   Q.   I'll want to go through that with you so

23   I can learn a little bit more about --

24   A.   Sure.  It hasn't changed that

25   significantly, there was very little.  But I do

1    remember that in September 1st somebody asked me

2    for update so I did that on September 1st this

3    year.

4        Q.   Okay.

5        A.   So let me look for it.

6        Q.   While you're looking, just for the

7    record, I'm going to mark this as designation as

8    --

9        A.   So I will have to close it so I can send

10   it.  I just opened that, I think that's the one.

11   Okay.  I sent it.  If you want I can open it and

12   look at these while you ask questions when you

13   get to it.

14       Q.   Yes, thank you.  All right.  Dr. Dimant,

15   we can keep going while I wait for that e-mail to

16   come through.

17       A.   Okay.  Sure.

18       Q.   I'll ask you, you know, about actual

19   questions about your CV in a little while.  I did

20   want to keep going through this deposition

21   notice.

22       A.   Sure.  Okay.

23       Q.   Is that on your screen?

24       A.   Yes.  I see it.  Yeah.

25       Q.   Okay.  So Number 5 asked for a list of

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    all cases in which you testified in the past five

2    years.  Do you maintain a list like that?

3        A.   No, I do not.

4        Q.   And Number 6 asks for all treatises,

5    reports, manuals and other reference materials

6    that you used or relied upon in coming up with

7    your opinions.

8            Did you use any treatises or reports or

9    manuals or anything like that?

10       A.   No, I did not.

11       Q.   And Number 7 asked for a copy of any

12   billing or time records that show the time you

13   spent consulting on this or any amounts that

14   you've billed.  Do you have any billing records?

15       A.   I probably have copies of whatever I

16   sent, yes.  I'll try to find that, unless

17   Jonathan provided that to you.

18       Q.   And I did not see that in the Dropbox

19   link.  I don't know if Jonathan already has those

20   and he can just forward them to me instead of you

21   having to look for them.

22       A.   I can look for them.

23           MR. STEELE:  My recollection is

24   that we haven't paid anything more than the

25   additional retainer, but that may not be

1  accurate.

2      A.   Let me see if I can find them.

3  BY MS. MOELLER:

4      Q.   Okay.

5      A.   Jonathan may not have that because it

6  has credit, that's why.  Okay.  I wouldn't -- I

7  did not send it but I can send it if you want.

8      Q.   So there is one bill that you've sent

9  but it's -- what do you mean it has a credit?

10     A.   I didn't send it.

11     Q.   Oh.

12     A.   Because I got a retainer and that

13  particular bill shows that there's still a credit

14  so I did not send it to him.  So he wouldn't have

15  it.

16     Q.   Okay.  So you received a $3,000 retainer

17  in this case and the time that you've billed to

18  date has not exceeded that yet?

19     A.   That's correct.  At that time, yeah.

20  There was only one bill that I see.

21     Q.   As of today, do you have unbilled time

22  that would exceed that $3,000 retainer?

23     A.   I didn't understand.  What's the

24  question again?

25     Q.   As of today, have you billed -- you said

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  that that invoice when you did it had a credit

2  basically, you hadn't exceeded the retainer.

3      A.   That's correct.

4      Q.   So as of today, have you exceeded that

5  retainer?

6      A.   I would assume so because I just spent

7  some time preparing for the deposition.

8      Q.   Do you know approximately how long you

9  spent preparing for today's deposition?

10     A.   Approximately five hours.

11     Q.   So I guess I probably -- well, if you

12  don't mind sending that bill to Jonathan?  I

13  understand that you didn't actually bill him

14  because there was a credit, but since you've

15  prepared that bill if on a break you could send

16  it to him that would be great.

17     A.   Okay.  When we do a break I'll send it

18  to him.

19     Q.   Yeah, I don't need to go through it with

20  you now.

21     A.   Okay.  No problem.

22     Q.   So category Number 8 says, if not

23  already produced, any other documents, items, or

24  data that constitute your complete file in this

25  case, including any materials referenced in

1  expert disclosures, documents, or materials

2  prepared that would be used or relied upon,

3  documents used or relied upon or consulted in

4  connection with forming your opinions, documents

5  or other tangible items sent or received to any

6  lawyer or anyone affiliated with Jonathan's

7  office.  So it's kind of a catch-all category of

8  whether there's anything else that you have that

9  you've used or received or created in this case

10  that we haven't already talked about.

11      A.   Not that I recall.  I don't think so.

12      Q.   And I know that there might be some

13  e-mails and Jonathan's going to help us out by

14  looking for those.  That kind of falls into the

15  next category, Number 9, that asks for any

16  e-mails, texts, letters, correspondence, with you

17  and either Jonathan or anyone else like a

18  parallel.

19      A.   Okay.  I mean, if Jonathan can find

20  them, I don't -- I don't have them.

21      Q.   Okay.  And that's what I was going to

22  ask.  It sounds like there might be some e-mails

23  and he's going to look, and we've got Exhibit 3

24  here which is three separate letters, you know,

25  formal letters on letterhead.  The first one's

1    dated November 5th, 2019 and then October 1st of

2    2020.

3         A.    Uh-huh.

4         Q.    June 22nd of 2021.  And those look like

5    letters that are transmitting records to you.  Do

6    you remember any other letters like this?

7         A.    Any other?  No.

8         Q.    Yeah.  Did you ever exchange any text

9    messages with Jonathan or anyone from his office

10   about this case?

11        A.    I would assume about this deposition

12   there must have been either a text or a phone

13   call.

14             MS. MOELLER:  Jonathan if there's

15   any texts with him, could you send those with the

16   e-mails?

17             MR. STEELE:  Yeah, I don't recall

18   any text messages but I'll take a look.

19             MS. MOELLER:  Okay.  Thank you.

20   BY MS. MOELLER:

21        Q.    All right.  We are through the

22   deposition notice.  I was next going to mark your

23   CV and go through that but would everyone --

24   we've been going for a little over an hour.

25   Would everyone be okay with a quick bathroom

1  break?

2      A.    I didn't hear what you said.

3      Q.    I said we've been going for about an

4  hour and before I start kind of going through

5  your CV with you, is everyone okay with just a

6  quick bathroom break?

7      A.    I think I don't need a break now, I

8  probably need lunch but not yet.

9      Q.    Okay.  Well, then we'll keep going and

10  if you need lunch or a break you just let me

11  know.  And I'll go ahead and mark the CV that I

12  just got as Exhibit 7.

13          (Deposition Exhibit Number 7 was marked

14  for identification.)

15  BY MS. MOELLER:

16      Q.    I think you've got your CV pulled up as

17  well, but I'll share my screen in case that's

18  helpful.

19      A.    Okay.  How do you want it?  I can't do

20  both because it will cover the -- it will cover

21  you.

22      Q.    Okay.

23      A.    And I need to look -- I need to look at

24  your lips to actually hear you.  It's very low so

25  it's helpful this way.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1      Q.    Which is easier for you, to have it on

2   your screen or have my screen shared?

3      A.    That's fine.  I see it on the screen

4   share.  That's fine.  You can go down it and ask

5   whatever you need.

6      Q.    Okay.  So I've marked this as Exhibit 7,

7   and I see that you went to medical school at

8   Hebrew University in Jerusalem; is that correct?

9      A.    Correct, yes.

10      Q.    And then I might go a little bit out of

11   order but I want to go look at your board

12   certifications.  And this showed that you had

13   been board certified in internal medicine and

14   then also with added qualifications in

15   geriatrics.

16      A.    That's correct.

17      Q.    What does that mean, added

18   qualifications?

19      A.    It's really a subspecialty board just

20   like any other.  I have no clue why the first one

21   ever was given in 1988 when geratics was finally

22   recognized as a specialty in the United States.

23   And for some reason at that time they decided to

24   give it this funny name, but in practicality it's

25   just the same as any other subspecialty of

1   internal medicine.

2       Q.   And this shows that you got that

3   certification in 1988, so you did that as soon as

4   it was available?

5       A.   Well, those -- this was actually I think

6   the first board that was not quote unquote "a

7   lifetime certification," and they apparently at

8   the time made it good for ten years only.  And

9   then you have to take a recertification exam.

10      Q.   And looking at this it shows that you

11  were certified from 1988 to 1998 and then again

12  from 2004 to 2014.  Why is there that six year

13  sort of gap?

14      A.   Actually I have no clue but my

15  recollection is that I didn't even know it was

16  good for ten years.  I thought it was like the

17  other boards that were for life and I may have

18  discovered at a certain point it was not so I

19  went and took another test.

20      Q.   So like the internal medicine here,

21  1976, that's lifetime?

22      A.   That's lifetime, yeah.  I did take it

23  once voluntarily in the same year actually, 1988,

24  I did take another test and actually passed even

25  better than the first one.  But that was part of

1   a national experiment to see whether physicians

2   actually can pass the boards again so -- and so I

3   must confess to my residents that I'm probably

4   one of the reasons why they have to recertify

5   every ten years.

6        Q.   Luckily they only make me take the bar

7   once.

8        A.   You don't have to take the bar every ten

9   years, do you?

10       Q.   I do not, no.

11       A.   Lucky you.  My son is the same.  My son

12   is an attorney and he has it for life.

13       Q.   If you want to get licensed in other

14   states depending on timing, sometimes you might

15   have to.  To get licensed in Kansas I didn't, but

16   my friend unfortunately did have to take the bar.

17       A.   I know several of them in law might be

18   reciprocal as far as I know.

19       Q.   Yeah.  Yeah, some are, some aren't.

20       A.   Yeah, that's what my son told me.

21       Q.   I'm looking at your certifications and

22   this also shows that from 1992 to 2016 you were

23   certified and then recertified as a medical

24   director for a long-term care facility.  Can you

25   explain what that certification is?

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    A.   Okay.  That is actually I'm one of the

2    developers of that so I know something about it.

3    In around 1992 the American Medical Directors

4    Association, which I was active in it since some

5    few years earlier I started to be active and

6    actually got on the board in '92.  We decided

7    that we want to teach physicians or medical

8    director how to be medical directors because this

9    -- how to be a medical director was really very

10    poorly defined in August of 1974, which was the

11    first the first compliance of federal law that

12    addressed issues in nursing homes from a legal

13    point of view.  So there was -- there was a

14    movement to try to teach physicians how to be

15    medical directors, because really no one knew

16    other than some literature that myself and other

17    people may have written about it, so we developed

18    a course.  The course was originally developed in

19    '98 -- in '88 in Minnesota, then became national.

20    In '92 I developed one for New York and then it

21    also got folded into the national.  By the same

22    time we decided that the people who took the

23    course rarely take -- have something to show for

24    it so we certified them.  The certification does

25    not require a test, which is -- was against my

1    recommendation, but it requires that you be a

2    medical director in a nursing home for a certain

3    amount of years and that you have taken our

4    course which we developed at (unintelligible),

5    some of which I was teaching, and that you kind

6    of get it passed in the course.  It wasn't really

7    a test-related pass, and then you get certified.

8    So it really to me didn't mean that much.  Given

9    that the association did not accept my

10   recommendation and others, I wasn't the only one

11   that said it has to be based on the test,

12   otherwise how do I know?  Just you take a course,

13   you may or may not do okay, but that's the way it

14   is so -- and they've never really changed that.

15   And then you had to be recertified I think every

16   three years by basically showing that you have

17   taken some additional CME courses in more related

18   to nursing home management, not just medicine,

19   pure medicine, but mostly related to either

20   medicine in nursing homes or management in

21   nursing homes.  And actually we developed a

22   course for advanced medical direction so we

23   required that you take that course in order to be

24   recertified.  And that's basically what the

25   basis, and I believe they still do it that way.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1     Q.   Okay.  And it shows that that

2  certification I guess ended for lack of a better

3  word in 2016?

4     A.   Yeah.

5     Q.   Why is it that you didn't maintain that

6  certification?

7     A.   I think I was at a certain point when I

8  was not a member anymore, but I think '16 I still

9  was and I just decided that, you know, any

10  certification that takes $300 to get period is

11  not worth $300.  So I'll tell you the truth,

12  that's what I kind of thought to myself.

13  Everything is you send them 300 bucks and you get

14  a piece of paper, and I -- I have advocated

15  throughout the years when I was active there and

16  I was also the president of the organization at

17  one time, advocated that they require a test.

18  But the population did not like a test, and so it

19  never came to pass that it really add some

20  meaning to the person who has the certification

21  really as a body of knowledge that can be very

22  fine.  That's my opinion.  I mean, I'm not saying

23  the opinions of that organization, I'm not a

24  member anymore.  I'm simply on their past

25  president council that, you know, to give them

1  some advice occasionally.

2      Q.   And I understand what you're saying, the

3  idea that having to take a test and prove your

4  knowledge to get certified gives that

5  certification a little bit more teeth I guess.

6      A.   Yeah.  Yeah, that's my feeling.  I just

7  didn't see at a certain point that there's any

8  use for that anymore.

9      Q.   I know on here you've got a lot of

10 different positions you've held over the years.

11 Can you just describe for me what your current

12 clinical practice looks like?

13     A.   Today?

14     Q.   Yes.

15     A.   Today I'm only working through my

16 employees actually at NYU School of Medicine and

17 my main job is to be -- actually I have two jobs,

18 running two departments at my hospital.  One is

19 chief of geriatrics at NYU Hospital in Brooklyn.

20 NYU has several hospitals and that's one of them.

21 And the one in the same hospital I'm also chief

22 of ethics, and then in -- I also work in a

23 hospital in Manhattan covering.

24     Q.   And at the hospital in Manhattan, do you

25 have a title or are you an attending physician,

1   or what's your role there?

2        A.   The way it works actually is all four

3   hospitals that NYU currently has are actually one

4   hospital and they just have different buildings.

5   So anybody who is -- who is an attending

6   physician in any of those hospitals would be --

7   can practice in any of the four.  I mean, your

8   appointment is for the four hospitals, not for a

9   specific hospital.  So I'm basically an associate

10  professor of medicine in the medical school and

11  I'm a full attending physician in what's called

12  NYU Hospital Center -- Hospitals Center is the

13  official name of the conglomeration of the four

14  hospitals, so I can work in any of them.

15       Q.   Does your chief of geriatrics and chief

16  of ethics title then apply to the conglomerate or

17  just --

18       A.   The title actually is not chief, it's

19  chief of geriatrics is the official title at

20  Brooklyn, and the other one is -- I think the

21  official title is chief of the ethics committee,

22  but that's essentially being the chief and doing

23  all the consults there in ethics.

24       Q.   And those sort of chief titles, does

25  that apply just at Brooklyn or do those apply to

1  the whole conglomerate?

2      A.    They apply only in Brooklyn.

3      Q.    Okay.

4      A.    Because each of the hospitals have their

5  own chief of services.  There's a chief of

6  medicine for each, and under that person there's

7  chiefs in the different sections, and it's

8  separate in each hospital.  So the title of chief

9  is only limited to one hospital.  Being an

10 attending physician who is allowed to practice is

11 in all the hospitals.

12     Q.    Got it.  That makes sense.  So right now

13 your practice is chief of geriatrics and the

14 chief of ethics in Brooklyn, and then you're also

15 an attending at any other of the conglomerates?

16     A.    In all of them, but I only work in the

17 main hospital in Manhattan covering -- in

18 covering on weekends and on weekdays sometimes.

19     Q.    Do you see your own -- let me start

20 over.  That was a bad question.

21     Do you still currently see a census of

22 your own geriatric patients?

23     A.    No.  My practice is limited to being

24 very essentially a hospitalist, a consultant

25 hospitalist.  I don't do primary care at all.  I

1   consult in geriatrics and I consult on ethics.

2      Q.   But you'll come in for a consultation

3   for a patient that's in the hospital right now?

4      A.   Only in the hospital.  I do not do any

5   outpatient work anymore.

6      Q.   When is the last time you did outpatient

7   work?

8      A.   I would say around 2010 I think.  And

9   after that I was limited only to inpatient

10   hospital -- hospital patient and inpatient

11   nursing home patients.

12      Q.   And that's what I was going to get to

13   next because I saw from your CV that you've

14   worked as a medical director for different

15   facilities over different periods of time.  So

16   when was the last time that you were actually

17   going into nursing homes and seeing the residents

18   there?

19      A.   In 2018.

20      Q.   And that's when you were a medical

21   director?

22      A.   I was the medical director there, yes,

23   and I also did some primary care during the time

24   it was being closed and I did wound care there as

25   well.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1     Q.   What was the name of that facility that

2  you were last at?

3     A.   If you go down I'll show you.  Go down a

4  little bit.  To the end of the first page.  Okay.

5  So what you can see that in the last entry in --

6  before it says current professional activities,

7  states -- yeah, you were just highlighted that.

8  That's 2015 to 2018 I was the medical director --

9  oh, no, that's the home care.  That's also closed

10  at that time, so it must be the one before that.

11  It says medical director NYU Augustana Center.

12     Q.   Okay.  And well, I guess it says on here

13  that that facility closed in 2018.

14     A.   Correct.

15     Q.   And at that point did you just decide

16  that you -- you didn't really want to work in

17  that capacity as a medical director anymore, or

18  why is it that you didn't end up --

19     A.   When the facility -- so I was working at

20  the hospital in the nursing home, the hospital

21  happens to be across the street from the nursing

22  home.  And I was asked to go full-time to the

23  hospital, and at that point I decided I don't

24  want to work full-time anymore so I kept my half

25  time at the hospital but I did not replace the --

1    the medical director job.  I've received several

2    offers for full-time job in nursing homes in the

3    area, but I did not want to work full-time, nor

4    did I want to leave the hospital because I like

5    the job there.

6        Q.    So you had it sounds like you said

7    offers to go work full-time as medical directors

8    at a different nursing home and just decided you

9    didn't want to work full-time anymore?

10       A.    I didn't want to work full-time anymore

11   from 2018, that's correct.

12       Q.    Okay.  That's understandable.  I didn't

13   mean that if that sounded rude, I just wanted to

14   make sure I understood.

15       A.    Well, Covid thwarted that idea.

16       Q.    I definitely understand.  I saw on here

17   that you still have two it looks like current

18   academic appointments.  Can you explain those?

19       A.    Okay.  So I was -- as you can see from

20   the beginning of my career, I was involved with

21   SUNY Downstate, which is the State University of

22   New York, Downstate Medical Center, which is in

23   Brooklyn.  And as such I was teaching medical

24   students from that -- from that medical school

25   which were assigned to our hospital, which at the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

```
 1   time was called Lutheran, it was before NYU took
 2   it over.  So that ended when NYU took over my
 3   hospital in -- end of 2014, beginning '15, they
 4   decided they did not want students from SUNY and
 5   they wanted to bring their own students to the
 6   hospital, so that association essentially ended
 7   in 2018 -- no, in 2015 I mean.  The association
 8   with Downstate ended but I've never really
 9   terminated my formal position, so I kept it but
10   I'm not active there since 2015.  And at that
11   point also NYU required that in order to teach
12   their physicians and their students, I needed to
13   have an appointment at their medical school.
14       Q.   So does this academic appointment
15   dovetail with your clinical practice so when
16   you're working as the chief of geriatrics or an
17   attending at Manhattan you have medical students
18   shadowing you?
19       A.   Not just medical.  It's mostly actually
20   medical residents, so physicians in training,
21   which are in the third year.  So actually my
22   contract calls for particularly teaching, is one
23   of my major responsibilities is teaching
24   geriatrics, and in Brooklyn I teach medical
25   residents in their third year.  In Manhattan I
```

1 teach fellow geriatrics, and also medical

2 students will come from time to time, but it's

3 not steady.

4     Q.   So I understand with the teaching, I

5 assume a lot of it is actually in the hospital

6 seeing patients in clinical practice, but do you

7 also have some teaching that you do as well?

8     A.   Yes.  I mean, most of the -- I'm a great

9 believer in bedside teaching because when we see

10 the patient that's when you learn.  So most of

11 the teaching is done during rounds when we see

12 the patients and we teach there at the same time

13 as we take care of the patient.  I'm also

14 assigned all kinds of clinical and administrative

15 responsibilities in the system-wide department of

16 geriatrics.  The department of geriatrics spans

17 all four hospitals and the medical school, and

18 there I will get assignments, give lectures,

19 sending us to fellows and residents, sometimes

20 students.  Recently it was quite a bit of

21 students, and some administrative activities as

22 well.

23     Q.   I'm scrolling through my notes because I

24 kind of jumped around a little bit.  I wanted to

25 ask you somewhere in here I saw -- I have an old

1   version of your CV I was able to look at ahead of

2   time, but somewhere I saw that you were a

3   president and operator.

4        A.    That's on Page 1.

5        Q.    Oh, I went past it.  Here it is.  So I

6   wanted to ask but these two.  What does president

7   and operator mean?

8        A.    President is a corporation function, so

9   there were corporations that owned those nursing

10  homes.  I was a shareholder in them and I was

11  elected president of the board.  There was a

12  board, the corporate board and I was president of

13  the board.  The title operator is specific to New

14  York State.  In New York State as I told you

15  before, a corporation that owns a nursing home

16  must operate that nursing home.  It cannot use a

17  management company.  Within that the state or the

18  corporation through the state will designate one

19  person who is designated as operator, which

20  basically means that that is the person that

21  signs official documents of the New York State

22  Health Department.  For example, cost reports, or

23  other reports, or what is -- when you submit the

24  MDS, for example, some official have to sign

25  those things.  Whenever there's submissions to

1    CMS in New York or to the state, the operator or

2    a designee have to sign, but the operator is kind

3    of the responsible party for those

4    communications.

5         Q.   That makes sense.  It's different in

6    Missouri, I've never -- so that's new to me.

7         A.   Yeah, no, this is -- New York is very

8    different in this, so I was designated the

9    operator, which means I had to sign certain

10   documents, or I would have to officially tell the

11   health department I'm designating the

12   administrator of the facility to do those things.

13        Q.   And you mentioned that you were a

14   shareholder; is that correct, for both of these?

15        A.   Yes, that's correct.

16        Q.   So you had an ownership interest in

17   those facilities?

18        A.   Yes, I did.

19        Q.   That shows that that ended in 2016.

20   Were those facilities then sold at that point?

21        A.   The facilities were sold and that closed

22   at the end of 2016.

23        Q.   Somewhere on here, there it is, there's

24   your consulting practice.  And I see the other

25   ones, the first one is consultant to long-term

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   care facilities on issues of medical management,

2   medical care and quality improvement since 1987.

3   What does that work entail?

4       A.   From time to time facilities would have

5   a problem with probably mostly with medical care.

6   It has to do mostly with medical care or

7   management of medical care.  And occasionally the

8   New York State Health Department will ask me to

9   go into a facility that was particular

10  problematic I guess and help them with issues

11  related to medical care or medical staff, so I

12  would do that from time to time.  This was not

13  obviously a steady work, it was occasional from

14  time to time.  And lately after Augustana was

15  closing in 2018, NYU developed a group of nursing

16  homes where we tried to send our patients because

17  we think there are the better places in the city,

18  New York City, and those are now kind of loose

19  network of nursing homes where we recommend that

20  patients go and worked in exchange of being a

21  fellow, at least they agreed for us to help them

22  out with medical issues and there's a group of

23  physicians, myself included, that would give them

24  medical advice.  For example, I have to make sure

25  that staph infections are recognized on a timely

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   basis and things like that. So from time to time

2   I'm called for to give -- to work with the

3   medical directors or medical staff and sometimes

4   directors of nursing in those facilities to

5   discuss quality issues that may arise as we get

6   patients in the hospital and I see them and if we

7   find there's an issue in a nursing home, we will

8   try to help them correct it.

9       Q.   Is that work that you're paid for

10   separately?

11       A.   No. No. That's part of my job. Again,

12   it's sporadic, it's not always. At the beginning

13   it was a lot of work putting it together and

14   meeting with each one of these nursing homes or

15   in groups to talk about. Since Covid, of course,

16   we meet on Zoom so there hasn't been that much,

17   and they have enough things to worry about. But

18   from time to time, it's not permanent.

19       Q.   And then you also referenced working as

20   an expert witness for law firms. I know we

21   talked about that a little bit already.

22       A.   Correct.

23       Q.   We'll talk about it -- we'll talk about

24   it more.

25       A.   Yeah, I see everything I said is there.

1    Okay.

2         Q.    Yeah.   How much of your time these days

3    is spent working as an expert witness?

4         A.    It's very, very -- very, very widely.

5    Sometimes I'm busy, sometimes not.   Lately a

6    little bit more because there was nothing going

7    on during Covid, and all of a sudden I guess the

8    job just woke up so -- and they are trying to get

9    things done so I'll get -- they will say, Can you

10   please finish something in like the next two

11   days?   You know, so it's been a little busy

12   lately, but normally from time to time.   Again,

13   it's not that much.

14        Q.    Can you give like a range, like a

15   percentage range?

16        A.    I didn't hear this.

17        Q.    Can you give like a percentage range?

18   Like is it like 10 to 30 percent of your time, or

19   20 to 50?

20        A.    Clearly it would be speculation.   I

21   really don't pay attention to that enough to come

22   up with a percentage.   Sometimes it's a lot of

23   work, sometimes nothing.   What I tend to do if I

24   get a case, I tend to open it continually until I

25   finish because it's a lot easier than coming back

1    a week later and trying to remember what you did.

2    So I would look for a chunk of time, generally on

3    a weekend where I can work for a few hours

4    uninterrupted and finish the case, or at least

5    finish the review of the records.

6         Q.    And I'm jumping back a little bit.  You

7    said that you're part-time at the hospital.  Is

8    that -- you know, approximately how many hours

9    per week your clinical practice at the hospital

10   takes?

11        A.    The contract calls for three days a

12   week, five hours, so it would be 15 hours a week

13   is what my con -- what I'm getting paid for.

14   Probably doesn't happen most of the time, it

15   would be more like 20.  The problem is that I

16   have to conform myself to the academic schedule,

17   so if I have the residents, the medical residents

18   have a certain schedule, when they are assigned

19   to me, and each one would be different because

20   they're different clinic days when they can come

21   to the hospital.  So I would ask each name when

22   they come for the two-week block that's required,

23   which days are your clinic?  And I'll then try to

24   be there the days that they are available,

25   obviously so they can make rounds with me and

1    learn something.  So sometimes it would be three

2    days a week, sometimes four days a week.  When I

3    geriatric or palliative care fellows, there is

4    five days a week, so I come in and I have to do

5    it.  I mean, if the trainees there, I have no

6    choice.  And then I'll -- if there's a week or

7    two and I don't have any training I will take

8    some time off to compensate.  So I would say

9    probably remains about 20 hours a week.  During

10   Covid all that was suspended.  It was pretty much

11   I would say one and a half or two times, not

12   full-time even.

13       Q.    Got it.

14       A.    Probably about 20 hours a week -- I mean

15   20 hours a day, seven days a week, particularly

16   when the crisis occurred here in the city for the

17   first few months, and then just recently again

18   when we had the surge, you know, my presence was

19   required a lot more.

20       Q.    Yeah.  I definitely understand from --

21       A.    Particularly with the ethics issue that

22   goes in a situation where there was totally

23   unknown disease that no one knew how to handle.

24   And you have to do the locations and things like

25   that, so ethics was extremely involved.

1      Q.   Yeah, I was just going to say I keep

2 reading on the news about different states where

3 things are getting really bad and having to

4 ration care and --

5      A.   Yeah.

6      Q.   I can imagine that the ethics issues are

7 --

8      A.   We went through that -- we went through

9 that the first few months and unfortunately I was

10 one of the people designated to make those

11 decisions, because you can't have the patient --

12 the person's -- the patient's physician can't

13 make those decisions, yes or no for a person.

14 They have the responsibility for that patient

15 that's theirs, so someone had to be designated

16 who was a little removed to make such decisions.

17 It was not exactly pleasant.

18      Q.   I can imagine. It's interesting, but

19 yeah, I wouldn't want to be in your shoes on that

20 one. That's for sure. Especially if --

21      A.   I didn't either, but I was on the job, I

22 had no choice.

23      Q.   Better they have you than me, that's for

24 sure.

25      I had one last question about and I -- I

1    might be able to guess the answer since we sort

2    of talked about it in the context of the medical

3    director certification.  But here it shows that

4    you're no longer a member of the American

5    Geriatrics Society and I was just curious why

6    that was.

7         A.   Why I stopped going there?

8         Q.   Yes.

9         A.   I actually didn't see much use for it

10   for myself, I guess.  I don't really recall what

11   the decision entailed, but I was not as active in

12   there.  And I was not really going to the annual

13   meetings anymore because I was too busy doing

14   other things so there's no use being a member.

15        Q.   I understand, I was just curious.  I

16   think I'm done with your CV.  How is everybody

17   doing break wise?  Do you want to take a break or

18   keep going?

19        A.   I can keep going, I'm not hungry yet.

20             MS. MOELLER:  Brent, how are you?

21             THE REPORTER:  I would certainly

22   welcome a five-minute break or so.

23             MS. MOELLER:  Okay.  It sounds like

24   Brent could use a break and I could use a quick

25   trip to the bathroom and refresh on caffeine.  So

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   if everyone's okay with a five or 10-minute

2   break?

3                   THE WITNESS:  Fine.  I'll get

4   something to eat then so we don't have to stop

5   again.  No problem.

6                   MS. MOELLER:  Do you want a little

7   bit longer than five or 10 minutes to eat then?

8                   THE WITNESS:  10 minutes should be

9   enough.  I just eat a sandwich.  It's not a big

10  deal.

11                  MS. MOELLER:  Okay.

12              (Recess taken at 11:49 a.m.)

13          (Back on the record at 12:11 p.m.)

14  BY MS. MOELLER:

15      Q.   Dr. Dimant, we're back on the record

16  after a quick lunch break and I --

17      A.    Hold on one second.  It looks like I

18  have a problem here with the computer.  Oh, good,

19  I found you.  Okay.  It's a little different than

20  the other Zooms, so how to navigate.  I can see

21  you now.  Can you hear me?

22      Q.   Yes, I can hear you.  Sorry.

23      A.    Good.

24      Q.   Okay.  Dr. Dimant, we are back on the

25  record after a quick lunch break and I also took

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  a minute to skim that chronology that you

2  prepared that I was provided today, and I think

3  we'll end up discussing that when we kind of get

4  to your opinions.

5          I have a couple more sort of background

6  type questions.  I know you've worked as a

7  medical director at a couple of at least

8  different nursing facilities.  Have you ever

9  authored any policies and procedures for a

10  nursing home?

11     A.   Yeah, for medical staff and things like

12  that, I was actually formulating or taken from --

13  I don't recall exactly right offhand or if I took

14  them from books or other places and then

15  redefined them for a particular facility, but I

16  was involved in doing that, yes.

17     Q.   Okay.  Are you familiar with the survey

18  process in Missouri?

19     A.   I'm familiar with the federal survey

20  process.  I don't know that it's -- in Missouri,

21  unless Missouri has additional -- they're

22  required to follow the federal survey process,

23  plus each state have their own additions if they

24  want to add.  New York does, so I'm not familiar

25  with whatever additions the State of Missouri

1 had.

2     Q.   A similar question about the

3 regulations, have you read the regulations that

4 are applicable to Missouri nursing facilities?

5     A.   No, I think I read some of them that

6 were sent to me. I can't answer that for sure.

7 I really don't recall for sure. Some of my

8 memory says I did, but I don't want to swear to

9 that. I'm not sure.

10     Q.   I understand. You said they were sent

11 to you. Do you think that those -- were those

12 something that maybe Jonathan provided to you for

13 this case or a different case or do you know?

14     A.   For sure not for this case because

15 otherwise it would have been in the file, but

16 it's possible that he sent -- I don't think I

17 read the whole text of regulations but something

18 tells me that I've read some, so somebody must

19 have sent me some. Most likely Jonathan, but I

20 can't swear to it. I'm not sure. I may mix that

21 with another state.

22     Q.   Okay. And it sounds like whatever it

23 was, it wasn't in this case because if it was it

24 would be in this file that we've --

25     A.   Not for this case, I don't believe so.

1     Q.   Is it fair to say then that you're not

2  going to be providing an opinion that Timberlake

3  breached or violated any regulation?

4     A.   I was not asked to review this in terms

5  of regulations.  I can provide that because I'm

6  very familiar with federal regulations,

7  particularly as they relate to nursing homes

8  because I was on the -- one of SCMS committee

9  that originally defined those regulations, so I'm

10  familiar with them.

11     Q.   Okay.  But as you sit here today in this

12  deposition, you've not been asked to provide that

13  opinion so you're not planning to provide that at

14  trial right now?

15     A.   Not unless attorney instructs me or the

16  court instructs me.

17     Q.   Okay.  Well, I only want to talk to you

18  today about the opinions you have today that

19  you've asked to provide at trial as of today, so

20  if that changes and you end up providing some

21  opinions about regulations, or coming to those

22  opinions, I'd ask that you or Jonathan -- or you

23  let Jonathan know so it might be that we talk to

24  you again if that were to occur.  But for now we

25  don't --

1      A.   That's fine.  Again, it's not up to me,

2   it's up to the attorney or the court telling me

3   what needs to be -- what opinions I need to

4   formulate.  If it's related to what I reviewed,

5   I'll be glad to do that.

6      Q.   We talked a little bit about how you

7   first started working in legal consulting.  Do

8   you advertise for your services as an expert

9   witness?

10      A.   Never.

11      Q.   Do you get these cases by word of mouth

12   basically?

13      A.   Generally somebody recommends one

14   attorney to the other.  That's how it's been.

15      Q.   Do you know when you first began working

16   with Jonathan?

17      A.   Few years back.  I have no clue.  I

18   really don't remember.

19      Q.   Do you know how that came about, either

20   I guess how he found you?

21      A.   I don't recall.  I would assume he got

22   the recommendation from someone, but I don't

23   really know.  I don't recall.

24      Q.   Over the past few years that you've --

25   since he first contacted you, do you know how

1 many approximately cases you've reviewed for him?

2   A.   I would say about a dozen.  More or

3 less.  Again, I don't want to speculate but I

4 think it's around that number.

5   Q.   I won't hold you to it.  I won't come to

6 trial and say, It's only been 11, you lied.

7   A.   Yeah, I don't want to lie.

8   Q.   No, just an estimate is fine.  Of those

9 cases that you've reviewed for them -- for him,

10 are there any where you've told to him that you

11 didn't think the case had merit?

12   A.   Yes.

13   Q.   Do you know approximately how many?

14   A.   I would say at least half a dozen.

15   Q.   Do you recall --

16   A.   Again, it's a rough estimate so don't

17 hold me to it.

18   Q.   I understand for sure.  Do you know if

19 any of those were pressure injury cases?

20   A.   That I would not recall.  I really have

21 no clue.

22   Q.   Do you know how many cases you actively

23 have with him?

24   A.   Now active?

25   Q.   Yeah.

1    A.   A couple.  Just other than the file a

2 few days ago that's no longer active I guess, and

3 this case, I don't recall if there's anything

4 active at this time.

5    Q.   Okay.  Have you ever been retained by

6 any other firms in the Kansas City area?

7    A.   I think so, yes.

8    Q.   Do you know who?

9    A.   I'm trying to remember.  Kansas City?  I

10 think so.  I'm not sure.  There's somebody in

11 Missouri that I'm not -- what's the main city?

12 St. Louis, I mean.

13    Q.   Okay.

14    A.   I think that firm may have had somebody

15 in Kansas City also.

16    Q.   Maybe Brett Williams?

17    A.   Yeah, Brett Williams, that's the name,

18 yes.

19    Q.   Okay.  They've got a St. Louis office.

20    A.   Thanks for reminding me.

21    Q.   Do you know how many cases you have that

22 you're currently working on, not just for

23 Jonathan?

24    A.   There's a few but I don't count them.

25 Very few, but I don't count.  Maybe five,

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  something like that.  Four or five I think.

2      Q.   I guess I already asked you this.  We

3  sort of -- in a way we talked about your

4  background and that you used to do some defense

5  work for but it sounds like primarily now it's

6  plaintiff's work, but have you ever reviewed a

7  nursing home case for a defendant?

8      A.   Who?

9      Q.   To defend a facility?

10     A.   Sure.

11     Q.   Okay.  Do you know how many of those

12 you've done over the years?

13     A.   I would not be able to estimate.  I know

14 that until 2002 it was only defense, and since

15 then I would say until -- I had a contact with

16 one of the insurance companies in New York to

17 defend their nursing homes, so there was a lot of

18 work there.  But then I stopped when the contract

19 ended, I did not renew it and that must have

20 been -- yeah, I really don't know.  Maybe 10

21 years.  And then I didn't have that much

22 thereafter.

23     Q.   Okay.  And I might have misunderstood

24 that your defense work included nursing homes.  I

25 had it in my head that it was mostly physicians

1   and doctors and hospitals.

2       A.   No, that was before, I said that mostly

3   physicians and workers' comp was mostly until

4   sometime in the early 1990s.  And then somebody

5   asked me to do malpractice defense, and I started

6   by doing those one case.  I think it was Florida

7   and then other people asked me so I did more, but

8   as I said, I do remember well that until 2002 I

9   never did anything but defense, and then I met

10  that lawyer who wanted me to do plaintiff, I

11  started doing plaintiff.

12      Q.   And so now it sounds like until the past

13  few years the majority of your work is for the

14  plaintiff?

15      A.   Yes.  Yeah.

16      Q.   Do you know what --

17      A.   Since I cut on the contract it's mostly

18  plaintiff now.

19      Q.   Do you currently have any cases for the

20  defense?

21      A.   Yes.

22      Q.   And are those for nursing homes?

23      A.   I didn't get it.

24      Q.   Are those for nursing homes?

25      A.   I believe, I'm trying to think, one is a

1    nursing home, and one is a home care agency.

2    Those are the couple that are active that -- not

3    that active but that (unintelligible).

4        Q.   So if a defense attorney called you and

5    said, I've got a case for a nursing home, can you

6    take a look?  You're willing to take a look,

7    right?

8        A.   Lately only if somebody that I know.  I

9    don't really want any new work right now.  So if

10   it's somebody I've worked with before, and

11   generally in New York.  Some of the firms in New

12   York I've worked with before and I kind of like

13   them so if they call me I don't say no.

14       Q.   Got it.  So what's your currently kind

15   of the overall percentage between plaintiff and

16   defendant?

17       A.   I'm a 90 to 10 percent.  90 plaintiff,

18   10 defense.  Again, that's really rough because

19   it changes.

20       Q.   That's fine.  Do you know how many times

21   this month you've been deposed?

22       A.   This month I think once or twice, I

23   don't remember.  There was like -- there was a

24   rush of depositions lately, so I think at least

25   one that I recall.  I think one actually, other

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    than this.

2        Q.    Okay.  I understand that rush of

3    depositions, I'm in the same boat.

4        A.    Yeah, exactly.  They're telling me and

5    they want it now because the trials is on their

6    back.

7        Q.    It's because the trials with Covid got

8    pushed out so nobody tried cases until, you know,

9    very, very recently.

10       A.    Right.

11       Q.    And we're getting slammed in to 2022.

12   What about depositions this year overall; do you

13   know how many approximately?

14       A.    I can't tell.  I really don't like to

15   speculate.  Maybe about -- this year was more

16   than usual, so maybe eight and I really -- I

17   don't pay attention to these.  I'm sorry.  I

18   can't tell for sure.

19       Q.    Okay.  On the break the cat snuck into

20   the room with me so she's in here screaming now.

21              I know you just testified at trial last

22   week.  Other than that, how many times have you

23   testified at trial approximately?

24       A.    Approximately five times before.  And

25   that's rough also because I'm not sure if it's

1    four or five.

2        Q.    Okay.  Do you know where those cases

3    were?

4        A.    At least one in Illinois, New Jersey

5    two, maybe it's four, and there's one more.  I

6    can't recall where it was.  Well, maybe three in

7    New Jersey.  They were a long time ago.  The last

8    one before that that I testified somewhere was

9    around 2015 in the court -- I mean in the trial.

10       Q.    Okay.  And I know the case that you

11   testified in last week was a pressure injury

12   case.  Were any of those other ones where you

13   testified at trial, do you recall if they were

14   pressure injury cases?

15       A.    At least one of them I recall was a

16   pressure injury.

17       Q.    Do you know what the outcome of that

18   case was?

19       A.    That's the one where the plaintiff won.

20       Q.    Do you have a company for your legal

21   consulting?

22       A.    I use an LLC for the --

23              THE REPORTER:  I'm sorry, I'm sorry

24   could you repeat that?

25              THE WITNESS:  I use an LLC for the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    income.

2              THE REPORTER:   Thank you.

3    BY MS. MOELLER:

4         Q.    Do you know the name of that company?

5         A.    DimantMed, MD, LLC.

6         Q.    I wanted to ask you quickly about your

7    hourly rate for case review, deposition and

8    trial, if it's different.

9         A.    Hourly rate for you right now is 400.

10   For deposition is 500, and for trial I have no

11   clue because even the trial last week, you know,

12   I did it on Zoom so I -- I won't charge more than

13   a deposition, but normally when years ago when I

14   was doing trials there would be a rate for the

15   whole day, or for half a day, stuff like that,

16   which I think is the standard among people who

17   testify.

18        Q.    Yeah.   I've seen that, but the daily

19   rate for trials, I didn't realize last week that

20   it was by Zoom, but that makes sense.

21        A.    Yeah, when it's by Zoom it doesn't make

22   sense.   I mean, I just would charge the same as

23   for a deposition.

24        Q.    Yeah, you're not having to travel or

25   hang out at KCI for eight hours.

1    A.   Yes, exactly.

2    Q.   You should have double billed Jonathan

3  for that just for having to sit at the airport.

4    A.   I like it.  I mean, I think that's the

5  way to do it because I don't have to lose time

6  from work and I hate airports, certainly given my

7  experience in your place.

8    Q.   Well, if you ever come back hopefully by

9  then it's a new airport.  I hear it'll be better

10  or at least have more than one restaurant.

11    A.   Oh, okay.  I still want to see the

12  Truman Library, so that's one of my dreams.

13    Q.   Oh, yeah, that's a very cool place.

14    A.   Yeah.

15    Q.   Kansas City doesn't have a lot of them.

16    A.   Well, I've seen a few of the other

17  presidents but this one I'm particularly

18  interested in.

19    Q.   Have you spoken with any colleagues or

20  peers about this case?

21    A.   No.

22    Q.   Have you spoken with any of the other

23  experts that were retained in this case?

24    A.   No.

25    Q.   Did you speak with either one of the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   plaintiffs?

2      A.   No.

3      Q.   Have you spoken with any other family

4   members of Geneva Miller?

5      A.   No.

6      Q.   And I would assume, but I have to ask,

7   that you did not speak with Geneva Miller?

8      A.   No.

9      Q.   It sounds silly, but I have to ask.  You

10   never know.

11          Did you ever speak with any of her

12   treating healthcare providers?

13      A.   No.

14      Q.   Have you ever spoken with any staff from

15   Timberlake?

16      A.   No.

17      Q.   Have you spoken with any witnesses in

18   this case or read any witness statements?

19      A.   Any witnesses?

20      Q.   Yeah.

21      A.   No.  No.

22      Q.   Are you going to provide any opinions

23   regarding the policies and procedures in this

24   case, like whether they were adequate or

25   followed?

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1      A.   I don't think so.  Do you mean about the

2   adequacy of policies and procedures or things

3   like that?  No.

4      Q.   Correct.  Yeah.  Did you receive the

5   records for Geneva Miller from Adult Protective

6   Services?

7      A.   I do not recall.  I don't think so.

8      Q.   Were you aware that there were at least

9   one or two hotline calls that were made to Adult

10   Protective Services before she was ever admitted

11   to Timberlake about concerns of suspected neglect

12   by her family?

13           MR. STEELE:  Object to form and

14   foundation.

15      A.   I do not recall.  It's possible, but I

16   do not recall.

17   BY MS. MOELLER:

18      Q.   In the file that I received from you, it

19   lists that you were provided with several

20   transcripts of depositions that were taken in

21   this case; did you review all of those?

22      A.   I did not have the chance to review

23   them.

24      Q.   So I'm just pulling this up to

25   double-check, going back to this third exhibit

1    which lists depositions here. Stephanie

2    Alexander, who is a plaintiff, Melissa Bixler,

3    Mike Catron, I think I said it wrong, the

4    administrator, Cassandra Gould, April Kessinger,

5    Kelly McMullen, Donna Parker who's the director

6    of nursing and Michelle White who's the other

7    plaintiff. You haven't read any of those

8    depositions?

9        A. I did not.

10       Q. Okay. And I think that since this

11    letter there were three additional depositions

12    that have occurred, Carla Hedrick and then two

13    other experts, Kathleen Hill-O'Neill and Valerie

14    Gray. Is it correct that you've not been

15    provided those yet?

16       A. I have not read them. I don't recall

17    being provided or not but no, I did not read

18    them.

19       Q. Why is it that you haven't read those

20    depositions that were sent? You just didn't have

21    time?

22       A. I don't think there was time and also I

23    don't recall that I was asked to do that.

24       Q. Would the testimony that, for example,

25    the plaintiffs gave or the administrator or the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  director of nursing be relevant to your opinions?

2      A.   May or may not be.  I generally don't

3  rely much on depositions.  I like to rely on what

4  I see in the record.

5      Q.   I wanted to move kind of more towards

6  the clinical stuff into your opinions now that

7  we've been going for a while.  We talked a little

8  bit about pressure injuries from the outset and

9  the correct terminology, but I kind of wanted to

10 get into risk factors and how pressure injuries

11 occur.  Do you have an opinion on whether

12 patients or nursing home residents might acquire

13 a pressure injury even when they get appropriate

14 care?

15     A.   Well, there is a definition of CMS.  I

16 go by that definition.

17     Q.   And what is that?

18     A.   Definition, CMS defines avoidable and

19 unavoidable pressure ulcer.  In the definition of

20 CMS, an unavoidable pressure ulcer occurs if a

21 facility gave all the interventions according to

22 standard of care; that is assessment of the risk,

23 their planning of what to do about that risk,

24 implementation of all interventions that are

25 appropriate for that particular patient.

1    According to standard of practice, they use that

2    goal, but it's (unintelligible) the standard of

3    care, and following up on their intervention to

4    see if they goal to making changes in the care

5    plan.  If appropriate if all that is done and the

6    pressure ulcer occurs anyway, then according to

7    CMS the pressure ulcer is -- is considered

8    unavoidable.

9        Q.   And do you have an opinion of what

10   aspects of that CMS definition, if any,

11   Timberlake failed to meet?

12       A.   Several of them, and if you -- if you go

13   over the details, we can go over each one.  There

14   are multiple parts of that definition that

15   Timberlake failed to -- failed to complete, or to

16   do it.

17       Q.   And I missed what you said at the very

18   beginning.  You said something if I would do it,

19   you could tell me which ones they failed to meet?

20       A.   No, if you ask me.  I think when you --

21   when you go over -- I guess when you go over the

22   timeline --

23       Q.   Okay.

24       A.   -- it would be easier to go through each

25   one of those things that were not done.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    Q.    Okay.  So I'll highlight that in my

2    notes.

3    A.    When you get to that, yeah.

4    Q.    Yeah, so I'll put your notes on the

5    screen and we can go through and I will want you

6    to tell me which parts of that definition you

7    think they --

8    A.    Okay.

9    Q.    -- didn't do.  So but it sounds like,

10   you know, following that definition there are

11   scenarios where a pressure injury can be

12   unavoidable?

13   A.    Yes.

14   Q.    Okay.

15   A.    That's correct.

16   Q.    Have you seen that in your clinical

17   practice where a resident develops a pressure

18   ulcer or pressure injury in the absence of

19   negligence?

20   A.    Which was -- I didn't hear the last two

21   words.

22   Q.    In the absence of negligence.

23   A.    Yes, because if you saw on the CV, I was

24   working also as chief of palliative care, which I

25   was doing before at Lutheran Hospital before it

1   was NYU, it's part of the geriatric department.

2   I was offering palliative care, and then later on

3   and later appointed me interim director until

4   they could find somebody when they took over

5   because of my experience.  So what happens in

6   palliative care many times, a patient -- and

7   that's too really both in a hospital or in a

8   nursing home, a patient cannot be turned and

9   repositioned, a patient cannot have appropriate

10  treatment for various reasons such as pain

11  (unintelligible) and in our course of care to

12  just basically keep the person comfortable and

13  die with the least pain and with some dignity, we

14  may not have -- may not be able to provide those

15  interventions.  So when these interventions are

16  not provided, some of those patients did develop

17  pressure injuries.  Some did, some did not.  But

18  only if it was known in advance that certain

19  intervention are not in comport with the course

20  of care of the patient and that interventions

21  like this would cause -- or will cause pain and

22  discomfort.  So then you see another avoidable

23  pressure ulcer.  You also see that sometimes in

24  the ICU, particularly with Covid patients, any

25  movement of the patient would cause the

1   saturation and the oxygen would fall.  Then we

2   did have Covid patients who were not moved and we

3   knew that we cannot move them, or they will die,

4   and some of them did develop pressure ulcers.

5   I've not personally seen that, but that's kind of

6   in the literature and it's known that happened

7   during Covid.

8        Q.   I'd heard about some scenarios like

9   that.

10       My understanding from looking at the

11  records is that Geneva Miller was 89 years old

12  when she was admitted to Timberlake.  Do you have

13  an opinion as to what her life expectancy was?

14       A.   The population life -- I don't have an

15  opinion because I'd have to look at the book that

16  gives the correct number, but she -- to the best

17  of my recollection is about four or five years.

18  But again, don't quote me because I'd have to

19  look at the -- at the CDC table for that

20  particular year to see the exact life expectancy.

21       Q.   And my understanding, I think I know

22  what you're talking about, the life tables, those

23  are just based on averages but they don't

24  necessarily take into account specific health

25  conditions or comorbidities; is that correct?

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1      A.    That's correct.   In other words, these

2   are population measures which are averaged for

3   the entire population and it depends -- generally

4   in the United States, it depends on the country

5   so we do our own in the United States.   It

6   depends of whether you're male or female, and it

7   depends -- in the United States we have separate

8   tables for white, Spanish and black individuals;

9   although, as you get older and older the

10   differences between them become fairly minimal.

11             MR. STEELE:   And just to be clear

12   we're not going to be asking him to opine on that

13   subjects.   Obviously you can ask him whatever you

14   want but he's not going to be offering any

15   opinions on that subject, at least based on any

16   life expectancy table.

17             MS. MOELLER:   Okay.   That's

18   helpful.

19   BY MS. MOELLER:

20      Q.    I only have one more question and I

21   guess I'll just ask it in part because I'm

22   curious.   So those tables at least to my

23   understanding how you've explain sort of they

24   take an average of the population, do you

25   consider Geneva Miller with her diagnoses and

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  comorbidities to be average?

2      A.   Well, there's really no average.  This

3  is not how it's done.  It includes the entire

4  population of people who died in the certain

5  years and then they calculate based on that what

6  is the -- the average is an average of the

7  number, not an average person.  There's no

8  average person, everybody's different.  It can

9  include somebody who's going to die tomorrow from

10 terminal cancer and it includes the person who is

11 now 90 and may die at 108.  So it includes really

12 everyone in that age group that is known to have

13 died in the population compared to the rest of

14 the population, and that's how they come up with

15 the number.  So it's really a population number,

16 it's not -- it cannot be applicable to each

17 person.  Each person has a prognosis according to

18 their conditions.

19     Q.   Okay.  That makes sense.

20         MS. MOELLER:  Can we go off the

21 record for like one minute?

22         (Off-the-record discussion.)

23 BY MS. MOELLER:

24     Q.   So back to Ms. Miller and her admission

25 at Timberlake.  Do you know what the reason for

1    her admission there was?

2        A.    Well, she came from a hospital.  She was

3    hospitalized for a long time and I don't know

4    exactly why.  Then she went in the same hospital

5    but to an inpatient unit, inpatient rehab unit

6    which is actually considered a different

7    hospital.  She was there, and following receiving

8    the rehab she went to (Unintelligible) to be

9    admitted to a long-term care facility because she

10   could not be taken care of at home.  I would

11   assume that was the main reason why she had gone

12   to a nursing home, and I think she was in some

13   facilities prior to that from what I saw in the

14   documents.

15       Q.    Do you have an opinion as to what her

16   ultimate course at Timberlake was going to be?

17       A.    I totally don't understand the question.

18   What does that mean?

19       Q.    Well, when she was admitted whether --

20   you know, if you have any opinion on how long she

21   might have stayed there for her long-term care

22   or, you know, the probability of her condition

23   improving or anything like that.  It might be

24   that you don't.

25       A.    Along these lines, generally an

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    admission for long-term care in a patient who has

2    a permanent condition that renders them disabled,

3    i.e., unable to take care of activities of daily

4    living, generally they don't return home because

5    unless we had meet them for short-term, we expect

6    improvement, so that's subacute.  So if the

7    patient comes in subacute, say following a

8    stroke, following a hospitalization they get --

9    got very good conditioned, then we expect them to

10   go home when they get better, when their

11   condition gets better.

12           In her case I am not sure there was that

13   expectation.  She wasn't acutely most likely

14   because she was deconditioned from being in the

15   hospital so long, so then she qualified for rehab

16   because she had a condition that was reversible.

17   And that was deconditioning from being in the

18   hospital is generally a reverse in the condition;

19   therefore, a patient like that is qualified to do

20   -- get into an inpatient rehab, which is what she

21   did.  When she came in, I do not believe there

22   was an expectation to be able -- to be able to

23   get her better.  And generally what we do in

24   long-term care with rehab is just trying to keep

25   them where they are, to the best we can.  It

1    depends on the condition.  I don't think she had

2    a condition that could have gotten better, but

3    also there was no particular expectation it would

4    get worse.

5        Q.    I want to definitely talk with you a bit

6    about the different diagnoses she had, but you

7    just mentioned that she wasn't necessarily

8    expected to get better, but also not necessarily

9    expected to get worse.  And I saw in her records

10   that she had dementia and that some providers had

11   described that as severe.  Is that not a

12   condition that would get worse with time?

13       A.    Not necessarily, depending on the cause

14   of the dementia and the time -- timeframe for

15   somebody who is 90 with some dementia could be 10

16   years.  So it depends on the type of dementia.

17   And generally dementia in and by itself, other

18   than very specific forms of dementia, takes a

19   long time to deteriorate.

20       Q.    You said --

21       A.    By a long time I mean many years

22   sometimes, or at least years.

23       Q.    And you said it depends on the type of

24   dementia.  Do you know what type of dementia she

25   had?

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1     A.     I don't know because no one figured it

2  out, but the likelihood is that she had vascular

3  dementia, number one, and the reason is that she

4  had contractures.  Contractures are associated

5  with degenerative disorders in the brain that has

6  to do with the vascular system, so we call it

7  vascular dementia.  Vascular dementia doesn't

8  necessarily progress at all unless there are new

9  strokes or new vascular insults of which there is

10  no indication that she had -- she was fairly

11  stable from that concern.

12          At 89 there's also approximately 30 to

13  40 percent chance that on top of this there's

14  also Alzheimer's disease.  And that's simply

15  statistical because there's no way to say whether

16  she did or did not have Alzheimer's disease

17  without a brain biopsy so -- and that wasn't done

18  and we don't usually do that.  But because at

19  that age approximately anywhere from 30, 40

20  percent of the population would have it, there is

21  that possibility.  It's not uncommon to see both

22  at the same time.  Alzheimer's disease may last

23  another 10, 15 years, sometimes depending on the

24  stage of it.  So there was -- whether she had

25  vascular dementia, Alzheimer's disease or a

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   combination thereof, there was no reason for her

2   to deteriorate fast, at least not for a few years

3   probably even exceeding the official life

4   expectancy.

5        Q.   And is that view or opinion that there

6   was no reason for it to deteriorate quickly, does

7   that change based on whether or not her dementia

8   was moderate or severe or basically how far along

9   it had progressed?

10       A.   Not really, no.  Because the dementia is

11  in stages and they're not that easy to discern in

12  a patient that has vascular disease.  So severe

13  may mean different things.  I don't know what

14  they meant by severe.  But most people mean

15  severe is when the cognition is such that a

16  person can no longer communicate, no longer can

17  remember anything, no longer can know who their

18  mother or father or children or sister is, et

19  cetera.  They don't recognize people.  That could

20  be severe in the mind of people.  In taking care

21  of dementia patients, I generally don't use the

22  word severe.  I try to kind of classify what

23  stage it is, if possible, whether or not there is

24  only minor memory loss, a lot of memory loss, a

25  lot of other cognitive domains that are lost.  So

1   just that alone if you have a very severe memory

2   loss, if you want to use severe, I don't use it,

3   but severe cognitive loss, which means you lost a

4   lot of the different function of your cognition.

5   I guess that's what we would call severe.  That

6   doesn't mean that the dementia will progress to a

7   point where they are going to die from it.

8   Almost no one dies from dementia.  They die from

9   all kinds of other diseases that are common in

10  people with dementia, or even without dementia,

11  particularly well in this age.

12      Q.   That all make sense.  I think I really

13  only have one other question for now and you kind

14  of described that, you know, there might be a

15  patient that can't communicate or remember

16  anything and doesn't recognize their family or

17  people, and that some people might call that

18  presentation severe.  Is that presentation, you

19  know, whether you want to call it severe or not,

20  is that still indicative of somebody that can

21  continue to live for years with that state of

22  dementia?

23      A.   Yes, absolutely.  I have a floor full of

24  them, and they are walking around and they live

25  for a very long time.  Because if you don't lose

1    other functions of the body, you can live a very

2    long time with Alzheimer's.  Pure Alzheimer's

3    disease, at the time it only affects your

4    cognition and before it gets so bad it's

5    affecting other neurological functions, they can

6    live for years and years.  And that's what I've

7    seen actually in my patients in the nursing

8    homes.

9    Q.   My grandpa had Alzheimer's and when he

10   finally passed and we cleaned out his house we

11   found seven vacuums.  He couldn't remember how

12   many vacuums he'd bought.

13        I wanted to get to her -- I know you

14   don't call it skin breakdown, but that's what

15   I've referred to it as, or the different pressure

16   injuries that she might have had.  Do you have an

17   opinion on whether she had any pressure injuries

18   or pressure ulcers or wounds at admission to

19   Timberlake?

20   A.   Yes, she did.  If you bring up that

21   timeline, I had it listed.  I believe she had one

22   on the right knee, she was at risk for other

23   parts of the body.  Or if you want I can bring up

24   mine so I can go up and down.

25   Q.   I have it.  Well, I just had to mark it.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    So we're talking about the notes that are the

2    chronology that you prepared and I've marked that

3    as Exhibit 8.

4            (Deposition Exhibit Number 8 was marked

5    for identification.)

6    BY MS. MOELLER:

7        Q.    Hopefully it is on your screen now.

8        A.    Yes, I see it.  Yeah.

9        Q.    So here's where Timberlake starts.

10       A.    Okay.

11       Q.    I don't know if you can see on there

12   what note you're referencing.

13       A.    This is just taken from the -- you know,

14   mostly copied from the chart.  I think that chart

15   allowed copying.

16       Q.    Yeah, I think you're right, it does.  So

17   can you tell me what areas you opine were present

18   on admission?

19       A.    It appears that the only pressure injury

20   was on the right knee upon admission.

21       Q.    Do you have an opinion as to where that

22   skin breakdown first developed?

23       A.    No.

24       Q.    If the hospital records show that it was

25   there, do you have any opinions about the

1  hospital or any criticisms of them?

2      A.   No, I did not review the hospital record

3  with an eye towards documenting -- towards

4  observing or assessing the quality of care.  I

5  just had facts.

6      Q.   So it's possible that if you did look at

7  those records you could find criticisms, but

8  that's just not something you did?

9      A.   I didn't look for any criticism.  I have

10  no opinion, from the hospital.

11      Q.   What are the different risk factors for

12  developing pressure injuries?

13      A.   Okay.  So the main risk factor happens

14  to be immobility, which means if a patient can't

15  move by themselves, there is pressure generated

16  in certain areas of their body, and that's

17  actually the major reason.  A second major reason

18  would be contractures, which is what this

19  particular lady had.  These contractures make a

20  person many times lie on parts of the body that

21  are not usually thought of as areas that would

22  develop pressure injuries, but many times --

23  therefore, many times caregivers, while they may

24  concentrate on areas that are at risk, don't pay

25  attention to areas that normally are at less

1  risk.  But in the patient with contractures, it

2  very high risk because that's what the patient is

3  putting their weight on.  Sometimes it's not that

4  easy to figure out and they really have to make a

5  very good assessment in a patient like that and

6  create a specific care plan to make sure that

7  areas that are vulnerable in that particular

8  patient -- patient are the ones that are

9  assessed.  So those are the major ones.

10        Patients who have malnutrition generally

11 are thought to be at risk, although malnutrition

12 doesn't cause pressure ulcers, is at least

13 considered a risk factor.  Patients who have

14 certain vascular disease in the lower extremities

15 only are more likely to develop pressure ulcers

16 in the low extremities, more likely means they're

17 at higher risk.

18        None of the conditions that any patient

19 may have causes pressure ulcers.  Pressure ulcers

20 are caused by pressure but some -- some

21 conditions make it a higher risk.  But the most

22 important conditions are those that cause the

23 patient to not be able to move by themselves, and

24 our interventions usually address that.

25        Q.   And you referenced in the contrast of

1    contractures that Geneva Miller had contractures.

2    She also had immobility and malnutrition,

3    correct?

4        A.    I'm not totally sure about malnutrition.

5    That appears later on -- it appears at least from

6    a nutrition note at the beginning, which I think

7    I may have in here, that albumin was not that

8    low, number one, it was three and a half.  That

9    she was able to eat, staff was feeding her, that

10   she could even tell which food she likes and

11   doesn't like and she was eating what was given to

12   her.  So patients who eat well don't necessarily

13   have malnutrition.  The fact that people have

14   loss of muscle or loss of weight does not always

15   point to malnutrition.

16       Q.    What would loss of muscle or loss of

17   weight be indicative of besides malnutrition?

18       A.    Loss of weight can occur for three major

19   reasons.  First of all, when you're old you

20   slowly lose muscle as you're getting older.  So a

21   person at 89 is likely to have lost muscle.  We

22   call that sarcopenia.  Sarcopenia means in other

23   language is less muscle basically.  So slow

24   weight loss in older persons is not unusual to

25   begin with.  In some women, in particular also

1  lose calcium for their bones, the bones which,

2  you know, considered with weight might be lighter

3  as well.  It's not unusual for older people to

4  lose weight to a certain degree.  Secondly, older

5  person tend to have cachexia.  Cachexia means

6  preferential loss of muscle, not because somebody

7  doesn't eat, because when somebody doesn't eat,

8  they first lose fat and then muscle.  So cachexia

9  is another condition, and malnutrition is a third

10 condition.  And many people have a combination

11 thereof, but just weight loss may mean that a

12 patient has one or more of those conditions but

13 not necessarily malnutrition.

14      Q.   What about a prior history of pressure

15 ulcers, is that a risk factor for developing

16 them?

17      A.   Yes, it is because it tells you that a

18 patient is vulnerable.  So if they already have a

19 pressure ulcer, it doesn't even matter where, or

20 if there's a history thereof, it's a risk factor

21 in that you know that the patient is more

22 vulnerable and therefore it's a sign for you, for

23 the caregivers, that they must do what's required

24 to prevent pressure ulcers.  So if a patient

25 already has it, that's for sure a risk factor.

1    Q.   I saw in some of Geneva Miller's records

2  that she was noted to have hypopigmented scars to

3  her ischium?

4    A.   I didn't hear the last part.

5    Q.   I saw in some of her records prior to

6  when she was admitted at Timberlake, it said she

7  had hypopigmented scars to her ischium.  And I'm

8  wondering first if you recall seeing that?

9    A.   I believe I did.  What that generally

10 mean in -- in a person of dark skin, any dark

11 skin, not necessarily a black person, but some

12 people with dark skin when they have any problem

13 in the skin, there is -- they lose the pigment in

14 that area.  So it does not mean that there was a

15 pressure ulcer or pressure injury, that could be.

16 It could be, for example, more associated to

17 dermatitis, which is an inflammation of the skin

18 that occurs from moisture or from incontinence.

19 It could be any other unrelated dermatological

20 disease.  If it's in an area that's vulnerable to

21 a pressure ulcer, it makes sense to assume it

22 might be -- might have been a pressure ulcer.

23 But it's not a definitive indication that there

24 was a pressure ulcer; however, the way I used to

25 teach nurses and the aides, if they see

1    hypopigmentation in a -- particularly in a black

2    person or anybody really with dark skin, they

3    should assume that there may have been a pressure

4    ulcer.  Why?  Because you want to make sure it

5    doesn't happen again, take that as a risk factor

6    and do something about it.

7        Q.   And you kind of answered my next

8    question, which is good, about whether it's

9    possible that that was the pressure injury.

10           I also saw in her records from before

11   Timberlake that she had a diagnosis of

12   rhabdomyolysis and I was wondering if you could

13   explain what that is?

14       A.   Rhabdomyolysis means a necrosis of parts

15   of the muscle cells, and that can happen for many

16   things.  Most commonly reason is the use of

17   statin medications, and the -- and another reason

18   could be if you lay on an area for a long period

19   of time without being moved, you get something

20   called a muscle cross signal.  The muscles in

21   that area may become necrotic and you get

22   rhabdomyolysis.  Rhabdomyolysis means simply loss

23   of the muscle.  Rhabdo means the muscle.

24       Q.   Would that, you know, contribute or be a

25   risk factor in terms of developing a pressure

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   injury?

2      A.   Usually they are not.  If you lay on an

3   area for a long time and you get rhabdomyolysis,

4   that may or may not eventually become a pressure

5   ulcer.  And the reason being is that the

6   mechanism for rhabdomyolysis in a patient who

7   lays on the muscle for a long time is the same

8   mechanism that occurs when a pressure ulcer

9   occurs.  The muscles are deformed, the muscle may

10  be deprived of some blood supply and they die.

11  And when they die you, depending on how far they

12  are from the skin, that inflammation will go up

13  and eventually the skin will open.  And it's one

14  of the stages of pressure ulcer, we call that

15  deep tissue injury.  But the mechanism when it

16  occurs is kind of similar to the way

17  rhabdomyolysis occurs, except rhabdomyolysis

18  generally not in a pressure area or normal

19  pressure area, and also in a larger area of the

20  muscle.  And it doesn't usually open up to an

21  ulcer.

22      Q.   Do you have any opinions on anything

23  that Timberlake did right in terms of

24  Ms. Miller's care while she was there?

25      A.   Of what they did right?

1     Q.   I'm sorry, I --

2     A.   So, for example, to begin with she had

3 right knee issue, and when you have an ulcer on

4 the knee that means it comes from the knees

5 rubbing against each other and causing pressure

6 on the tissue, and then you get what we call a

7 kissing ulcer, an ulcer on both sides or on one

8 side.  Eventually a few days after admission she

9 also got the left knee pressure ulcer, presumably

10 from this type of pressure and at that point they

11 actually did the right thing, which the right

12 thing is to put a pillow in between.  So the care

13 plan they did for that, for the right knee

14 actually, but it was really also for the left

15 knee, they did a care plan where they said she

16 should have -- she should have a pillow in

17 between.  And in fact eventually both of them

18 healed, which probably just from preventing the

19 pressure there was no reason they shouldn't heal,

20 and they did.

21     Q.   Is there anything else that you saw that

22 you thought that they did properly?

23     A.   The only other thing I think was -- I

24 found is that when she finally developed a

25 pressure ulcer on the right buttock, they asked

1    for a low air loss mattress.  I don't know if it

2    was given or not.  I assume it did, but that --

3    that was the right thing to do.  The criticism

4    related to that is that she needed the low air

5    loss mattress from day one because of her

6    extremely high risk and because of her

7    contractures.  So that was done wrong, because

8    that was actually one of the causes for pressure

9    -- for development of a pressure injury.  But

10   when the pressure injury developed, it was

11   certainly appropriate at that point to give her a

12   low loss air mattress.

13       Q.   So it's your opinion that she did not

14   have a low air loss mattress from the date of

15   admission?

16       A.   That's correct.  Anybody with this much

17   contractures, which means that there -- there's a

18   risk for pressure ulcers on, number one, unusual

19   areas of the body.  Number one multiple area of

20   the body that you don't even think of usually,

21   such as the knees, for example.  And also the

22   areas that she had from simply not being mobile

23   and having incontinence.  All those are risk

24   factors for pressure ulcer.  The risk was high

25   enough for her to require a low air loss

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  mattress.

2      Q.   Do you know when that low air loss

3  mattress was placed?

4      A.   If you go down I think 2-19.  That was

5  an order.  Right there.  It should be on that

6  page.  So I believe that here, I see a care plan

7  on 2-19, which shows that she was receiving a low

8  air loss -- that that was the care plan.  Again,

9  I didn't see it was provided, but I would assume

10  it was.

11     Q.   So I'm about to ask you more generally

12  and get into the specifics of your opinions, but

13  is it -- I don't want to assume things.  Are you

14  providing a standard of care opinion about the

15  placement of this low air loss mattress?

16     A.    I provide that with respect to the first

17  part, which is the development of the pressure

18  ulcer, prior to 2-19.  There were many deviations

19  there from standards of care, but one of the

20  deviations was the failure to provide the low air

21  loss mattress upon admission, immediately upon

22  admission.

23     Q.   All right.  So in this case you've been

24  designated to provide opinions as to standard of

25  care, causation, and damages.  So I want to start

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  with the standard of care and learn the ways in

2  which you believed Timberlake violated the

3  standard of care.  And I'm not sure if it's

4  easiest for you to go through your notes here or

5  for you to just start telling me the ways in

6  which you think they violated the standard of

7  care.

8       A.   Okay.  The notes are not that helpful in

9  the first section, but I can kind of give you a

10  general -- a general way we look at this.  We

11  look at the process of care that's required, and

12  how the process of care was violated.

13          So the process of care for at least for

14  pressure ulcers start with the risk assessment.

15  So a risk assessment actually was done, they had

16  the Braden score.  It showed 12.  12 is a very

17  high risk.  And also generally there is a more --

18  it's better to have also in a care plan that also

19  discusses or at least lists the risk factors

20  because the requirement for a care plan is that

21  it addresses each and every risk factor that

22  patient has.  Such a list was not compiled.  So

23  while there was a Braden score, there was a

24  failure to do what we call a comprehensive risk

25  assessment, which is essentially to make it

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    simpler for you creating a list of all the risk

2    factors, and then adding a care plan that

3    addresses each one of them.  Because the care

4    plan has to be individualized, so that's the

5    first thing.

6            Second, you have a care plan.  So upon

7    admission, immediately upon admission, that means

8    minutes after admission because that's a high

9    risk time for a resident.  A facility needs to

10   make what we call -- to prepare what's called an

11   interim care plan that addresses the most obvious

12   and important risks so they can implement some

13   intervention immediately.  That's as they walk in

14   the door.

15           Then of course they need time for a more

16   comprehensive assessment, and the regulations

17   give them a certain amount of time to prepare

18   another care plan, which is what we would call a

19   comprehensive care plan.  But while you are doing

20   that, you really want to address the risks.  So I

21   didn't see any care plan whatsoever as I state

22   here because I looked for it.  There are care

23   plans, but there was no comprehensive or interim

24   care plan for prevention of pressure ulcers.

25   That is a very serious violation because that

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    care plan should have listed all the risk factors

2    that could have been assessed upon admission, or

3    that were known from transfer notes from wherever

4    the patient comes from, and then you have to

5    implement them immediately.

6            So in her case the first thing I already

7    mentioned, you need a low air loss mattress

8    because of her contractures and because of her

9    very high risk.  To me a Braden score of 12 is

10   enough to give a low air loss mattress, barring

11   none else.

12           Then you have to implement other

13   interventions.  So what are the other

14   interventions?  In her case she needed a specific

15   individualized care plan to address removing

16   pressure or relieving pressure as much as

17   possible, not just from the normal areas.  They

18   say turning and repositioning every two hours.

19   Assuming that they have done that, which they

20   didn't.  That's like the basic.  The basic

21   standard of care is turning and repositioning at

22   least every two hours.  Why at least?  Because

23   many patients need a lot more than that.  So at

24   least means that's the minimum, or the maximum

25   depending how you look at it.  But it's a minimum

1  that is required; however, in the -- in the

2  hospital where she was before at the rehab

3  center, it was noted that she was turned and

4  repositioned every one hour, which means that

5  they have assessed the risk and decided at least

6  every two hours.  In her case it means at least

7  every hour because that's what she needed.

8  Again, be -- and then the care plan has to do

9  with that.

10        So you figure about the timing, then you

11  have to figure out how to reposition the patient.

12  When you have a patient with -- with

13  contractures, they lay in a different way in bed

14  that a person who doesn't have them lays in bed.

15  So you don't just turn them on their sides and

16  their back, you have to turn them away from the

17  area that's the most vulnerable, and that

18  requires a very good assessment.  There was zero

19  of that.  No one did that despite her

20  contractures that they knew about.  And nobody

21  could look at her, you know, and told me there's

22  not much knowledge required to look at the person

23  like this and say she needs a specific care plan

24  to address that.  You have to have specific

25  wedges or pillows that you use in order to make

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   sure that she doesn't move around to another

2   position while she's being placed in a certain

3   position.  You need to do these things in not

4   only more frequently but also you do what we call

5   partial turns because she's at such risk that you

6   don't want to have pressure in one area for too

7   long.  So sometimes we do -- again, depending on

8   the level of risk what we call quarter turns,

9   partial turns, weight shifts.  Different facility

10  uses different names, but I saw none of that.  So

11  basically there was absolutely no care plan.

12          Then you have to make sure that there's

13  no maceration of the skin.  So when a patient has

14  incontinence, there's skin maceration.  Skin

15  maceration can cause inflammation of the skin is

16  what we call moisture associated dermatitis.  And

17  also it is now known that having wet skin

18  decreases the amount of pressure that's needed to

19  cause pressure injury.  Really important.  So you

20  must keep her dry.

21          And then you have to keep away the

22  stool.  If a patient has bowel incontinence,

23  which she did, you have to make sure that you

24  have a plan to keep that stool away from the

25  skin.  We talk later about the pressure ulcer

1   present, but at that time she didn't, so she

2   needed just make sure of the skin.  Usually you

3   do that by deciding how often you are going to

4   look at her diaper to make sure, because you

5   don't wait for your smell to work.  You want to

6   make sure that somebody checks her.  Again, the

7   minimum there happens to be about every two hours

8   and then you can change that according to how

9   frequently she has a bowel movement or how

10   frequently she urinates.  So again, there was

11   nothing like that, which I call diversion of

12   stool from the skin, a diversion away from the

13   skin to the extent possible because those things

14   also cause risk factors for the development of

15   the pressure injury to the area.

16         So there was basically no care plan.  No

17   interventions whatsoever that were provided,

18   other than protecting the knees, and also the

19   intervention to protect the heels that were in

20   there, but for some reason there was no term of

21   reposition for her.  That has to be consistent,

22   that means all the time, and has to have all the

23   other characteristics that I just described.

24      Q.   Okay.  I guess I have a couple few

25   follow-up questions.  I guess we'll start with

1   what you last said, that there was no turning and

2   repositioning program.  How is it that you

3   concluded that they didn't have that in place?

4       A.   Did you see any documentation showing?

5   I didn't see a care plan.  It showed no care

6   plan.  Care plan is the whole map for the nurses

7   to do what they're supposed to do.  If there's no

8   care plan, you can't do it.  That's -- that's

9   obvious.  That's why care plans are required by

10  regulations, and the regulations require care

11  plans because studies before that had shown that

12  before they implemented those things that nurses

13  weren't doing any interventions unless they had

14  some road map for it.  So the whole idea of

15  assessment and care plan, which is what the MDS

16  is all about, was that you have to give the

17  nursing staff a road map and other -- other

18  professionals, I'm talking about aides, too.

19  That's their road map.  This is what this patient

20  needs.  An aide cannot decide on their own what

21  to do.  A nurse can decide on their own each time

22  when she sees the patient, but she's not there

23  all the time.  Nursing change and you can't have

24  each nurse deciding for what needs to be done, so

25  the preparation of a care plan is exceedingly

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   crucial to make sure that interventions that are

2   appropriate for that patient that are created not

3   by one person, by a group of professionals.  It

4   has to be interdisciplinary and there's a lot of

5   different expertise in the nursing home that can

6   contribute.  And the lack of a care plan is an

7   extremely serious violation.  Not just of

8   regulations, but of standards of care.  That's

9   what you need.

10      Q.   And I understand what you're saying.

11  Hypothetically I -- like I said, I understand

12  what you're saying about the care plan.  But what

13  about the interplay with physician orders, aren't

14  those something that's there telling these nurses

15  and aides what to do in terms of caring for the

16  residents and implementing interventions and

17  treatments?

18      A.   Okay.  So physicians in general are not

19  involved in the care of -- in preventative care.

20  This is none of what I described before, none,

21  zero meets any physician orders.  You sometimes

22  see physician orders if facilities feel that

23  either the nurses won't do it otherwise, or if

24  they want accountability because they want it in

25  the (unintelligible) and not back in their own

1  documentation.  But none of it is required to be

2  done by a physician.  All of these interventions,

3  are nursing interventions have to be put in place

4  immediately upon admission, and there's no need

5  for any of them to get a physician order.  A

6  physician has the choice to do it and I must say

7  that I've seen physician orders and things like

8  that when the physician realizes it's not being

9  done and he or she could force it to be done.  So

10  there's no interaction with the physician at all.

11        The physician may or may not know

12  anything about pressure ulcers, many of them

13  don't.  And that's part of my job by the way is

14  to teach the future geriatricians of this country

15  exactly what this is all about, and asking them

16  to get a lot more involved and supervise.  I'm

17  not telling them they have to do it, but

18  everything I just told you is part of what I

19  teach them when I give them seminars on pressure

20  injuries that they should at least know about and

21  make sure it's done.  Because that will just be

22  another step to see that the quality is -- but

23  nonetheless all of this should be done by nurses.

24  Nothing to do with the physician.

25        Q.   And as to the turning and repositioning,

1   you said that -- I don't remember exactly what
2   you said.  You said there was no turning and
3   reposition program.  So I'm wondering in your
4   opinion what is required in terms of having a
5   turning and repositioning program and doing it,
6   whether it's documented on a repositioning
7   roster, or whether a standing policy that all
8   residents are returned and repositioned.  What's
9   required?
10      A.   Okay.  So they -- what's required by
11  CMS, particularly if you mark that X on M-1200C
12  in the MDS is that you have a care plan setting
13  forth exactly what needs to be done.  Again,
14  going along the lines that I mentioned before,
15  and at least the minimum of regular turning and
16  repositioning every two hours, at least every two
17  hours, and more if necessary.  That is required.
18          Two, it's required they document that in
19  some way that it's done consistently.  If you
20  don't do it and you go with an X on M-1200C, then
21  you sign under penalty of perjury, federal, that
22  you do something that you did not do.  That is a
23  problem.  So these are the minimal requirements.
24  I'm not saying that it's all the requirements.
25  Standard of cares many times exceed the minimum

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1　requirements, but remember MDS means minimum data

2　set.  Minimum is not what I want for my mother

3　when she's in the nursing home.

4　　　　The minimum was established because the

5　federal government had realized at certain times

6　in the past that even the minimum is not being

7　given.  The same goes, this is the minimum that

8　you have to do.

9　　　　And I must say that this facility did

10　not even do the minimum required, and on top of

11　it they put in an X in a place in the MDS which

12　they shouldn't have because they didn't have any

13　basis to do that in the regulation, and therefore

14　they told the government they do something that

15　they did not.

16　　Q.　What about like a standing policy for

17　turning and repositioning if they've got a

18　policy?

19　　A.　Okay.  So everybody uses that as a

20　defense.  It's not a defense.  First of all, not

21　everyone needs a turning and repositioning.

22　There are people who are independently moving,

23　there's no reason to turn and reposition, then

24　they can do it by themselves.  You might want to

25　supervise them in doing it.  So telling me that

1   there's a policy to turn and reposition everyone
2   is nonsense.
3           Secondly, a policy on a piece of paper
4   in a book doesn't mean that things are done.  As
5   I said, the process of care is the standard of
6   care.  The process of care you make a care plan,
7   and in the care plan you will say what
8   interventions are.  In the case of this lady,
9   there was nothing you can do in a policy that
10  would be more appropriate for her.  I was going
11  to say generally repositioning at least every two
12  hours.  What does that mean?  At least means that
13  you have to assess.  How much?  Two hours?  An
14  hour and a half?  One hour?  And we know well
15  that prior providers already determined that she
16  needs every one hour.  How do you put that in the
17  a policy?  A policy can say you shall assess the
18  patient.  It doesn't say you should turn and
19  reposition everyone, because how do you know how
20  often you need it to begin with?
21          Secondly, I mentioned and I'll repeat
22  that, that she needed a very specific plan for
23  turning and repositioning because of her
24  contractures.  That was certainly required
25  because the expectation in a patient like that is

1   that if they develop a pressure ulcer in an

2   unusual place.  So you want to make sure you

3   protect that unusual place.  And how do you know

4   what it's going to be if you don't assess where

5   that place is.

6           So saying there's a policy that

7   everybody should be turned and repositioned, does

8   not protect you because it's not the standard of

9   care.  You can write what you want in the policy.

10  You can't write everything about every patient in

11  the policy.

12  Q.   I should have asked earlier and I

13  didn't, and it just occurred to me.  We've

14  already sort of referenced that Ms. Miller had

15  multiple areas of skin breakdown or pressure

16  injuries or wounds, whatever you want to

17  characterize them as.  Do your opinions that the

18  standard of care was breached apply to all wounds

19  that she had or are you focussing on a certain

20  one?

21  A.   I'm focussing particularly on the

22  question I feel of the right buttock.  And again,

23  talking about occurrence, occurrence of the

24  pressure ulcer on 2-19.  February 19th she

25  developed a pressure ulcer, so the focus of what

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    I'm saying is, what is the causation of pressure

2    ulcer and whether it was caused because of a

3    serious breach of the standards of care, and

4    that's what I'm saying.

5         A, there was a serious breach of the

6    standards of care as I described in detail, and

7    there was even more than that, but those were the

8    major issues.  And plus, I also mentioned there

9    was no plan or protection from urine and stool.

10    But all that was the deviation.

11         The deviation caused specifically Mrs.

12    -- gee, I forget her name already because there

13    are two names there, caused her to have pressure

14    on an area of the skin.  So my opinion that a

15    pressure injury, meaning something that occurred

16    due to pressure that was unrelieved and could

17    have been relieved, had occurred on or about

18    2-19, probably a little bit earlier than 2-19.

19         And that also I have an opinion that

20    only wasn't -- was that a pressure ulcer, but

21    also my opinion is that it was an avoidable

22    pressure ulcer.  A, because she didn't have any

23    condition that could have in and by itself caused

24    the pressure ulcer; and B, because she meets the

25    CMS definition.  She did not get practically any

1   interventions appropriate for her, according to

2   the standard of practice to prevent the

3   occurrence of the pressure ulcer, therefore it

4   developed. So that's the sum and substance of my

5   opinion -- opinions with respect to the causation

6   of the development of a pressure ulcer on the

7   right buttock.

8               THE REPORTER: Elizabeth, when you

9   get to another breaking point I could certainly

10   use one.

11               MS. MOELLER: Yeah, we can go ahead

12   and take one right now.

13             (Recess taken at 1:32 p.m.)

14            (Back on the record at 1:40 p.m.)

15   BY MS. MOELLER:

16     Q. All right. Dr. Dimant, we're back on

17   the record after another break. We were in the

18   middle of going through your standard of care

19   opinions against Timberlake. And one thing I

20   wanted to follow up or follow back to is you had

21   talked about protection from urine or stool and

22   that the facility didn't do that. And I'm

23   wondering what the basis of your opinion on that

24   is.

25     A. I haven't seen any specific plan. As I

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  said, with respect to stooling in particular,

2  that is the more costly problem.  There has to be

3  what we call a check and change program, which

4  means you check the diapers every so often and

5  then you replace it if it's soiled or it's wet.

6  And the reason for that is that we never know

7  when these things happen.  What happens generally

8  at facility after a fairly long time, when the

9  aides get used to a patient like that, they

10  figure out a patient who has incontinence, they

11  figure out the type of incontinence.  For

12  example, is it a constant leak or does it happen

13  from time to time?  Is it diarrhea or is it

14  formed stool?  And then they also figure out,

15  could aides do that after a while, they kind of

16  figure out the patients and when they are going

17  to have to go to the bathroom, because every

18  patient have their own clock, so to speak.  And

19  what happens they then know, for -- to do

20  preventative care that is, take the patient to

21  the toilet when they expect to go.  For example,

22  many times it's after a meal.  A meal may cause

23  somebody to have to go to the bathroom, so the

24  aides know that, and if they know that patient is

25  -- is what happened to her or him then they take

1   them to the bathrooms.  That's a preventative

2   kind of thing.  They don't want any soiled diaper

3   at any time obviously, particularly

4   (unintelligible).  And those that are in diapers

5   all the time, they kind of develop sense what's

6   their schedule, so they may change it from every

7   two hours to less often; however, when you don't

8   know when a patient comes in, standard of care

9   calls for check and changing a patient like that

10  at least every two hours.  Sometimes more if they

11  have a constant leak.  If they really they're not

12  having very frequent bowel movements, you might

13  do it more often but that's why it's again the

14  same kind of thing with turning and repositioning

15  at least every two hours.

16          And you have to have a care plan for

17  that and you have to document that that's done,

18  and I didn't see any evidence that such a program

19  or schedule if you want was actually implemented

20  and given.

21      Q.   In terms of documenting that that's done

22  besides the care plan, is that something you

23  expect to see in nursing notes or on the MARs or

24  the TARs, or where are you looking?

25      A.   No, it's not something they put on the

1   MARs and TARs because it's almost never a doctors

2   order.  Very occasionally a doctor will get

3   upset, it's not done and then they order it.

4   Then they have to put it on the MAR or TAR, but

5   in general you might find it.  In some facilities

6   they use the -- what they call documentation

7   survey.  I don't know if you are familiar with

8   that term?

9       Q.   Yeah.

10      A.   Which is where you -- the purpose of

11  that is to document the frequency of ADL care,

12  like duties of daily living care, which has to do

13  with the payment mechanism, or at least the

14  formal payment mechanism.  It was changed a

15  little bit a couple years back.  Where the

16  (unintelligible) of the payment had to do with

17  how much care the aides had to give the patient,

18  how much ADL care.  So normally facilities have

19  used only those things that are required by the

20  MDS because that's reported to CMS and part of

21  the payment has to do with it.  And they had to

22  have documentation for the government to come and

23  review and see that it was done.

24          Now, many facilities now have

25  incorporated things like turning and

1    repositioning, toileting schedules, which is what

2    we are talking about, into those.  Again, it's

3    not required by regulation but if you want to

4    show that you've done it, you have to have some

5    form of accountability.  So in some facilities

6    they ask the nurses to attest every -- every

7    shift.  For example, yes, my aides did that

8    during the shift.  In some facilities which have

9    point of care, they can click -- the aides can

10   click each time they do something, then it goes

11   in the computer so you can document every time.

12          It would be hard to ask an aide to go

13   write down each two hours that she did X or Y,

14   but many of us have now this little clicker that

15   they keep in their pocket and they can just click

16   each time they did, whatever they did.  So that

17   works very well because for this regulation which

18   says if you didn't document, you're not going to

19   get paid.  But also it tells you that there's

20   some accountability for the nursing leadership to

21   say, Hey, this was actually -- we know it was

22   done for the patient.  So I didn't see anything

23   like that there.

24        Q.   And you kind of touched on, I think you

25   said if you didn't document it, you don't get

1  paid but it kind of touches on the old phrase if

2  it wasn't documented, it didn't happen.  What's

3  your stance on that adage?

4      A.   My stance is if it is not documented, it

5  doesn't happen and that's what I tell my nurses

6  in the hospital, too.  You know, it's part of the

7  professional -- excuse me, I need to see if it's

8  the hospital.  Can you hold on?  This is my

9  fellow, I need to answer and see what he needs.

10              MS. MOELLER:  Of course.  Let's go

11  off the record.

12          (Off-the-record discussion.)

13              THE REPORTER:  We're back.

14  BY MS. MOELLER:

15      Q.   You were talking about that you do agree

16  with the if it wasn't documented it didn't happen

17  phrase.

18      A.   Yes.  I feel that it's -- you know, we

19  require professionalism from our nurses and part

20  of the professionalism is document what you have

21  done.  And this is a frequent questioning in

22  depositions, Oh, it doesn't matter what's on the

23  paper, it matters what they did for the patient.

24  That's utter nonsense.  And the reason is, the

25  reason we document is that that's how we

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   communicate with other people in the team.  Yes,

2   we do at meetings, we have others, we have this,

3   we have that, but the most important thing is if

4   I come to see a patient -- and it doesn't matter

5   what's my profession.  I could be an aide or I

6   could be the chief of medicine.  It doesn't

7   matter.  I want to be able to go in the chart and

8   see what's going on with the patient.  And when I

9   don't see that, I get very upset because now you

10   are compromising the patient's safety.  So you

11   are required to document what you do so people

12   who come later on know.  It's not enough to say,

13   I kept the patient dry and clean.  Many times

14   nurses are told the old school just like that and

15   everything will be fine.  It's not fine.  You've

16   got to have a system.  Whatever the system for a

17   facility, and I'm not fighting with any specific

18   system, if they say, You Mrs. Nurse, please

19   document at the end of your shift that you attest

20   in effect that your aides did this, this, this,

21   and that during the shift, that might be

22   sufficient.  It's not sufficient in nursing homes

23   generally, not what's being done because payment

24   is not related.

25         In a nursing home when CMS used to do --

1   used to do all these, that's what they wanted to

2   see.  They came by and they said, You know what,

3   we're reducing your pay by $2 million for the

4   last time because in one percent of the cases I

5   found that you didn't document.

6          And by the way that has document codes

7   -- it's called sampling, so -- statistical

8   sampling.  So now facilities realize that they

9   have to do it.  That's why you are seeing all

10  those -- you know, the CMS has the stand, very

11  simple:  You didn't document it, you didn't do

12  it.  You didn't do it, I'm not paying.  So if

13  that's CMS stance, that is my stance.

14         The reason for CMS, obviously part of it

15  was money but I'm participating with those

16  committees and the CMS and there's real genuine

17  concern about the care, the quality of care.  And

18  the quality of care cannot be appropriate if you

19  don't document appropriately.

20  Q.   I understand what you're saying and I

21  think everyone would agree that documenting

22  patient care that's given is important.  Is the

23  whole adage of if it's not documented, it didn't

24  happen?  Obviously that's a best practice, but in

25  terms of the reality wouldn't you agree that at

1   some point nurses and CNAs can't document every

2   single thing that they do?

3       A.    Then management is responsible to get

4   them the appropriate technology.  The technology

5   exists and it's very good.  And it so happens I

6   was one of the people that was asked to assist in

7   developing that technology, which is the EMF for

8   nursing homes.  I was one recipient part of 25

9   facilities that received the grant in the mid 90s

10  from the State of New York to develop exactly

11  what you see in all those charts.  So it's there.

12  And CMS already had that where I participate in

13  another experiment when they asked my nurses to

14  have this ones, now they are little things, now

15  it's in their cell phones, and to document

16  everything they do.  And it's not that hard.

17          Aides and nurses can do it, we call it

18  point of care.  They can do it easily.  It's a

19  lot easier for them, they sit there at the end of

20  the -- of the shift in front of a computer and

21  spend half an hour documenting putting Xs in

22  pieces of paper.  That's not today's technology,

23  that's not patient safety.  You have to have a

24  computerized system.  Anybody who doesn't should

25  not be in the business of patient care today.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   And the technology's there to document those

2   things at point of care.  It's easy.  It's not a

3   problem.  Maybe they don't want to spend the

4   money on it.  It's not cheap.

5       Q.   I wanted to loop back to where we were

6   talking about the right buttock wound.  I think

7   that's the one that you --

8       A.   I can't hear you, there was outside

9   noise.  That was not your fault this time.

10      Q.   Oh, good.  Redemption for me.

11          We were talking about I believe the

12  right buttock wound that you had referenced and

13  you said that your opinions focused primarily on

14  that wound.  And you had noted in your testimony

15  and both on your notes that we have that that was

16  documented on February 19th, I believe.  And you

17  said had something to the effect if it was

18  documented on the 19th and it might have started

19  a few days before that, so I wanted to ask you in

20  your experience as a doctor, and now an expert in

21  this case, how long would it take for a wound

22  like that to form?

23      A.   It's not a question of a matter of how

24  long it takes because that varies.  The formation

25  of the wound occurs when there is unrelenting

1   pressure on underlying tissues, and that causes

2   -- eventually because of compression of the

3   tissues and probably to a certain extent lack of

4   supply when blood vessels are compressed, they

5   cause necrosis, which is death of the tissue.

6   That eventually opens up towards the skin because

7   when you have inflammation from that, there's

8   increased pressure inside the tissue and then it

9   opens up.  So this process is very, very -- it

10  can take 24 to 48 hours to actually -- but that

11  part of it is not something you can see.  You can

12  see when it becomes a deep tissue injury, which

13  is the -- there is evidence of inflammation under

14  the skin, but the skin still didn't open.  That

15  skin can open anywhere between generally,

16  particularly that area of the body, a day or two.

17  But sometimes it's instant.  So I can't base an

18  opinion based on the process of wound

19  development, what I'm -- what I base that opinion

20  on is that the fact that find granulation tissue

21  in the wound at a time it was discovered.

22          So granulation tissue is a sign of a

23  healing tissue.  It's basically from a part of a

24  physiological point of view, the position of a

25  material called collagen inside the wound and

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  when it's being deposited there to -- which is

2  part of the healing process, we call it a

3  granulation tissue.

4       So that tells you two things:  Number

5  one, it was already a full thickness ulcer, which

6  means at least three or four -- a stage three or

7  four; and two, it was at least there a day or two

8  because that's what it takes for a granulation

9  tissue to develop.  It wasn't -- again, it wasn't

10  based on how long I think it took the pressure

11  ulcer to develop because that's why it varied and

12  there's no total agreement in the medical

13  literature.  But there is an agreement that it

14  takes time for granulation tissue to develop.

15  Q.   Okay.  I think I understand what you're

16  saying but I want to make sure.  The deep tissue

17  injury, as it's always been explained to me and I

18  think you touched on, it forms from the inside

19  out, it's underneath the surface.  And how long

20  it takes from when it starts underneath the

21  surface to when it fully opens might vary, but

22  the opening would usually take a day or two; is

23  that right?

24  A.   If it opens, yes.  Sometimes it doesn't

25  open.  If you see a DTI, or a deep tissue injury,

1  or DTPI, deep tissue pressure injury, and you

2  catch it early enough to remove the pressure from

3  the area, it might not ever open.  And that's

4  better because there's no way for bacteria to get

5  in and eventually it will heal from the inside.

6  But most of them unfortunately open up,

7  particularly in areas of the body where the

8  injury is fairly close to the skin.  It will

9  quickly open up, so then it becomes an ulcer,

10 because an ulcer is defined as an open area.

11      Q.   But as to how long things might be

12 brewing beneath the surface, it varies; is that

13 right?

14      A.   It varies.  I don't think I can answer

15 this question because there's really no agreement

16 in the part of the physiological literature about

17 it.

18      Q.   Is there a range that's been discussed?

19      A.   Not really.  I mean, I would say it's

20 more on speculation.  I don't think there's a

21 very good way.  You can -- you can do human

22 experimentation on that obviously.

23      Q.   Okay.

24      A.   So experimentation I have -- we have is

25 on rats and animals.  Animals have very different

1  skin structure, very different tolerance.  I

2  don't think we can carry any of the -- we can see

3  the process in a dog or a cat or a rat or

4  whatever they use, hopefully not dogs, that's my

5  favorite.  I know yours is cats, so hopefully not

6  cats.

7      Q.   I love cats.

8      A.   But I'm not sure, you seem like to be a

9  cat lover and I'm a dog lover.  So obviously if I

10  see any experimentation on those animals I get

11  upset.  But in certain countries which shall

12  remain unnamed, unfortunately that's what they

13  use and I don't like that.  But it's very hard to

14  deduct from what you see in animals to the human

15  tissue so -- and we cannot do this on humans.  So

16  whenever I subject somebody to pressure to see

17  what happens, so it's unethical.  I'll vote

18  against it in my ethics committee.

19      Q.   No, I definitely can understand that.  I

20  just wasn't sure if there was any sort of range,

21  and like I said I know you said there's really no

22  consensus and that makes sense.  You can't see

23  it, same with like Alzheimer's.

24      A.   And you can have Alzheimer's for 10

25  years and you can't see it, but you can have some

1  symptoms so, I mean, you -- medicine is still

2  limited.

3      Q.   Yeah.  I wanted to move back because

4  we've been talking about your standard of care

5  opinions, and earlier in this deposition you had

6  referenced the CMS definition as to avoidable and

7  unavoidable and you told me to loop back and we

8  would go through that definition and you would

9  tell me which parts of it you felt that

10 Timberlake violated.

11     A.   If you want I can bring that up.  I

12 don't remember the text word for word.  But do

13 you have that available?

14     Q.   I don't have the text but I have what I

15 wrote down.

16     A.   I'll have it pretty quickly.  Let me

17 see.  I think I know where I have it, hold on and

18 I'll bring that up.  Okay.  So this is from the

19 F-686 which is something that came into effect on

20 November 28, '17, and the citation for is CFR 42,

21 Number 483, 25 B -- or B-1 actually, B-1.  And it

22 talks about pressure ulcer and in there in the

23 instructions for surveyors, here's what they say

24 "Avoid the bill means that the resident developed

25 the pressure ulcer/injury," interestingly they

1   use the same wording I do, and that the facility

2   did not do, did not do one or more of the

3   following:  Number 1, evaluate the resident

4   clinical condition and risk factors.  We

5   mentioned that.  Number 2, define and implement

6   interventions that are consistent with the

7   resident needs, goals and professional standards

8   of practice.  So this is the care plan.  And

9   already we talked about resident goals with

10  respect to these when you say patient goal is to

11  die with no pain and dignity and therefore I

12  don't care, I'm not going to give him

13  intervention that may make him feel bad or make

14  him have pain.  So that's where the resident

15  goals come in.  The third piece is monitor and

16  evaluate the impact of the interventions.  Well,

17  here they couldn't do that because they didn't

18  give any interventions.  And revise the

19  interventions as appropriate.  So that's kind of

20  the cycle and if any of this was not done, then

21  it's avoidable.  Pretty much when it's

22  unavoidable it's the same thing in the reverse.

23  That's the next paragraph.

24      Q.   And so I don't want to impugn opinions

25  but it sounds like as to these four factors I

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  guess, your opinion is that Timberlake didn't do

2  any of those?

3      A.   That's correct.  I mean, they did not

4  evaluate, completely evaluate the risk factor.  I

5  said they did some, they did a Braden score but

6  they didn't really give -- make a listing so to

7  speak or assessment of all the risk factors.

8           Why is that important?  So you can

9  create an appropriate care plan according to

10  those.  Secondly, they did not have a care plan.

11  Thirdly, they didn't give the interventions so

12  certainly they could not evaluate them and revise

13  them.  So that's really what -- so none of what

14  they say in the definition is done.  But that's

15  really always been my definition, CMS or not.

16  I've always used that as a definition, because if

17  you do everything for the patient that is

18  required by standards and they still develop a

19  pressure ulcer, I told you I agreed, then it's

20  unavoidable.  But that wasn't the case here.

21      Q.   Do you have an opinion as to whether if

22  they had done all this her wound would have

23  gotten better or if it still would have --

24      A.   Well, I'm talking about the -- first of

25  all the development.  Getting better is a

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    different story.  I believe that if they have

2    done all that she would not have developed a

3    pressure ulcer in -- in the right buttock.  And

4    that is fairly clear because remember she was in

5    another facility before and she was in the

6    hospital for 45 days, and she did not develop a

7    pressure ulcer which stands to reason they have

8    done the right things.

9        Q.   In talking about the CMS definition you

10   referenced the factor about monitoring and

11   evaluating the impact and interventions, and you

12   referenced what I wrote down was they couldn't do

13   that because they didn't give any interventions.

14   So I wanted to know what interventions you think

15   should have been in place that weren't.

16       A.   I think I really as they say in your

17   language, asked and answered.

18       Q.   I know.

19       A.   But to summarize I said there was no

20   appropriate pressure redistribution device,

21   that's a fancy name for a mattress, even when

22   it's in bed, and that should have been a low air

23   loss mattress.  Two, there was no appropriate

24   turning and repositioning individualized for her

25   and I already gave you all the details.  I don't

1  think we need to repeat that.  And three, there
2  was no attempt to have a consistent program of
3  schedule to make sure that there's no wetness of
4  urine and there's no stool contamination at this
5  point the skin.  I'm not talking about the
6  (unintelligible).  Those are the major things
7  that you need to do in order to get -- to prevent
8  a pressure ulcer.  And there was no reason in the
9  world in her case that if they had done all that
10 there was no reason for her to develop a pressure
11 ulcer.
12         There was one other issue, which is she
13 was in a wheelchair and in a wheelchair in a
14 patient like her, you are required to have two
15 things.  One, you are required to have a
16 specialized wheelchair.  And two, you are
17 required to have a special cushion just like you
18 have on the bed that would do a pressure
19 redistribution.  It doesn't really reduce
20 pressure because physics doesn't allow you to
21 reduce, but it redistributes it from a more
22 vulnerable area to a less vulnerable area.  It
23 kind of reduces pressure the pressure on the
24 vulnerable area.
25         So in her case at a certain point later,

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    in the later photographs, I discovered that she
2    was in something called a Broda chair, which was
3    the appropriate thing for her to be.  But I
4    didn't see any documentation that she was in that
5    kind of chair prior to the development of the
6    pressure ulcer.  But I didn't enumerate this
7    because I'm not sure.  I know that I was told the
8    picture was taken later in the course but that's
9    all I know.  But I did see the appropriate
10   wheelchair.
11       Q.   So at some point she had the appropriate
12   wheelchair, but whether she had that Broda chair
13   from admission not you don't know?
14       A.    That I don't know so I can't -- I can't
15   say for sure.  I don't really want to say
16   anything that doesn't have a good basis, but I
17   did not see any evidence that there was a chair
18   like that prior to when she had the pressure
19   ulcer.  But I did see the photographs.  Once I
20   saw the photographs I know that at a certain
21   point she had it so that could not be part of my
22   real criticism even from before, unless I have
23   some evidence it was there.
24       Q.   What about the actual wound care
25   treatments that were being performed?  Do you

1   have any criticisms of those?

2      A.   Not in particular because first of all

3   there was an expert that was seeing her, treating

4   her, somebody who was a wound care physician.

5   And secondly, because the standard of care is to

6   the treatment, extremely wide, I mean there's a

7   very wide latitude for a person doing this, which

8   is what I've done 40 years when there were

9   actually no guidelines whatsoever as to what you

10   are going to do for the pressure ulcer. So it's

11   really -- I generally tend not to criticize

12   unless there's something that's contraindicated.

13   If you put something in the wound that should not

14   be there by standard of care, I'll say something.

15   But generally the method of treatment is

16   something that's very hard for me to judge

17   without actually seeing a photograph of the

18   ulcer, a good colored photo of that, and even

19   then it's not 3D, so it's very hard to criticize.

20   So the treatment itself that was local to the

21   wound I'm not criticizing. What I'm criticizing

22   is that in order for a wound to heal you can't

23   just rely on the local care. You need to do two

24   basic things for wound healing. A, you need to

25   offload the pressure from that wound at all

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    times.  Why?  Because nothing is going to heal if

2    it has continuous pressure on the tissue.  That

3    granulation tissue that I talked about is not

4    going to last if there's pressure on it.  It's

5    extremely sensitive and particularly at the

6    earliest stages of its formation.  It's sensitive

7    to pressure so you have to offload the pressure

8    ulcer completely.  Two, you have to make sure

9    that you never have any stool in that pressure

10   ulcer.  The urine becomes somewhat less important

11   at that point because you are causing maceration

12   of the skin around and may cause actually

13   enlargement of the pressure ulcer if you don't

14   offload the pressure.  But the important thing is

15   to make sure there is no stool because the stool

16   is what generally infects the pressure ulcer in

17   that area.  The stool has all kinds of bacteria

18   and while they might be okay.  If they're in your

19   gut, then that's okay.  If they are outside your

20   gut or on your wound, so that can cause a lot of

21   trouble.  So those are the two important things.

22          In addition to the local care, so I do

23   not have any specific criticism of the local care

24   itself.  My criticism is that I did not see a

25   complete offloading of the pressure ulcer at that

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   point.  So it's not enough to say I have a

2   turning and repositioning program, which they did

3   have in their care plan, but the turning and

4   repositioning problem is, to be even more

5   specific, to make sure that you are not on the

6   ulcer at any time.  Two, you have to certainly

7   have a low air loss mattress because it's almost

8   impossible at that point, in her case it was from

9   the beginning really, to turn and repositioning

10  without that type of a mattress.  And then you

11  have to show that you do whatever you can

12  possibly to avoid any stool contamination, and

13  that means you probably need to look there a lot

14  more often and if any stool comes out, make sure

15  it's removed immediately, wash the wound, clean

16  the wound, replace the dressing, et cetera, et

17  cetera.  I saw none of that done.  Even though

18  they did document more often turning and

19  repositioning in the care plan, it was certainly

20  not specific for a wound like that.  So that's my

21  criticism there.  And also again, I didn't see a

22  good program to divert stool from the pressure

23  ulcer.

24      Q.   Okay.  I think I've asked all my like

25  follow-up questions about your standard of care

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1  opinions but I wanted to make sure that there's

2  not something that we've missed, that there's not

3  another standard of care violation that you found

4  that we haven't talked about.

5      A.   I don't believe so.  I think I kind of

6  gave you a sum and substance of why the pressure

7  ulcer occurred, why the pressure ulcer

8  deteriorated and became infected.  I think that's

9  the bottom line.  There could be some other minor

10 issues, but I don't recall at this point.

11     Q.   And I'm looking through your chronology

12 at your notes to see if I have any other

13 questions about --

14     A.   Yeah, maybe you'll realize that there's

15 something else there.  I think most of it like in

16 the middle is the progression of the pressure

17 ulcer and I just copied those notes.

18     Q.   Yeah, I was going to say that it looked

19 like those were copied and pasted from the chart.

20          I did have I guess one quick question,

21 I'll throw this on the screen.

22     A.   I didn't hear this.

23     Q.   Oh, I said I have one question about

24 some of the things you wrote down so I'm going to

25 share my screen.  Did that pop up for you?

1     A.    Yeah, I can see.  Yeah.

2     Q.    So you have a couple things here in red

3 and I'm just wondering why those are in red ink,

4 if that was something you --

5     A.    No, it's just to highlight the

6 significance that sometimes a pressure ulcer can

7 get smaller, which actually doesn't mean much

8 because a lot of it might be underneath.  But

9 when it gets deeper, that's very significant.

10 For example, you can see that I'm not sure how

11 accurate the descriptions are, but you have a

12 depth -- of where is that?  Seven point the depth

13 was 4-12.  If we look at 4-12 the depth is does

14 it look like 1.3 or 1.5?  Oh, 1.5.  So then it

15 becomes 5.7.  I actually should have highlighted

16 the 1.5 also.  It was just to call my own

17 attention when I re-reviewed that for the fact

18 that there was a deterioration, although in the

19 wound is a sign of deterioration.  Pain in the

20 wound could be a sign of deterioration because

21 you get a lot of pain when the bone becomes

22 involved so it's a significant issue.  Plus

23 obviously it's one of the -- one of the damages

24 and outcomes here so I had highlighted that just

25 for myself to recall.

1    Q.   Okay.

2    A.   And I re-reviewed.

3    Q.   And then here you have some stuff in

4  bold print.

5    A.   Oh, okay.  Again, this is to call my

6  attention to certain issues in the findings.  So

7  let me see what I -- yeah, so we are looking at

8  St. Joseph, right?  Are we on the same page?

9    Q.   Yes.

10    A.   St. Joseph, when she goes there I

11  highlighted the fact that they talked about

12  neglect in the I'm presuming in the nursing home,

13  quality of care and the amount of neglect.  They

14  didn't elaborate on that.  I will say if you

15  noticed I showed that the temperature was 94.

16  When you have what you call hypothermia, low

17  fever, particularly in an older person, it's a

18  very serious sign of sepsis.  Then I say that the

19  pressure ulcers, which we know, and then I

20  highlighted sodium and BUN and Galantamine and

21  GFR a lactic -- the lactic acid.  Those are all

22  signs of sepsis.  How you (unintelligible) BUN

23  indicate that there was dehydration which occurs

24  from sepsis.  Galantamine means that she had

25  acute kidney injury, very common in sepsis,

1  because of multiple factors like lack of enough

2  blood pressure into the kidney.  The GFR of 9

3  means again that she had acute renal failure,

4  again that's from the sepsis in this case.  And

5  the last one is lactic acid of 4.7.  She's got

6  lactic acidosis, means that because of the sepsis

7  there is hypoxia in the tissues.  Not that the

8  tissues don't get enough oxygen, and the lactic

9  acid therefore goes up.  So it's really just

10  highlighting to show the important things that

11  are in the findings.

12      Q.    I think that that's all my questions

13  about your chronology.  I know you've also been

14  designated to testify regarding causation and

15  damages.  I guess we've talked a little bit about

16  causation, but I want to make sure that you've

17  told me all of your opinions about causation.  So

18  I don't know if you have any other causation

19  opinions that we haven't already talked about,

20  but if so --

21      A.    Well, the only other one that's relevant

22  here, I think there may be some addition, detail,

23  that I did not talk about, but obviously I said

24  that the lack of appropriate care have caused the

25  progression and infection, that the lack of

1   appropriate care caused some additional pressure

2   ulcers to develop, notably the ischium.  You

3   didn't ask about that but that's one of the

4   opinion, talking about the new pressure ulcers

5   that occur.  It's starting I believe, I think it

6   was there 4-17 and then there were more new ones.

7   I think I actually highlighted that at 4-17 there

8   was the start of several other pressure ulcers.

9   And then so -- so those are all included in my

10  opinion that those things did occur as a result

11  of breaches of standards of care.  And finally, I

12  have an opinion that the death was directly

13  related to the pressure ulcer and to the

14  infection that it caused, infection and sepsis

15  that it caused.

16      Q.   And you referenced the ischium and then

17  said that I hadn't asked about that.  I asked you

18  earlier about the different wounds that she had

19  and if your opinions were related to a specific

20  one and you had referenced the right buttock

21  wound.  So that's why I didn't ask about the

22  ischium but since you've mentioned it I guess I'd

23  like to know what your opinions regarding the

24  ischial wound are.

25      A.   Okay.  So I think I did try -- I tried

1  to clarify when you asked because I recall that.

2      Q.   Yeah.

3      A.   What I said was at that point I was

4  talking only about the period until the first

5  pressure ulcer occurred, which is the right

6  buttock.  So I kind of divided in my mind, I put

7  a line in between on just before 2-19 in there

8  because in my mind I look at this as kind of two

9  different issues.  One, is why did the pressure

10  ulcer occur?  That's not what I asked myself when

11  I -- I look at the chronology and I have to come

12  up with an opinion.  In the pressure ulcer case,

13  the first causation is why did this pressure

14  ulcer occur?  It also, by the way, goes with the

15  regulation because if you notice the regulation

16  for pressure ulcer talks about, number one, if

17  you have a pressure ulcer thou shall not make one

18  happen.  That's the first one.  My -- my

19  translation.  But the second one says if you

20  already have a pressure ulcer, then you have to

21  treat it appropriately and prevent the

22  deterioration, but also prevent the development

23  of new pressure ulcer.  That's what the

24  regulations say.  So I kind of -- given I was

25  somewhat involved in the development of those

1  regulations in the 90s, I kind of keep it in my

2  mind the same way.  So I first look at the first

3  pressure ulcer that occurred.  Was there a

4  deviation, and can I come up with an opinion that

5  there was a causation?  So that's what I gave

6  you.

7         Then I look to see what happens

8  afterwards, because afterwards is sometimes

9  different.  For example, many times you don't

10  need the low air loss mattress in the beginning

11  when there's no ulcer, but you need it later.

12  And I emphasized in this case it was not so.  But

13  if, for example, it's the other way, I would look

14  to see now she has a pressure ulcer or he has a

15  pressure ulcer.  Did they give appropriate

16  pressure distribution devices in the bed?  Did

17  they give appropriate pressure redistribution

18  devices in the chair?  Did they do offloading?

19  Like offloading sometimes may be required if you

20  have a very vulnerable area like in this case,

21  you have to assess where it is.  But once you

22  have the pressure ulcer, it's different.  Now you

23  have to do turning and repositioning to make sure

24  you offload the pressure ulcer.  Now you have to

25  make sure that the stool doesn't contaminate the

1  pressure ulcer, not just the skin in general.  So

2  it's kind of different, so that's why I divided

3  it.

4          And the second part of that, so now you

5  have a pressure ulcer that deteriorated but you

6  also have new pressure ulcers developing.  And

7  many times it happens for the same reason.  You

8  don't do appropriate turning and repositioning to

9  offload the ulcer and at the same time you have

10 pressure on other areas.  And sometimes your plan

11 is not appropriate because what you do -- okay,

12 it's just an example, you offload pressure from X

13 and it goes to Y, now Y develops a pressure ulcer

14 in that area.  So you have to look at all those.

15         In this case I determined that there was

16 a relationship between the lack of appropriate

17 offloading and turning and repositioning

18 afterwards, and the development of at least the

19 ischial ulcer.  I did not address the leg ulcers

20 in that case.  So that's -- that's why I did not

21 mention the ischium originally because it was in

22 again, in my mind the second part of the

23 discussion and I thought you will ask about that

24 at that point.

25    Q.    Yeah.  And I think I follow, and maybe I

1  didn't know what you were thinking on that so

2  that all makes sense.

3      A.   I said it might make it more clear.  I

4  apologize.

5      Q.   I just want to make sure that I'm

6  tracking.  So you referenced not only a failure

7  to treat existing ones, you don't as a nursing

8  home you need to treat existing pressure ulcers

9  within the standard of care, but also not allow

10 new ones to develop.  So I want to make sure that

11 I'm understanding your opinions and that's that

12 Timberlake failed to prevent the development of

13 the buttock ulcer?

14     A.   Correct.

15     Q.   And then also the ischium?

16     A.   Correct.

17     Q.   Is there a part of your opinion that's a

18 failure to treat an existing ulcer?

19     A.   Well, yes, because treatment and I -- I

20 think again I may have not made it very clear

21 because you asked me about local treatment of the

22 pressure ulcer.

23     Q.   Uh-huh.

24     A.   The treatment of the pressure ulcer

25 consists of A, removing the pressure from the

1   ulcer.  That's called offloading.  B, removing --

2   if it's in the appropriate area, removing stool

3   and urine from the ulcer, kind of in general.  C,

4   treating it locally with appropriate treatment,

5   local care, appropriate dressings, whatever the

6   case may be.  I said that the only part of the

7   treatment that I did not have a problem with is

8   the local care, the dressing, whatever they put

9   in the ulcer and so on, and also there was a

10  wound care person that was provided that was

11  doing that.

12      Q.   Yeah.  And that's fair.  In my brain,

13  I'm not a doctor so I don't think --

14      A.   And I want to make sure that I'm very

15  clear about what I'm saying.

16      Q.   Yeah, no, I appreciate that.  I don't

17  necessarily think of in my brain as removing the

18  pressure and removing the stool as treatment, but

19  I think you're right when you explain it that

20  way, that's an aspect of the treatment.

21      A.   Yeah.

22      Q.   And so the failure to treat existing

23  wounds falls to the buttock in the ischium --

24      A.   You just froze.

25      Q.   Did I cut out?

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    A.   Yeah, I didn't hear anything in the last

2  minute or so because you froze.

3    Q.   I apologize.  I am approximately in the

4  middle of nowhere Kansas City, even less exotic

5  than the airport, and sometimes my husband

6  decides to play video games on his lunch break

7  so...

8         I was just trying to summarize your

9  opinions that there's the kind of two prongs that

10  you outlined as a failure to treat existing

11  pressure ulcers and to also not allow new ones.

12  And the your opinions as to the buttock and the

13  ischium wound incorporates both of those prongs?

14    A.   Yeah, I mean, pretty much.  I mean, I

15  kind of go along with how the regulations go.

16    Q.   And your opinions, you're not going to

17  be providing opinions about the different leg and

18  knee wounds that she had; is that right?

19    A.   The knee wounds healed so I don't -- I

20  don't have an issue with that.  The only thing I

21  did say is the left wound did most likely occur,

22  the left knee wound occurred in the facility a

23  few days later, they claim it was there, there

24  was no evidence, but it doesn't matter.  It

25  healed so there's no outcome.  And the right

1    heel, which she came with to the facility, also
2    healed eventually.  Sometimes it will -- so I
3    have no issues with those wounds.  And any new
4    wounds in the leg I have no opinion because,
5    number one, I saw that there was some protection
6    there of the heels.  And secondly, I don't know
7    if she did or did not have any vascular disease
8    in lower extremities.  So given I don't have
9    enough information I don't have an opinion.  I'm
10   not saying the opinion that it was good or bad,
11   I'm just saying I have no opinion because I
12   didn't have enough information to form one.
13        Q.   And as you pointed out, she had a couple
14   wounds that healed, you referenced the right heel
15   and I think a knee wound.  Did those wounds heal,
16   doesn't that indicate to you that at least
17   they're doing some level of repositioning and
18   offloading?
19        A.   Well, with the knee wounds I already
20   said, the reason they healed because they did
21   offload.  The offloading of the heels is when you
22   prevent the two heels from touching each other.
23   So given that they had a care plan to do so, and
24   given that they healed, I would assume that that
25   was done.  That she had the separation of the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1    knees with a pillow or wedge between them and

2    therefore they healed.  So that's one thing.

3            With respect to the other wounds is very

4    different.  The -- because there was no evidence

5    that these were done consistently and that's why

6    those -- that's why they didn't heal and that's

7    why a new one occurred.  And actually now that

8    I'm thinking, there was also something on the

9    hip, a new one just before she left.  Check my

10   notes, see if I'm right.  I'm not right on

11   everything.

12       Q.   No, I definitely understand.  I had one

13   expert that said, I can't remember if he or she,

14   but they took no notes.  They just read the chart

15   and took no notes and read thousands of pages of

16   records and I was like, How can you possibly

17   keep this --

18       A.   You can't remember without notes.  I

19   think it's not -- you know, it's not doing the

20   job right because how can you remember all the

21   details of something like that?

22       Q.   Well, and if you're looking at even more

23   than one case, you know, a lot of these cases end

24   up with similar issues and diagnoses.  I couldn't

25   do it, but they are smarter people in this world

1   than me.

2           I'm scrolling through my notes that I

3   had written ahead of time to make sure I've kind

4   of covered all the specific questions I wanted to

5   ask you.  Are you going to be providing any

6   opinions about the staffing levels at the

7   facility or whether they were or were not

8   appropriate?

9       A.    No.

10      Q.    We've obviously talked a lot about your

11  standard of care opinions and causation opinions

12  and damages opinions, and we also talked earlier

13  about how there are these two other companies

14  that have been sued in this case, LTC Management

15  Services and Health Systems, Inc.  So I want to

16  understand I guess what your opinions are against

17  those two companies.

18      A.    Okay.  So again, my understanding of the

19  federal regulations -- and again, it's different

20  in New York.  Different regulations obviously

21  apply in Missouri and Kansas and everywhere else.

22  You have a -- the responsibility for patient care

23  and patient safety, which is the issue here,

24  patient safety, in a nursing facility that

25  receives Medicare or Medicaid funds is with the

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1   governing body.  And the governing body and

2   anybody that's designated by the governing body

3   to supervise the care.  And that is embodied also

4   in many of the findings and surveys.  You'll find

5   many times that in a survey when a pressure ulcer

6   occurred and the severity, the surveyor found

7   that it was avoidable pressure ulcer, let's say.

8   They might -- and some of them do depending on

9   the state, they might cite not only the nursing

10  department, but they also might cite the

11  administrator that's -- that's the legal standard

12  for administrator, and they may very frequently

13  cite the governing body as well.  The governing

14  body here, I'm not totally sure exactly how it

15  works, who is the governing body with respect to

16  the federal government and the state government

17  there.  But it is obvious that these two other

18  entities had something to do with the supervision

19  of the care; and therefore, if care was not given

20  according to standards of care, they become

21  responsible.  So that's what I've seen certainly

22  in surveys in many states, including New York.

23  So that's my understanding of how that legal

24  standard works, so therefore, those two other

25  entities would be responsible for that reason.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1      Q.   But you said that you don't actually

2   know who's on the governing body --

3           MR. STEELE:  Elizabeth, he's not

4   going to be offering -- he's not going to be

5   offering any opinions regarding -- I mean, you

6   can ask him about it but he's not going to be

7   offering any opinions about those two other

8   entities at trial.

9           MS. MOELLER:  Okay.  I appreciate

10  that, Jonathan.  I did just want to --

11          MR. STEELE:  Yeah.

12          MS. MOELLER:  -- clarify what --

13          MR. STEELE:  No, you're fine.  I

14  just wanted to let you know.

15          MS. MOELLER:  No, I appreciate the

16  clarification at trial and because of that I

17  won't spend a lot of time on it.

18  BY MS. MOELLER:

19     Q.   I just wanted to make sure that I

20  understand that as far as your opinions on these

21  two companies, they're more based generally on

22  regulations and that these companies can be

23  involved, but here you don't know specifically

24  whether either of these companies was on the

25  governing body or what their actual role was?

1    A.   That is correct.  I was going to say

2  that next, that I do not have specific

3  information as to exactly how these relationship

4  in these companies work.

5    Q.   And you had said that these companies in

6  general based on regulations and that they exist

7  and can exist, at least not in New York I guess,

8  but you said something that they have something

9  to do with the supervision of care.  Here as far

10  as HSI, Health Systems, Inc., or LTC Management

11  Services, you don't know what role they had

12  specifically in terms of any supervision of care;

13  is that correct?

14    A.   That's correct.  Yeah.

15    Q.   Okay.  We've been going for quite a

16  while and I think --

17    A.   Yes.

18    Q.   -- I'm essentially done.  I just want to

19  make sure that after however many hours this has

20  been, you've given me all of your opinions that

21  you have against these three defendants in this

22  case and that I haven't missed anything.

23    A.   I believe I gave you the sum and

24  substance of the most important opinions.  It's

25  possible I missed something but I don't think it

1    would be that substantial.

2         Q.   Okay.  And if you come up with something

3    after the fact and you're like, you know, you

4    think of some other opinion that we didn't

5    discuss, I'd appreciate it if you'd let Jonathan

6    know and he'll let me know.

7         A.   I will let him know.  Absolutely.

8         Q.   I know I'm not a doctor or anything like

9    that.  Have you done your best to help explain

10   your opinions to me today?

11        A.   I believe I did.

12        Q.   And do you understand, I'm sure from

13   doing all this work for a while, that you

14   understand that this is my only chance to talk to

15   you before trial and to learn what you might say?

16        A.   Yes, I'm fully aware of that.

17        Q.   Well, in that case I don't think I have

18   anymore questions for you right now.  I might if

19   Jonathan asks you anything, but other than that I

20   really appreciate your time.  I hope that I was

21   polite and courteous to you.

22        A.   Yes, you were.  I appreciate that, too.

23   Thank you very much.

24                     EXAMINATION

25   BY MR. STEELE:

1    Q.   I just have I think one question.  Based

2  on your review of the records, did the facility

3  make any representations to the federal

4  government regarding the life expectancy or the

5  existence of any terminal illness for Ms. Geneva

6  Miller?

7    A.   Yes.  In the MDS Section J-1400, there's

8  a question essentially that says does the patient

9  have a life expectancy of less than six months.

10  And the answer was, no, which means that the

11  expectation was that she would live more than six

12  months.

13    Q.   And does that also mean that the nursing

14  home was representing to the federal government

15  that she didn't have any terminal illness?

16    A.   That's correct.  Yes, because if there

17  is a terminal illness you usually have to

18  (unintelligible) on that answer.

19    Q.   So if a medical expert comes into this

20  case later and says that this pressure injury was

21  the result of the dying process or some sort of

22  terminal illness, he's going to be calling the

23  nursing home a bunch of liars then, huh?

24    A.   I guess so.  I would agree with that.

25  All I can say is she did not have any terminal

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1 illnesses, none of her diagnoses showed a

2 terminal disease, number one. Number two, she

3 certainly was not in the process of dying

4 actively at that point so -- and what I

5 represented was I believe correct, she was not

6 going to die within -- within six months because

7 there was nothing in the chart to show that she

8 was going to die within six months.

9        MR. STEELE: I don't think I have

10 any additional questions.

11        MS. MOELLER: I don't have any

12 other questions.

13        THE WITNESS: Okay.

14        MR. STEELE: He'll read and sign.

15 Can you just e-mail me the transcript and then

16 I'll send it to him.

17        THE REPORTER: Yes, and do you want

18 a copy of this?

19        MR. STEELE: Sure, please. I don't

20 need the video.

21        THE REPORTER: All right. We're

22 off the record.

23    (The deposition concluded at 2:39 p.m.)

24

25

E R R A T A   S H E E T

RE:  ALEXANDER, ET AL. VS. N&R OF SOUTH KC, ET AL.
DEPOSITION OF:  JACOB DIMANT, M.D. (09/28/21)

  PG/LN NO.  CORRECTION          REASON FOR CHANGE

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

:_____:_____:_____

_____  I certify that I have read my deposition
          in the above case and I request that no
          changes be made.
_____  I certify that I have read my deposition
          in the above case and I request that the
          above changes be made.



          _____
                JACOB DIMANT, M.D.
STATE OF_____ )
                               SS:
COUNTY OF_____ )
Subscribed and sworn to before me this _____day
of_____, 2021.


          _____
                NOTARY PUBLIC

My Commission Expires:_____

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

1                    October 18, 2021

2

3    THE STEELE LAW FIRM
     Atty:  Mr. Jonathan Steele
4    Wit:  Jacob Dimant, M.D.
     2345 Grand Boulevard, Suite 750
5    Kansas City, Missouri  64108

6    In Re:  ALEXANDER, ET AL. VS. N&R OF SOUTH KC, ET AL.

7    Dear Dr. Dimant:

8    Enclosed is a copy of your deposition transcript
     for your examination and signing.  You will also
9    find an errata sheet for your convenience in
     making any changes or corrections.
10
     Pursuant to the law, any change in "form or
11   substance" of an answer shall be accompanied with
     a statement of the reason given by you for making
12   such change.

13   Upon completion of your examination and reading,
     please sign the enclosed signature page and
14   errata sheet in front of a notary public and
     return them to this office in the enclosed
15   self-addressed envelope.  If we have not received
     the signed documents from you within 30 days of
16   the date of this letter or by time of trial,
     whichever occurs first, an unsigned copy of your
17   deposition will be filed.

18                    Sincerely,

19

20
                     CHRISTOPHER VIDEO & REPORTING
21                   BY:  BRENT W. CHRISTOPHER
                     Certified Court Reporter
22
     Enclosures
23

24

25

174

```
 1              C E R T I F I C A T E
 2              I, Brent W. Christopher, a Certified
 3    Shorthand Reporter of the State of Missouri, do
 4    hereby certify:
 5              That prior to being examined, the
 6    witness was first duly sworn;
 7              That said testimony was taken down by me
 8    in shorthand at the time and place hereinbefore
 9    stated and was thereafter reduced to typewriting
10    under my direction;
11              That the foregoing transcript is a true
12    record of the testimony given by said witness;
13              That I am not a relative or employee or
14    attorney or counsel of any of the parties or a
15    relative or employee of such attorney or counsel
16    or financially interested in the action.
17              Witness my hand and seal this 18th day
18    of October, 2021.
19
20
21              _____
                BRENT W. CHRISTOPHER, CCR, CSR
                Certified Court Reporter #883
22              State of Missouri
23
24
25
```

1   IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
                    AT KANSAS CITY
2
    STEPHANIE ALEXANDER
3   and
    MICHELLE WHITE, Individually,
4   And in a Representative
    Capacity for All Persons
5   Identified by R.S.Mo. 537.080,
6           Plaintiffs,
7   -vs-                    CASE NO: 1916-CV29764
8   N & R OF SOUTH KANSAS
    CITY, LLC, ET AL.,
9
            Defendants.
10
11          CERTIFICATION OF TAKING DEPOSITION
                   AND COSTS INCURRED
12
13      I hereby certify that the deposition of JACOB
    DIMANT, M.D., taken on behalf of the Defendants,
    on October 28, 2021, is in the custody of
14  Ms. Elizabeth Moeller of Brown & Ruprecht.
15  The Cost taxed is $_____ Pending Payment by the
    Plaintiff.
16
    Copy $_____ Pending Payment by Defendant.
17
18
19      _____
    BRENT W. CHRISTOPHER, CCR, CSR
20  Certified Court Reporter #883
    State of Missouri
21
22
23
24
25

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

CONFIDENTIAL: Produced subject to the Stipulated and Agreed Protective Order entered in Stephanie Alexander and Michelle White, individually and in a representative capacity for all persons identified by R.S.Mo. 537.080 v. N & R of South Kansas City Systems, Inc., and LTC Management Services, LLC, Case No. 1916-CV29764, pending in the Circuit Court of J.

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**Subject:** InDeed Nurse ads

**Date:** Thursday, April 4, 2019 at 3:01:31 PM Central Daylight Time

**From:** Timberlake Care Center - Admin

**To:** Melissa Bixler

Last email for the day, I hope☺

I just wanted to follow up on our RN/LPN nurse ads on Indeed.  We haven't had anyone for quite some time apply and it's been quite a while since I've seen any emails from recruiter.  We are now having issues with Agencies not finding us nurse staff…. With Census going up.

Just thought I would check.  Thank you for all you do!

Mike Catron, LNHA
Administrator
Timberlake Care Center
12110 Holmes Road
Kansas City, MO  64145
816-941-3006
816-942-8049 fax
timberlakeadmin@socket.net

EXHIBIT

I

TCC 892

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

# Health Systems and Timberlake
## What did they know about understaffing?

"We've Dedicated Our Lives to Yours"

**Timberlake Care Center**

| | |
|---|---|
| **Subject:** | InDeed Nurse ads |
| **Date:** | Thursday, April 4, 2019 at 3:01:31 PM Central Daylight Time |
| **From:** | Health Systems and Timberlake - Adm in |
| **To:** | Melissa Bixler |

Last email for the day, I hope ☺

I just wanted to follow up on our RN/LPN nurse ads on Indeed. We haven't had anyone for quite some time apply and it's been quite a while since I've seen any emails from recruiter. We are now having issues with Agencies not finding us nurse staff .... With Census going up.

Just thought I would check. Thank you for all you do!

Mike Catron, LNHA
Administrator
Health Systems and Timberlake
12110 Holmes Road
Kansas City, MO 64145
816-941-3006

Source: TCC 892

**EXHIBIT**

**J**

CONFIDENTIAL: Produced subject to the Stipulated and Agreed Protective Order entered in Stephanie Alexander and Michelle White, individually and in a representative capacity for all persons identified by R.S.Mo. 537.080 v. N & R of South Kansas City, LLC, Health Systems, Inc., and LTC Management Services, LLC, Case No. 1916-CV29764, pending in the Circuit Court of Jackson County, Missouri.

| | |
|---|---|
| **Subject:** | Any nurses wanting extra hours? |
| **Date:** | Thursday, April 4, 2019 at 2:30:33 PM Central Daylight Time |
| **From:** | Timberlake - DON |
| **To:** | 'Casandra Gould', Judy Bailey |
| **Attachments:** | image001.png |

Hi there ☺
Mike said to ask if you would know of any nurses at other facilities that might want extra hours here? We have this Fri/Sat night that agency has been unable to fill so far (still crossing fingers), as both me and Rachelle were already coming in this weekend. And then there is the third week that we don't have day shift coverage all week Mon thru Sat.
Thank you,

**Donna L. Parker RN, DON**

Donna L. Parker, RN, DON
Timberlake Care Center
12110 Holmes Rd.
Kansas City, MO 64145
PH: (816) 941-3006
Fax: (816) 942-8049
timberlakedon@socket.net

Health Systems, Inc.

**PHI & HIPAA Act Compliance Statement:** This communication may contain confidential Protected Health Information. This information including any attachment is intended only for the use of the individual or entity to whom it is addressed. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is STRICTLY PROHIBITED by federal law. If you have received this information in error, please notify the sender immediately and delete this transmission.

**EXHIBIT**

**K**

# Health Systems and Timberlake
## What did they know about understaffing?

**Timberlake Care Center**
*"We've Dedicated Our Lives to Yours"*

**Subject:** Any nurses wanting extra hours?
**Date:** Thursday, April 4, 2019 at 2:30:33 PM Central Daylight Time
**From:** Timberlake - DON
**To:** 'Casandra Gould', Judy Bailey
**Attachments:** imageOOl.png

Hi there 😊

Mike said to ask if you would know of any nurses at other facilities that might want extra hours here? We have this Fri/Sat night that agency has been unable to fill so far (still crossing fingers), as both me and Rachelle were already coming in this weekend. And then there is the third week that we don't have day shift coverage all week Mon thru Sat.
Thank you,

**Donna L Parker RN, DON**
Donna L. Parker, RN, DON
Health Systems and Timberlake
12110 Holmes Rd.
Kansas City, MO 64145
PH: (816) 941-3006

*Source: HSI 15*

EXHIBIT

L

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

CONFIDENTIAL: Produced subject to the Stipulated and Agreed Protective Order entered in Stephanie Alexander and Michelle White, individually and in a representative capacity for all persons identified by R.S.Mo. 537.080 v. N & R of South Kansas City, LLC, Health Systems, Inc., and LTC Management Services, LLC, Case No. 1916-CV29764, pending in the Circuit Court of Jackson County, Missouri.

**Subject:** FW: Census Incentive started Friday

**Date:** Monday, March 4, 2019 at 1:40:41 PM Central Standard Time

**From:** Timberlake Care Center - Admin

**To:** Timberlake - SS

---

**From:** Casandra Gould [mailto:cgould@health-systems-inc.com]
**Sent:** Monday, March 04, 2019 1:37 PM
**To:** Joplin Gardens - Admin; Hermitage - Admin; 'McDonald - Admin'; Nevada - Admin; Timberlake - Admin; 'Westwood - Admin'
**Subject:** Census Incentive started Friday

Here is each of your census as of March 1st.  The home with the highest increase by April 30th will be the winner.  Go marketing.  🙂

Timberlake – 67

Good luck teams…. GO GET THOSE ADMISSIONS……

Thank you,
Casandra Gould, DOP
Health Systems, INC
816-592-0900

PHI & HIPAA Act Compliance Statement: This communication may contain confidential Protected Health Information. This information including any attachment is intended only for the use of the individual or entity to whom it is addressed. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is STRICTLY PROHIBITED by federal law. If you have received this information in error, please notify the sender immediately and delete this transmission.
Please be aware that e-mail communications can be intercepted in transmission or misdirected. Any transmission of Protected Health Information must comply with HIPAA EDI [Electronic Data Interchange] and Privacy Regulations. Therefore, unless your e-mail communication is compliant, please consider communicating any sensitive information by telephone, fax, or mail.

---

Virus-free. www.avast.com

**EXHIBIT**

**M**

**WD 87040**

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

**STEPHANIE ALEXANDER AND MICHELLE WHITE Individually, And In A Representative Capacity For All Persons Identified By RSMO. § 537.080**

**Appellants**

**v.**

**N&R OF SOUTH KANSAS CITY, LLC d/b/a TIMBERLAKE CARE CENTER and HEALTH SYSTEMS, INC.**

**Respondents,**

**Appeal From The Circuit Court of Jackson County, The Honorable Marty Wayne Seaton**

---

**REPLY BRIEF OF APPELLANTS' STEPHANIE ALEXANDER AND MICHELLE WHITE INDIVIDUALLY, AND IN A REPRESENTATIVE CAPACITY FOR ALL PERSONS IDENTIFIED BY RSMO. § 537.080**

---

**JONATHAN STEELE**
**Mo. Bar. No #63266**
**Steele Law Firm II, LLC**
**2029 Wyandotte, Suite 100**
**Kansas City, MO 64108**
**Ph: (816) 466-5947**
**Fax: (913) 416-9425**
**jonathan@nursinghomeabuselaw.com**

**ATTORNEYS FOR APPELLANTS**

EXHIBIT

N

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................3

ARGUMENT .......................................................................................................................5

I.    **The Personal Attacks Respondents' Counsel Leveled Against Appellants' Counsel Are Unprofessional And Improper.** .............................................5

II.   **The Court Must Only Conclude That Dr. Hill-O'Neill's Deposition Testimony Did Not Constitute "Unfair Surprise" To Order A New Trial.** ......................7

    A.   **The Deposition Record Conclusively Defeats Respondents' Argument And The Trial Court's Conclusion That Dr. Hill-O'Neill's Failed To Disclose Her Opinion Regarding The Necessity Of A Higher-Level Mattress** ..........................................................................................7

    B.   **Appellants Are Entitled To A New Trial Under Points I And II As A Matter Of Law** ...................................................................................12

    C.   **Respondent's Fail To Acknowledge — Let Alone — Wrestle With The Jury Instruction No. 10's Effect On The Prejudice Prong Of Appellants' Point 1** .............................................................................16

CONCLUSION .................................................................................................................18

CERTIFICATION ............................................................................................................18

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM/025 - 12:14 PM

# TABLE OF AUTHORITIES

## CASES

*Bair v. Faust*, 408 S.W.3d 98 (Mo. 2013) ...........................................................................7

*Barnes v. Kissell*, 861 S.W.2d 614 (Mo. App. W.D. 1993)................................7, 13, 14, 15

*Calvin v. Jewish Hosp. of St. Louis,* 746 S.W.2d 602 (Mo. App. W.D. 1988)..7, 13, 14, 15

*Kansas City v. Keene Corp.*, 855 S.W.2d 360, 372 (Mo. banc 1993) ...............................15

*Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299 (Mo. 2011) ...........12, 15

*Lyon Fin. Serv., Inc. v. Harris Cab Co.,* 303 S.W.3d 589 (Mo. App. E.D. 2010) ...........14

*Marchosky v. St. Luke's Episcopal-Presbyterian Hosps*, 363 S.W.3d 121 (Mo. App. E.D. 2012) ...........................................................................................................7, 14, 15

*McClure v. State*, 543 S.W.3d 54 (Mo. App. W.D. 2018).................................................15

*Sherar v. Zipper*, 98 S.W.3d 628 (Mo. App. W.D. 2003) ................................................11

*State v. Addie*, 655 S.W.3d 456 (Mo.  App. W.D. 2022).................................................. 12

## STATUTES

RSMo § 490.065 ...............................................................................................................12

## RULES

Mo. R. Gov. Bar Jud. 4-8.3(a) ...........................................................................................6

*** This brief is filed on January 13, 2025, by agreement of counsel due to inclement weather and school closings the week of January 6, 2025 ***

# ARGUMENT

## I. The Personal Attacks Respondents' Counsel Leveled Against Appellants' Counsel Are Unprofessional And Improper.

Respondents allege that Undersigned "violated Missouri Rule of Professional Conduct 4-3.3(a)(1) by knowingly making false statements of fact to the court and jury" during trial and the Court should consider these allegations in resolving the merits:

> the Court should take into account Plaintiffs' counsel's misconduct during his closing argument at trial, . . . the court, and the jury when falsifying evidence.

Resp. Br. at 41.[1] At the outset, these allegations are false. The discrepancy between the original email and demonstrative was the result of a contracted graphic designer making a typographical error when retyping the text of the email so that it could be used on a large board. The resolution of the original document did not allow for a blown-up version.[2]

---

[1] *See also id* at *33*. ("Plaintiffs' counsel had doctored it;" "deliberate alteration of evidence;" and "constitutes a clear violation of Rule 4-3.3(a)(1), which prohibits knowingly making false statements of fact to a tribunal."). Respondents also used the words "altered;" "fake demonstrative;" "doctored;" "fraudulent;" and "falsified." *Id*. at 22, 33-34.

[2] No one contacted Undersigned since the day the jury returned the verdict to discuss the circumstances surrounding the error.

Undersigned considered for weeks whether to respond — or remain silent — regarding the false allegations of ethical misconduct. Plainly, the false accusations are significant and — **if true** — would make Undersigned subject to losing his license in every jurisdiction which he practices. But even worse, Respondents do not **actually believe** the veracity of their own allegations. If Respondents believed the intentionality of the misconduct — as opposed to throwing mud in a hope that it sways this Court on appeal — then they had an **ethical** obligation to report the issue to the Chief Disciplinary Counsel.[3] This **has not** occurred, nor did defendants' trial counsel[4] seek a mistrial, or any other relief from the trial court.[5]

So then, what was the point? Distract from Respondents' inability to respond to multiple dispositive arguments.

---

[3] Mo. R. Gov. Bar Jud. 4-8.3(a): "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects shall inform the appropriate professional authority."

[4] Trial counsel for Respondents are referred to here as defendants' counsel.

[5] Respondents do correctly assert that Appellants made two errors of citations in their brief. The reference to LF 339 at 83:2-100:06 on pgs. 10-11 of Appellants Brief should be LF 330 at 83:2-100:06; and the reference to Tr. at 916:12-12 pg. 12 of Appellants Brief should be Tr. 967:17-23. The remaining purported "Misstatement of facts" are simply different interpretations of the facts.

II. **The Court Must Only Conclude That Dr. Hill-O'Neill's Deposition Testimony Did Not Constitute "Unfair Surprise" To Order A New Trial.**

If the Court concludes Dr. Hill-O'Neill disclosed in her deposition that defendants should have implemented a higher-level mattress then reversal is required under *Calvin v. Jewish Hosp. of St. Louis,* 746 S.W.2d 602, 605 (Mo. App. W.D. 1988);[6] *Barnes v. Kissell*, 861 S.W.2d 614, 620 (Mo. App. W.D. 1993); *Marchosky v. St. Luke's Episcopal-Presbyterian Hosps*, 363 S.W.3d 121, 126–27 (Mo. App. E.D. 2012); and *Bair v. Faust*, 408 S.W.3d 98, 102–03 (Mo. banc 2013) because defendants' counsel Merrill in closing argument highlighted during closing argument that Dr. Hill-O'Neill did not identify any intervention defendants failed to implement — an adverse inference that existed only because of Respondent/Defendants' own motion.

A. **The Deposition Record Conclusively Defeats Respondents' Argument And The Trial Court's Conclusion That Dr. Hill-O'Neill's Failed To Disclose Her Opinion Regarding The Necessity Of A Higher-Level Mattress**.

This is a simple case that has been overly complicated. Here, the trial court excluded an opinion of Dr. Kathleen Hill-O'Neill on the basis it was not disclosed during her deposition and constituted "unfair surprise" under the *Gassen* principle. However, the actual contents of Dr. Hill-O'Neill's deposition render this conclusion unsupportable.

---

[6] *Id*. (stating "[w]hen a witness testimony is excluded on an attorneys' motion, it is misconduct constituting manifest injustice and thus reversible error if that attorney requests the jury to draw an adverse inference from his opponent's failure to produce that witness even though the error is not preserved for appellate review.").

The portion of Dr. Hill-O'Neill's deposition transcript containing her opinion regarding the necessity of a higher-level mattress starts with defendants' counsel requesting "opinions" regarding "pressure injuries" and the injury to Geneva Miller's "buttocks":

> 2  Q.  Okay.  That's fair.  Well, I know I asked
> 3  at the beginning of the deposition kind of for the
> 4  categories of your opinions and I wrote them down
> 5  as best I could so I did want to get into the
> 6  detail now.  The first one you said was -- what I
> 7  wrote down was the main area, and I guess the
> 8  first category would be related to pressure
> 9  injuries and the injury to her buttocks, so I
> 10 guess if you could give me what your opinions are
> 11 in this case with regard to that category and we
> 12 can go from there.

LF. at 330, 83:2-12.

Here — on page 86, lines 11 and 12 — Dr. Hill-O'Neill's testimony conclusively debunks the "unfair surprise argument." The deposition transcript reads:

> 24  The other big area is the off-loading,
> 25  and, you know, you've got to make sure you're

> 1  doing basic turning and repositioning, you've got
> 2  to be keeping them clean and dry, but you've also
> 3  got to recognize the fact if you've got multiple
> 4  wounds like you did here, six by the time she gets
> 5  to the hospital, you've got to say to yourself
> 6  what are we doing with this mattress, what should
> 7  we be doing, and consider the need to upgrade
> 8  again to a Clinitron mattress, and certainly if
> 9  you don't have access to them or you can't get one
> 10 for whatever reason, then you have to consider the
> 11 need to transfer her somewhere else, so not having
> 12 that also contributed to the right buttock wound.

LF. at 330, 85:24-86:12.  In other words:

> if you don't have access to them [**a higher-level mattress**] or you can't get
> one [**a higher-level mattress**] for whatever reason, then you have to consider
> the need to transfer her somewhere else, **so not having that** [**a higher-level
> mattress**] also **contributed to the right buttock wound**.

*Id*. (emphasis added).  "Not having that" refers to the higher-level mattress meaning that

defendants had to implement the higher-level mattress to prevent the injury to Geneva

Alexander's right buttock wound.

Put simply, there is no fair way to read Page 86, lines 11-12 of Dr. Hill-O'Neill's deposition without concluding that she offered the opinion that defendants had to implement a higher-level mattress to prevent the right buttock wound. Indeed, defendants' counsel asked a follow up question establishing that Dr. Hill-O'Neill had just offered this opinion:

> Do you have an opinion of at what point **they should have changed out the low air loss mattress for a Clinitron mattress**?

There is no reason to ask when defendants should have implemented a higher-level mattress if Dr. Hill-O'Neill was not of the opinion such a change was required. In response, Dr. Hill-O'Neill opined that early February was when the higher-level mattress first needed to be considered as an intervention. Specifically, the transcript reads:

17    Q.  Do you have an opinion of at what point
18    they should have changed out the low air loss
19    mattress for a Clinitron mattress?
20         A.  Well, you're looking -- in February
21    you're seeing that her wounds -- some of them are
22    getting worse.  Now there's a new wound, now that
23    right buttock wound gets worse, so sometime in
24    February you've got to say, you know, what are we
25    doing here, we have a problem, we need to really

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM025 - 12:14 PM



```
Page 100
1  think about a different mattress.  As you said,
2  she's screaming, she's in pain, she's having
3  difficulty maintaining a position, so you've got
4  to look at all the interventions and you've got to
5  say what can we do better, and certainly you would
6  think about that.
```

LF. at 330, 99:17—100:6.

Conceivably, Dr. Hill-O'Neill could have been more specific and explicitly stated the "the standard of care required defendants to implement a higher-level mattress on x date," but depositions do not always flow in that manner.  Even more, that possibility does not render the opinion "unfair surprise" in that cross examination was the appropriate tool to address any variance between her deposition and trial testimony.  In fact, this Court specifically described the limitations of the *Gassen* principle — used by the trial court as the sole basis for exclusion — of unfair surprise in *Sherar v. Zipper,* 98 S.W.3d 628, 632 (Mo. App. W.D. 2003), stating "[i]t is not intended as a mechanism for contesting every variance between discovery and trial testimony. Impeachment of the witness will accomplish that goal."  Instead, this Court held the purpose of the *Gassen* principle is to provide relief to a party:

> when an expert witness suddenly has an opinion where he had none before, renders a substantially different opinion than the opinion disclosed in discovery, uses new facts to support an opinion, or newly bases that opinion on data or information not disclosed during the discovery deposition

*Id*.

Here, there is no evidence that Dr. Hill-O'Neill (1) suddenly had an opinion where he had none before; (2) rendered a substantially different opinion than the one disclosed on page 86, lines 11 and 12 of her deposition; or (3) used new facts or provided a new basis for the opinion. Therefore, Dr. Hill-O'Neill's opinion regarding a higher-level mattress as disclosed on page 86, lines 11 and 12 of her deposition did not constitute unfair surprise and RSMo § 490.065 required its admission as evidence.[7]

**B. Appellants Are Entitled To A New Trial Under Points I And II As A Matter Of Law.**

If the Court determines Dr. Hill-O'Neill disclosed her opinion regarding the necessity of a higher-level mattress during her deposition, then controlling caselaw requires reversal and a new trial. During closing argument, the Defendants' counsel highlighted to the jury that Dr. Hill-O'Neill had not testified that any "**particular intervention**" had **not** been implemented to prevent Geneva Miller's pressure injury:

---

[7] "[T]he trial court must admit [the expert's] testimony" if it complies with § 490.065. *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 310-311 (Mo. banc 2011). Here, neither at trial, nor **on appeal** have Respondent's asserted any portion of Dr. Hill-O'Neill's testimony failed to meet the requirements of RSMo § 490.065. Respondents instead assert it was Appellant's duty to raise the issue of whether Dr. Hill-O'Neill's testimony regarding the higher-level mattress complied with RSMo § 490.065. Br. at 26-28. But this argument misunderstands the purpose of RSMo § 490.065. It is the statute that permits the Court to engage in its "gatekeeping function," i.e., the mechanism to exclude expert testimony. *State v. Addie*, 655 S.W.3d 456, 459 (Mo. App. W.D. 2022). Plainly, it is the burden of the party challenging the admissibility of the expert testimony to raise the issue that the proffered opinions fail to comply with § 490.065 and that the trial court should exercise its gatekeeping function.

> There has been no testimony, not even by Dr. Hill-O'Neill, that says that there is any particular intervention that they didn't put in place. So it doesn't look like anybody is still writing so I'll take this down.

Tr. at 1387:1-7. This argument was made possible only by defendants' counsel moving to exclude the evidence — and the circuit court improperly sustaining the motion — which prevented Plaintiffs from offering the evidence of a **particular intervention** defendants failed to implement: the higher-level mattress

Dispositively, defendants' counsel's conduct during closing argument has constituted reversible **plain error** — as a matter of law — since 1988. *See e.g., Calvin v. Jewish Hosp. of St. Louis,* 746 S.W.2d 602, 605 (Mo. App. W.D. 1988) ("When a witness testimony is excluded on an attorneys motion, it is misconduct constituting manifest injustice and thus reversible error if that attorney requests the jury to draw an adverse inference from his opponents failure to produce that witness **even though the error is not preserved for appellate review**") (emphasis added). *Barnes v. Kissell*, 861 S.W.2d 614, 620 (Mo. App. W.D. 1993) ("The *Calvin* court's reasoning was based upon the fact that plaintiff's attorney knew his motion was the only reason the defendant had not presented expert medical testimony. . . . As a result, we find that the trial court's rulings concerning Dr. Cook were arbitrary and, therefore, an abuse of discretion.") (internal citation omitted).

In 2012, the Eastern District in *Marchosky v. St. Luke's Episcopal-Presbyterian Hosps* reinforced the propositions in *Calvin* and *Barnes* and further explained their rationale:

> As the court in *Barnes* notes, this Court's reasoning in *Calvin* was based upon the fact that counsel making the argument knew his motion to exclude the evidence was the only reason the expert testimony was not presented at trial. Here, the same reasoning applies. In making its closing argument, St. Luke's knew its motion to strike Johnson as an expert was the reason Dr. Marchosky did not present specific evidence to the jury concerning preventative measures.

> For the foregoing reasons, we conclude that the trial court abused its discretion in striking Johnson as an expert witness and excluding her testimony at trial. Accordingly, the judgment in favor of St. Luke's is reversed, and the cause is remanded for a new trial.

363 S.W.3d 121, 126–27 (Mo. App. E.D. 2012) (internal citation omitted). The Court in *Marchosky* established once more that the misconduct that — occurred here — and described in *Calvin* and *Barnes* constitutes plain error[8] as a matter of law and requires reversal on appeal absent a limiting instruction:

> Although Dr. Marchosky did not object to this argument, Missouri courts have stated that such argument from a party, where the evidence was excluded on the party's own motion is "misconduct constituting manifest injustice and thus reversible error. *Barnes,* 861 S.W.2d at 619; *citing Calvin v. Jewish Hosp. of St. Louis,* 746 S.W.2d 602, 605 (Mo. App. E.D. 1988).

---

[8] Plain error occurs when the issue was not preserved for appellate review by a timely objection. *See Lyon Fin. Serv., Inc. v. Harris Cab Co.,* 303 S.W.3d 589, 590 (Mo. App. E.D. 2010) ("If an issue was not preserved this court can only intervene if there is plain error. Plain errors are those which affect substantial rights that, even though not properly preserved, result in such a manifest injustice or miscarriage of justice as to warrant relief.") (citation omitted).

*Marchosky,* 363 S.W.3d at 126.

Here, defendants' counsel made the motion to exclude Dr. Hill-O'Neill from testifying about the need for a higher-level mattress. Thus, defendants' counsel knew his motion was the only reason Dr. Hill-O'Neill was excluded from identifying the higher-level mattress as an intervention. Therefore, the conduct constitutes plain error under *Calvin*, *Barnes*, and *Marchosky*, and the abuse of discretion[9] required under Points I and II for reversal. Incredibly, Respondents fail to acknowledge — let alone attempt to distinguish — the holdings.

_____

[9] The standard of review regarding Points 1 and 2 are the same. *See Kivland*, 331 S.W.3d 299 at 311 (evidentiary rulings regarding expert testimony are to be reviewed for abuse of discretion); *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 372 (Mo. banc 1993) ("the denial of a motion for new trial is reviewed upon an abuse of discretion standard."). Here, Respondent's counsel's conduct during closing argument has been described as plain error meaning that it rises to a level above that of an abuse of discretion. *See McClure v. State*, 543 S.W.3d 54, 57 (Mo. App. W.D. 2018) ("Abuse of discretion (for preserved error) is a lower standard of review than both *Strickland* and plain error review. *Deck v. State*, 68 S.W.3d 418, 427 n.5 (Mo. banc 2002)".). Accordingly, Appellants have satisfied the standard for a new trial under Points I and II.

**C. Respondent's Fail To Acknowledge — Let Alone — Wrestle With The Jury Instruction No. 10's Effect On The Prejudice Prong Of Appellants' Point 1**.

Even if the Court decided to disregard *Calvin* and the caselaw that followed, Appellants presented sufficient prejudice to require a new trial under Point. 1. *See* App. Br. at 34-36. Instruction No. 10 asked the jury to determine whether defendants failed to implement a pressure injury intervention and the trial court's ruling prevented Appellants from presenting eveidnce regarding all the interventions required by the standard of care.[10]

Instruction No. 10 stated in relevant part:

> In your verdict you must assess a percentage of fault to Defendant Timberlake Care Center if you believe:
>
> * * *
>
> First, Defendant Timberlake Care Center either:
>
> * * *
>
> Failed to implement interventions to prevent the development of an avoidable pressure ulcer on Geneva Miller's right buttock

LF at 325:12-14.

---

[10] It is also true the trial court's decision denied Plaintiffs the opportunity to present the most practicable and rational theory of the case, which is that the defendants were negligent in failing to provide a higher-quality mattress. Plainly, the plaintiffs did not plan to present the case as one in which the lack of documentation in the medical chart was the only proof of negligence because that strategy is so susceptible to the defense that "we did those things; we simply neglected to document them." Practically speaking, the trial court's decision inhibited Plaintiffs from presenting a concrete and verifiable intervention — a 6-foot by 4-foot mattress — the lack thereof that could not be explained as a simple failure to document the implementation of the intervention. Instead, trial court forced Plaintiffs' hand, and its erroneous ruling effectively **required** Plaintiffs to frame the case in a manner that the lack of documentation served as the only source of negligence.

Plainly, the definition of avoidable was critically important for the jury at trial and here to understand the prejudice associated with the trial court's decision that precluded the jury from hearing eveidnece about all the required interventions.  A pressure injury is avoidable if the nursing home:

> (1) assesses the resident's risk of developing a pressure injury;
>
> (2) creates a written comprehensive care plan that includes interventions to prevent the development and/or worsening of a pressure injury;
>
> (3) implements those interventions, i.e., actually does them; and
>
> (4) monitors the effectiveness of the interventions and if they are not working then considers and implements new interventions.

Tr. at 466:24-468:17.  Step four is the key in this case and requires defendants to consider and implement **new** or **different** interventions if the existing ones are not working.  *See id.* For example, you start with a low air loss mattress and turning the resident every 2 hours. If that set of interventions does not work and a pressure injury develops or worsens then perhaps you implement a higher-level mattress and turn the resident 1 hour.  The nursing home completes this process repeatedly until no more interventions exist.  At that point, the nursing home can declare the pressure injury was unavoidable because implemented every intervention they could, and the injury still developed.  This means to determine whether a pressure injury was avoidable — and if the defendant failed to try a certain intervention — the jury needed a comprehensive list of required interventions as described by Dr. Hill-O'Neill in her deposition.  The trial court's decision precluded the jury from having that comprehensive list.

## CONCLUSION

Plaintiffs respectfully asks this court to reverse the circuit court and to remand this case for a retrial. They also seek a directive that expert witness Dr. Kathleen Hill-O'Neill be allowed to testify regarding the standard of care requiring defendants to consider and implement a mattress higher in standard than a low-air-loss-mattress for Geneva Miller.

## CERTIFICATION

This document complies Rule 84.06(b) and contains 3,450 words.

Respectfully Submitted,

STEELE LAW FIRM II, LLC

By: _/s/ **Jonathan Steele**_
Jonathan Steele  MO #63266
2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com

ATTORNEYS FOR APPELLANTS

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on January 13, 2025 a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system to all parties and attorneys of record.

_/s/ **Jonathan Steele**_
Attorney for Plaintiff(s)

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM /025 - 12:14 PM

**2516-CV37442**

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

STEPHANIE ALEXANDER and
MICHELLE WHITE Individually, And In
A Representative Capacity For All Persons
Identified By RSMo. § 537.080

**Plaintiffs.**

Case No.: 1916-CV29764

v.

**JURY TRIAL DEMAND**

N & R OF SOUTH KANSAS CITY LLC

**Defendants.**

### AFFIDAVIT PURSUANT TO RSMO. § 538.225

Jonathan T. Steele, of lawful age, being first duly sworn upon his oath, states as follows:

I have obtained the written opinion of a legally qualified health care provider who states that defendant N & R Of South Kansas City LLC, failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

The health care provider who has furnished me with such an opinion is Jacob Dimant, MD, 400 E. 56th Street, #29B, New York, NY 10022..

Dr. Dimant offers this opinion based on his medical training and experience as a physician with extensive experience in long term care treatment, geriatric medicine, and long term care facility administration.

**Further Affiant Saith Naught.**

**EXHIBIT 29**

**EXHIBIT**
A

Jonathan Steele                    MO # 63266
2345 Grand Blvd., Suite 750
Kansas City, MO 64108
Telephone: 816.754.6473
E-mail: jonathan@jsteelelawfirm.com

*Attorney for Plaintiffs*

STATE OF  _MISSOURI_          )
                                                      ) ss:
COUNTY OF  _JACKSON_        )

Subscribed and sworn to before me this  _23rd_  day of  _DECEMBER_ , 2019.

_____
Notary Public

My Appointment Expires:

GERALDINE F. JACKSON
Notary Public - Notary Seal
STATE OF MISSOURI
Clay County
My Commission Expires Oct. 27, 2022
Commission # 14546783



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | Case Number: 2516-CV37442 |
| Plaintiff/Petitioner:<br> LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO 64108 |
| **vs.** | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | |
| | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** STEELE CHAFFEE, LLC
Alias:

JONATHAN STEELE
2029 WYANDOTTE, STE 100
KANSAS CITY, MO 64108

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

19-NOV-2025
Date

Clerk

Further Information:

---

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server                    Signature of Sheriff or Server

*(Seal)*          **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____          _____
                                                 Date                                             Notary Public

---

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) *For Court Use Only:* Document ID# 25-SMCC-12573   1 of 1       Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4.25-cv-00926-DGK    Document 1-1    Filed 11/24/25    Page 251 of 267

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | **Case Number: 2516-CV37442** |
| Plaintiff/Petitioner:<br>LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO 64108 |
| **vs.** | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | |
| | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** STEELE LAW FIRM II, LLC
**Alias:**

JONATHAN STEELE
2029 WYANDOTTE, STE 100
KANSAS CITY, MO 64108

*COURT SEAL OF*



*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

<u>19-NOV-2025</u>
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

*(Seal)*      **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $_____10.00_____ | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) *For Court Use Only:* **Document Id # 25-SMCC-12572** 1 of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:25-cv-00926-DGK Document 1-1 Filed 11/24/25 Page 253 of 267

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | **Case Number: 2516-CV37442** |
| Plaintiff/Petitioner:<br> LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO  64108 |
| vs. | |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO  64106 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| **The State of Missouri to:** | **STEELE LAW FIRM, LLC**<br>**Alias:** |

JONATHAN STEELE
**2029 WYANDOTTE, STE 100**
**KANSAS CITY, MO  64108**

*COURT SEAL OF*

*JACKSON COUNTY*

   You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

19-NOV-2025
Date

Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by:  (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server                Signature of Sheriff or Server

*(Seal)*          **Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____     _____
                           Date                      Notary Public

| | |
|---|---|
| **Sheriff's Fees** | |
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and petition must be served on **each** defendant/respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCF) *For Court Use Only:* Document Id # 25-SMCC-12571   1 of 1     Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4.25-cv-00926-DGK    Document 1-1    Filed 11/24/25    Page 255 of 267

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org  →  Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JALILAH OTTO | **Case Number: 2516-CV37442** |
| Plaintiff/Petitioner:<br>LTC MANAGEMENT SERVICES, LLC | Plaintiff's/Petitioner's Attorney/Address:<br>DOUGLAS L CARTER<br>2345 GRAND BLVD<br>SUITE 1675<br>KANSAS CITY, MO 64108 |
| | vs. |
| Defendant/Respondent:<br>JONATHAN STEELE | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | |

(Date File Stamp)

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

**The State of Missouri to: STEPHANIE ALEXANDER**
          **Alias:**

**4607 TIMBERGLEN RD.**
**APT. 1724**
**DALLAS, TX 75287**

*COURT SEAL OF*

          You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the plaintiff/petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

          19-NOV-2025
          Date                                    Clerk

*JACKSON COUNTY*

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by: (check one)
   - ☐ delivering a copy of the summons and petition to the Defendant/Respondent.
   - ☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.
   - ☐ (for service on a corporation) delivering a copy of the summons and petition to _____ (name) _____ (title).
   - ☐ other _____.

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server            Signature of Sheriff or Server

**Subscribed and sworn to** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)
   - ☐ the clerk of the court of which affiant is an officer.
   - ☐ the judge of the court of which affiant is an officer.
   - ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
   - ☐ authorized to administer oaths. (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $ _____ |
| Non Est | $ _____ |
| Mileage | $ _____ ( _____ miles @ $ _____ per mile) |
| **Total** | $ _____ |

**See the following page for directions to officer making return on service of summons.**

## Directions to Officer Making Return on Service of Summons

A copy of the summons and petition must be served on each defendant/respondent. If any defendant/respondent refuses to receive the copy of the summons and petition when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the defendant's/respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person at least 18 years of age residing therein, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the defendant/respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than 10 days nor more than 30 days from the date the defendant/respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

OSCA (11/2021) SM60 (JAKSMOS) For Court Use Only: Document ID# 25-SMOS-1637   2  of 2        (2516-SK37442)
Rules 54.06, 54.07, 54.14, 54.20, 506.500, 506.510 RSMo

Case 4:25-cv-00926-DGK   Document 1-1   Filed 11/24/25   Page 258 of 267

**SUMMONS/GARNISHMENT SERVICE PACKETS**
**ATTORNEY INFORMATION**

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

6/2020

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| LTC MANAGEMENT<br>SERVICES, LLC, at al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>JONATHAN STEELE, et al. )<br><br>Defendants. ) | Case No.: 2516-CV37442<br><br>Division 15 |

**ORDER**

It is hereby ordered that the Plaintiff's Motion for Approval and Appointment of

private process server is granted and the following individuals are hereby approved and

appointed to serve process in the above-captioned matter:

D&B Legal Service, LLC.: Legal Names (s):

Scott Brady PPS25-0013
Brandon Fisher PPS25-0382
Terri Frank PPS25-0422
Darnell Hamilton PPS25-0038
Darnell I Hamilton PPS25-0536
James Hannah PPS25-0039
Rufus Harmon PPS25-0040
Moses Hicks PPS25-0340
Kennedy Hoy PPS25-0046
Angelique Julian PPS25-0051
Chelsey Ketron PPS25-0054
Leisa Ketron PPS25-0055
Brent Kirkhart PPS25-0058
Janice Kirkhart PPS25-0056
Tyler Kirkhart PPS25-0057
                    .

Justin Mertzig PPS25-0073
Greg Noll PPS 25-0081
Charles Perry PPS25-0084
Jacob Peterson PPS25-0085
Candy Poese PPS25-0427
Craig Poese PPS25-0086
Samantha Powell PPS25-0087
Kenneth Prewett PPS25-0088
David Shirley PPS25-0104
Austin Weekley PPS25-0121
Ryan E Weekley PPS25-0120
Ryan M Weekley PPS25-0122
Robert Weishar PPS25-0123
Andrew Wickliffe PPS25-0127
Conni Wilson PPS25-0128

11/19/2025

DEPUTY CLERK

1

**RE**: **LTC MANAGEMENT SERVICES, LLC ET AL. V. STEELE, ET**
**CASE NO:** **2516-CV37442**

**TO:** **DOUGLAS L CARTER**
**2345 GRAND BLVD**
**SUITE 1675**
**KANSAS CITY, MO 64108**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on _____.
However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ Additional service instructions are needed.
☐ Incorrect case number/filed in wrong county.
☐ Document is unreadable.

**RULE 4.2 (2)**
☐ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee, or incorrect fee, received; fee required is $_____.
☐ Insufficient Filing Fee; Please Remit $_____
☐ No signature on check/form 1695.
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12 SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

☒ **OTHER: Please, include the servers information on the Proposed Order for Private Process Server like how you have it on the Motion. Questions, call 816-881-3970.**
☒ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ The private process server listed is not on our approved list.
☐ Execution in effect. Return date _____. Request may be resubmitted within one week prior to return date.
☐ Supreme Court Rule 90.13 requires interrogatories be served with summons of garnishment.

**If the filing was a new case, please be advised that unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost. Collection efforts will be pursued for these costs.**

**Please refer to the Court's website at www.16thcircuit.org for Court Rules or Forms.**

Copies electronic noticed, faxed, emailed and/or mailed NOVEMBER 17, 2025 to:

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

_____
NOVEMBER 17, 2025
Date

By _____
Deputy Clerk
☒ 415 East 12th St., Kansas City, Missouri 64106
☐ 308 W. Kansas, Independence, Missouri 64050

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

**LTC MANAGEMENT SERVICES, LLC,**

|  |  |
|---|---|
| **PLAINTIFF(S),** | **CASE NO. 2516-CV37442** |
| **VS.** | **DIVISION 15** |

**JONATHAN STEELE,**

**DEFENDANT(S).**

### NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE AND ORDER FOR MEDIATION

---

NOTICE IS HEREBY GIVEN that this case is currently assigned to the Honorable JALILAH OTTO and a Case Management Conference will be held with the Honorable JALILAH OTTO on **23-MAR-2026** in **DIVISION 15** at **09:45 AM,** pursuant to Administrative Order. All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting. Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file. All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1. A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2. The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS. Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

a. A trial setting;

b. Expert Witness Disclosure Cutoff Date;

c. A schedule for the orderly preparation of the case for trial;

d. Any issues which require input or action by the Court;

e. The status of settlement negotiations.

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court.  Each party shall personally appear at the mediation and participate in the process.  In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case.  If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.

**/S/ JALILAH OTTO**
JALILAH OTTO**, Circuit Judge**

### Certificate of Service

This is to certify that a copy of the foregoing was mailed postage pre-paid or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition.  It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
DOUGLAS L CARTER, 2345 GRAND BLVD, SUITE 1675, KANSAS CITY, MO 64108

Defendant(s):
JONATHAN STEELE
 STEELE LAW FIRM II, LLC
 STEELE CHAFFEE, LLC
 STEELE LAW FIRM, LLC
STEPHANIE ALEXANDER
MICHELLE WHITE

 Dated:  17-NOV-2025

BEVERLY A. NEWMAN
Court Administrator

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
☒ AT KANSAS CITY    ☐ AT INDEPENDENCE

**RE**:    **LTC MANAGEMENT SERVICES, LLC ET AL. V. STEELE, ET**
**CASE NO:    2516-CV37442**

**TO:    DOUGLAS L CARTER**
**2345 GRAND BLVD**
**SUITE 1675**
**KANSAS CITY, MO  64108**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on <u>11/14/2025</u>. However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ Additional service instructions are needed.
☐ Incorrect case number/filed in wrong county.
☐ Document is unreadable.

**RULE 4.2 (2)**
☒ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee, or incorrect fee, received; fee required is $_____.
☐ Insufficient Filing Fee; Please Remit $_____
☐ No signature on check/form 1695.
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12 SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

☒ **OTHER:    Per Local Court Rule 4.22, please submit a Form 4 - Confidential Civil Filing Information Sheet for all parties which can be found at https://www.16thcircuit.org/miscellaneous-forms. Also, file a Proposed Order for Private Process Server. The one attached with the motion has its own heading, so it needs to be filed separately. For questions please contact at 816-881-3970.**
☒ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ The private process server listed is not on our approved list.
☐ Execution in effect. Return date _____. Request may be resubmitted within one week prior to return date.
☐ Supreme Court Rule 90.13 requires interrogatories be served with summons of garnishment.

<u>**If the filing was a new case, please be advised that unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost.  Collection efforts will be pursued for these costs.**</u>

**Please refer to the Court's website at www.16thcircuit.org for Court Rules or Forms.**

Copies electronic noticed, faxed, emailed and/or mailed NOVEMBER 14, 2025 to:

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

NOVEMBER 14, 2025
_____
Date

By _____
Deputy Clerk

☒ 415 East 12th St., Kansas City, Missouri 64106
☐ 308 W. Kansas, Independence, Missouri 64050

Electronically Filed - Jackson - Kansas City - November 14, 2025 - 09:47 AM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| LTC MANAGEMENT SERVICES, LLC, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | )      . |
| v. | ) |
| | ) |
| JONATHAN STEELE, at al. | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

**MOTION FOR APPROVAL AND APPOINTMENT**
**OF PRIVATE PROCESS SERVER**

COMES NOW Plaintiff, by and through its attorney of record, and for its

Motion for Approval/Appoint of Private Process Server, and requests that

D&B Legal Service, LLC.: Legal Names (s):

| | |
|---|---|
| Scott Brady PPS25-0013 | Justin Mertzig PPS25-0073 |
| Brandon Fisher PPS25-0382 | Greg Noll PPS 25-0081 |
| Terri Frank PPS25-0422 | Charles Perry PPS25-0084 |
| Darnell Hamilton PPS25-0038 | Jacob Peterson PPS25-0085 |
| Darnell I Hamilton PPS25-0536 | Candy Poese PPS25-0427 |
| James Hannah PPS25-0039 | Craig Poese PPS25-0086 |
| Rufus Harmon PPS25-0040 | Samantha Powell PPS25-0087 |
| Moses Hicks PPS25-0340 | Kenneth Prewett PPS25-0088 |
| Kennedy Hoy PPS25-0046 | David Shirley PPS25-0104 |
| Angelique Julian PPS25-0051 | Austin Weekley PPS25-0121 |
| Chelsey Ketron PPS25-0054 | Ryan E Weekley PPS25-0120 |
| Leisa Ketron PPS25-0055 | Ryan M Weekley PPS25-0122 |
| Brent Kirkhart PPS25-0058 | Robert Weishar PPS25-0123 |
| Janice Kirkhart PPS25-0056 | Andrew Wickliffe PPS25-0127 |
| Tyler Kirkhart PPS25-0057 | Conni Wilson PPS25-0128 |

who are qualified persons to serve process, are not parties to the case and are not less than

1

eighteen (18) years of age, as private process servers in the above cause to serve process in this case.

Respectfully Submitted,

**LAW OFFICES OF DOUGLAS L. CARTER, P.C.**

By: /s/ Douglas L. Carter
Douglas L. Carter     MO #35759
2345 Grand Blvd., Suite 1675
Kansas City, Missouri 64108
Tel: (816) 283-3500
Fax: (816) 283-3084
E-mail: doug@carter.law

***COUNSEL FOR PLAINTFF***

2

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**AT KANSAS CITY**

| | |
|---|---|
| **LTC MANAGEMENT SERVICES, LLC, et al.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )　　. |
| **v.** | ) |
| | ) |
| **JONATHAN STEELE, at al.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## ORDER

It is hereby ordered that the Plaintiff's Motion for Approval and

Appointment of private process server is granted and the above-named individuals

are hereby approved and appointed to serve process in the above-captioned matter.


Date: _____     _____

                                     Judge or Clerk